# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

THE STATE OF NEW MEXICO ex rel.            )
GOVERNOR BILL RICHARDSON, et al.,          )
                                           )
Plaintiffs.                                )
v.                                         )          Civ. No. 05-0460 BB/RHS
BUREAU OF LAND MANAGEMENT, et al.,         )
                                           )
Federal Defendants.                        )
                                           )
and                                        )
                                           )
INDEPENDENT PETROLEUM ASSOCIATION          )
OF NEW MEXICO.                             )
                                           )
Defendant-Intervenor.                      )
                                           )                  and
NEW MEXICO WILDERNESS ALLIANCE,            )
et al.,                                    )
                                           )
Plaintiffs,                                )
v.                                         )          Civ. No. 05-0588 BB/RHS
                                           )          (consolidated)
LINDA RUNDELL, et al.,                     )
                                           )
Federal Defendants.                        )
_____)

05 OCT 17  AM 9: 38

CLERK SANTA FE

## STATE OF NEW MEXICO'S OPENING CASE BRIEF



**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**STATEMENT OF FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

The Chihuahuan Desert Ecosystem and the Otero Mesa and Nutt Grasslands . . . . . . . . . . . . . . . 1

Cultural Resources in the RMPA Project Area and Otero Mesa . . . . . . . . . . . . . . . . . . . . . . . . 4

The Salt Basin Aquifer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Oil and Gas Development and the Planning Process for the RMPA . . . . . . . . . . . . . . . . . . . . . 8

Governor Richardson's Consistency Review and Recommended Plan . . . . . . . . . . . . . . . . . . . 15

Implementation of the RMPA on the Bennett Ranch Exploratory Unit . . . . . . . . . . . . . . . . . . 17

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

I.   STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

II.  BLM WAS REQUIRED TO PREPARE A SUPPLEMENTAL DRAFT EIS
     WHEN IT CHANGED ITS PREFERRED PROJECT TO A BRAND NEW
     ALTERNATIVE THAT WAS NOT ADDRESSED IN THE DRAFT EIS . . . . . . . . . . . . 21

     A.  NEPA Requires An Agency To Prepare and Circulate For Public
         Comment A Supplemental EIS When There Are Substantial Changes
         To the Proposed Project That Have Environmental Repercussions . . . . . . . . . . . . . . . 21

     B.  The New Proposed Action Presented in the FEIS (Alternative
         A-Modified) Is Fundamentally Different From Any of the Alternatives
         That Were Analyzed in the DEIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

III. THE RMPA EIS IS UNLAWFUL BECAUSE BLM FAILED TO ADEQUATELY
     ANALYZE THE DIRECT ENVIRONMENTAL IMPACTS OF THE RMPA . . . . . . . . . 33

     A.  NEPA Requires the BLM to Take a "Hard Look" At the Potential
         Environmental Consequences of It Proposed RMPA . . . . . . . . . . . . . . . . . . . . . . . . 33

     B.  The FEIS Fails To Adequately Analyze the Direct and Indirect Impacts of
         the Proposed Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

         1.   BLM Failed To Adequately Analyze the Potential Impacts of the
              Proposed RMPA on the Salt Basin Aquifer . . . . . . . . . . . . . . . . . . . . . . . . . . 35

2.   BLM Failed To Adequately Analyze the Impacts of Alternative
A-Modified, Including Particularly the Impacts of Fragmentation
And Surface Disturbance of Chihuahuan Desert Grasslands . . . . . . . . . . . . . . 37

IV.   THE BLM DIRECTOR VIOLATED FLPMA BY ADOPTING AN RMPA THAT
CONFLICTS WITH FEDERAL AND STATE PLANS, POLICIES, AND PROGRAMS,
AND BY REFUSING TO DETERMINE THAT GOVERNOR RICHARDSON'S
RECOMMENDED PLAN PROVIDES A REASONABLE BALANCE BETWEEN
FEDERAL AND STATE INTERESTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

A.  The RMPA Conflicts With New Mexico Plans, Policies, and Programs . . . . . . . . . . . 41

B.  Overwhelming Evidence In the Record Confirms That the BLM Director
Must Determine That Governor Richardson's Plan Provides A Reasonable
Balance Between State and Federal Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

V.  BLM VIOLATED FLPMA BY REFUSING TO PROVIDE THE PUBLIC THE
OPPORTUNITY TO COMMENT ON GOVERNOR RICHARDSON'S PLAN . . . . . . . . 45

VI.  BLM VIOLATED SECTIONS 106 AND 110 OF THE NATIONAL HISTORIC
PRESERVATION ACT IN APPROVING THE RMPA AND THE OTERO MESA
LEASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

A.  Application of NHPA's Section 106 Consultation Requirements To Oil and
Gas Leasing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

B.  BLM Violated NHPA Section 106 In Connection with Its Approval of the
RMPA and the Otero Mesa Lease . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

BLM Also Violated Section 110 of NHPA In Connection with Its Approval
of the RMPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

VII.  BLM'S APPROVALS OF A 1600-ACRE LEASE AND A 3.3 MILE GAS PIPELINE
ON THE BENNETT RANCH UNIT ON OTERO MESA VIOLATED NEPA . . . . . . . . 54

A.  BLM Has Unlawfully Failed to Analyze the Cumulative Impacts Of
The Anticipated Oil and Gas Development in the Bennett Ranch Unit
Area in Connection With the Otero Mesa Lease and the Gas Pipeline
On the Unit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

B.  The Otero Mesa Lease, the Gas Pipeline, and the Gas Flaring at Wells
1-Y and 25-1 Are Connected Actions That Must Be Analyzed In a
Single Environmental Document . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

# TABLE OF AUTHORITIES

CASES

Airport Neighbors Alliance, Inc. v. United States
90 F.3d 426(10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Blue Mountains Biodiversity Project v. Blackwood
161 F.3d 1208 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

California v. Block
690 F.2d 753 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 32, 33

Citizens to Preserve Overton Park v. Volpe
401 U.S. 402 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Colorado Environmental Coalition v. Dombeck
185 F.3d 1162 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 45

Conner v. Burford
848 F.2d 1441 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Custer County Action Ass'n v. Garvey
256 F.3d 1024 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 33

Dubois v. U.S. Dep't of Agriculture
102 F.2d 1273 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 23, 32, 33

Hughes River Watershed Conservancy v. Glickman
81 F. 3d 437 (4th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Kern v. BLM
284 F.3d 1062 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35, 58

Klamath-Siskiyou Wildlands Center v. BLM
387 F.3d 989 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Montana Wilderness Ass'n v. Fry
310 F.Supp.2d 1127 (D. Mont. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 55

Muckleshoot Indian Tribe v. U.S. Forest Service
177 F.3d 800 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

National Trust for Historic Preservation v. Blanck

938 F.Supp. 908 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

National Wildlife Federation v. National Marine Fisheries Service
235 F. Supp. 2d 1143 (W.D. Wash. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

NRDC v. Hughes
437 F.Supp. 981 (D.D.C. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 32, 33

NRDC v. USFS
421 F.3d 797 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 58

Olenhouse v. Commodity Credit Corp.
42 F.3d 1560 (10th Cir. 1994) 20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Park County Resource Council, Inc. v. U.S. Dep't of Agriculture
817 F.2d 609 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 55, 59

Pennaco Energy, Inc. v. U.S. Dept. of the Interior
377 F.3d 1147 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Pueblo of Sandia v. United States
50 F.3d 856 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 50, 51

Sierra Club v. Peterson
717 F.2d 1409 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Utah Shared Access Alliance v. U.S. Forest Service
288 F.3d 1205 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Utahns For Better Transportation v. U.S. Dep't of Transportation
305 F.3d 1152 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 34

STATUTES

Federal

16 U.S.C. § 470a(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

16 U.S.C. § 470a(d)(6)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 48

16 U.S.C. § 470a(d)(6)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

16 U.S.C. § 470(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

16 U.S.C. § 470f . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

16 U.S.C. § 470h-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

42 U.S.C. § 4332(2)(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 32

43 U.S.C. § 1712(c)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

<u>New Mexico</u>

17-1-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

17-1-1.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

17-2-37-46 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

70-20-12(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

74-6-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

76-7D-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

<u>REGULATIONS</u>

36 C.F.R. § 60.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

36 C.F.R. § 800.1(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

36 C.F.R. § 800.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

36 C.F.R. § 800.4(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

36 C.F.R. § 800.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

36 C.F.R. § 800.5(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

36 C.F.R. § 800.8(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

36 C.F.R. § 800.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

36 C.F.R. § 800.9(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

36 C.F.R. § 800.9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

40 C.F.R. § 1502.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

40 C.F.R. § 1502.9(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

40 C.F.R. § 1502.9(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

40 C.F.R. § 1502.9(c)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

40 C.F.R. § 1502.14(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

40 C.F.R. § 1502.14(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 32

40 C.F.R. §§ 1507.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

40 C.F.R. § 1508.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

40 C.F.R. § 1508.8(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

43 C.F.R. § 1610.3-2(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

43 C.F.R. § 1610.3-2(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

43 C.F.R. § 1610.3-2(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42, 46, 47

43 C.F.R. §3101.1-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

## INTRODUCTION

In this action, the State of New Mexico challenges a land use plan amendment (Resource Management Plan Amendment or "RMPA") adopted by the Bureau of Land Management ("BLM") that regulates oil, gas, and geothermal development under federal jurisdiction in Otero and Sierra Counties, in southern New Mexico. The State claims that the RMPA, and the accompanying Final Environmental Impact Statement ("FEIS") and Record of Decision ("ROD") prepared under the National Environmental Policy Act ("NEPA"), are legally deficient. BLM has violated NEPA, the Federal Land Policy Management Act ("FLPMA"), and the National Historic Preservation Act ("NHPA"). The State also alleges that BLM has violated NEPA in connection with its approval of a 1600-acre oil and gas lease and a gas pipeline in the Project Area on Otero Mesa.

Within the RMPA Project Area lie approximately 600,000 acres of rare Chihuahuan Desert grasslands, most notably the vast grasslands on Otero Mesa in southern Otero County. DEIS p. 3-24; AR 16742.[1] The future of these unique and fragile grasslands, and the vast fresh water aquifer underlying Otero Mesa, is the central focus of this litigation.

## STATEMENT OF FACTS

### The Chihuahuan Desert Ecosystem and the Otero Mesa and Nutt Grasslands

The Chihuahuan Desert, in southern New Mexico, west Texas, and northern Mexico, is one of the three most biologically rich and diverse desert ecoregions in the world. AR 16226;

---

[1]      Citations to the BLM's portion of the Administrative Record are denoted "AR ____"; the U.S. Fish & Wildlife Service ("FWS") portion of the Record is denoted "FWS AR ____." The State is providing the Court with hard copies of documents in the Record that are particularly significant. These are cited in **bold**. Citations to the Draft EIS ("DEIS"), FEIS, Supplemental FEIS, and ROD, are to the documents themselves rather than the AR cite, because the State understands that BLM Defendants will furnish the Court with hard copies of those documents. Documents included in the State's Motion to Supplement the Administrative Record are denoted "St. Exh." and also cited in **bold**.

16742; 20044. It is "by far the most diverse, biologically rich desert in America." AR 20048.

About 70% of the Chihuahuan Desert lies south of the border in Mexico, where there is little

longterm protection of the ecosystem. **AR 16734**; 15579. Most Chihuahuan Desert lands in

Texas are privately held. **AR 16734**. In New Mexico, BLM has jurisdiction over more

Chihuahuan Desert lands than any other entity. Id.

Over 3,000 plant species live in the Chihuahuan Desert, BLM. AR 20043. Between 20

and 30% of the world's 1500 cactus species are found in the Chihuahuan Desert. AR 20043;

19709. More than 500 species of birds, 130 species of mammals, 180 species of reptiles, 250

species of butterflies, and 110 species of native freshwater fish live in the Chihuahuan Desert.

AR 19709; **16741**.

Chihuahuan Desert grasslands are especially fragile, and are "the most endangered

ecosystem or plant community type in North America." **AR 14101**. The great majority of

Chihuahuan Desert grasslands have been lost, i.e., converted to less productive vegetation and

habitat. Id.; AR 20044. The Draft Environmental Impact Statement for the RMPA ("DEIS")

estimates that 62% of the grasslands in the RMPA Project Area have been destroyed over the

past 150 years; elsewhere the BLM has estimated that 75% of grasslands in the Project Area

have been lost. FEIS at 3-20; **St. Exh. 1**. See also **AR 15580 & 12500; AR 14101**. Once

invaded by shrubs, these grasslands no longer provide the resources needed by the many species

dependent on grasslands. AR 18454.

The greater Otero Mesa is an expanse of Chihuahuan Desert grassland lying south of the

Sacramento Mountains, east of the Tularosa Valley, west of the Guadalupe Mountains, and north

of the Texas border. AR 17486-95. The western portion of the Mesa lies within the McGregor

Range of the Fort Bliss Military Reservation and is not subject to the RMPA; the remaining

portions of the Mesa lie within the RMPA Project Area.  Id.; AR 15504.  According to BLM,

"Otero Mesa is the largest block of desert grasslands remaining on public land, anywhere."  AR

15518.  While most of the remaining un-degraded Chihuahuan Desert grasslands are in small

patches (usually less than 100 acres) and isolated from other grassland patches,

> [t]he Otero Mesa grasslands are the one exception.  **Otero Mesa grasslands are
> thousands of acres of contiguous, Chihuahuan Desert grassland formation that is
> free of invasive shrubs**.  Otero Mesa is the last remnant of formerly expansive grassland
> ecosystems and therefore can correctly be described as **the most endangered ecosystem
> type in the United States.**

**AR 18457-58** (emphasis added).

Healthy Chihuahuan Desert grasslands, like those on Otero Mesa, are diverse and

species-rich.  **AR 18454**.  The core grasslands on Otero Mesa have no invasive shrubs, and an

abundance of species of native grasses.  **AR 18454**.  While there are a number of roads crossing

the Mesa, none are paved.  They are generally narrow dirt roads used very infrequently only by

ranchers, hunters and a few others.  **AR 18463a**.

Otero Mesa contains a number of species of animals that have experienced "dramatic

population declines elsewhere in North America, and that are now sparse or absent from other

degraded grassland areas in the United States."  **AR 18458**.  These animal species include

Pronghorn antelope, Black-tailed prairie dog, and grassland birds such as Loggerhead shrike,

Grasshopper sparrow, Western meadowlark, Bairds sparrow, Burrowing owl, Horned lark, and

Cassin's sparrow.  **AR 18458**.  Otero Mesa's pronghorn herd, numbering between 100 and 800

antelope, is one of the very few pronghorn herds in the United States that survived overhunting a

century ago and was not replaced with out of state stock.  AR 18468; DGF DEIS comments at 3.

Observations by New Mexico Department of Game and Fish ("NMDGF") officials indicate

Otero Mesa's pronghorn herd may already be in decline.  FEIS at G-1-146.

Over twenty Black-tailed prairie dog colonies still survive on Otero Mesa, notwithstanding this species' decline throughout much of its range. AR 18468; **AR 18774** (22-23 colonies on the BLM portion of Otero Mesa; Black-tailed prairie dogs now estimated to occur on only 4% of their historic range). Endangered aplomado falcons also have been sighted on Otero Mesa, even though these birds have been found so rarely in the United States in recent decades that the Fish and Wildlife Service has never established any critical habitat for them. **AR 18464a; St. Exhs. 15, 16.** In fact, aplomado falcons were observed multiple times in August 2005 at the Bennett Ranch headquarters, immediately adjacent to the 1600-acre lease site at issue in this case. Id. The BLM considers the grasslands of Otero Mesa to be essential habitat for the recovery of the aplomado falcon because of their huge, relatively unfragmented and un-degraded condition. DEIS at D-1-6.

**Cultural Resources in the RMPA Project Area and Otero Mesa**

The RMPA Project Area contains a wealth of archaeological, cultural, and historical resources. BLM estimated that "there could be more than 50,000 archaeological and historical sites on public land" in the Project Area -- a density of 19 archaeological and historical sites per square mile. FEIS at 3-28. Despite the high concentration of sites, BLM did not conduct any site surveys in connection with the RMPA. Instead, BLM relied on past surveys even though they cover no more than 10% of the Project Area. Id.

In addition, a number of Indian tribes have significant cultural and religious ties to the Project Area. Both the Advisory Council on Historic Preservation ("ACHP") and New Mexico maintain county-by-county lists of tribes with such ties. According to those lists, there are nine tribes with cultural and religious resources that are potentially affected by oil and gas development in the RMPA Project Area. **St. Exh. 14.** BLM's contact with several of these

tribes was limited to telephone calls made only after the FEIS had been circulated. AR 20897-8. While BLM began its consultations with other tribes earlier in the RMPA planning process, even those earlier consultations were perfunctory. For example, tribes that failed to respond to initial correspondence from BLM were deemed by the BLM to be uninterested in the possibility of adverse effects. AR 21576.

Despite BLM's limited efforts to contact potentially affected tribes, since 2001 two tribes Ysleta del Sur Pueblo and the Mescalero Apache Tribe -- have made clear to BLM that they have a strong affinity to "traditional cultural properties" ("TCPs")[2] in the Project Area, and serious concerns about how the development of oil and gas resources will affect those properties. Ysleta del Sur Pueblo communicated its longstanding cultural interests and concerns to the BLM repeatedly. AR 22373; 12469-71; 12556-7; 12567-8; 17331-4. The Pueblo forwarded a four volume ethnographic survey detailing the tribe's historical and continuing use of the Otero Mesa area to BLM, and advised that drilling would likely degrade sacred areas. AR 12469-71; 12526. Ysleta del Sur and Mescalero Apache tribe both told BLM that "significant landscapes, plant gathering areas, springs, caves, and possible rock shelter sites and caches" could be adversely impacted by oil and gas mining.   AR 12567.

Despite these alerts from tribes about the potential harm that drilling would cause to cultural and religious areas, BLM failed to comply with its statutory and regulatory duties to (1) identify National Register-eligible TCPs in the Project Area and (2) assess the effects of oil and

---

[2]     NHPA authorized the creation and maintenance of the National Register of Historic Places. 16 U.S.C. §470a(a)(1)(A). The 1992 amendments to NHPA clarify that "[p]roperties of traditional religious and cultural importance to an Indian tribe . . . may be determined to be eligible for inclusion on the National Register." 16 U.S.C. §470a(d)(6)(A). Such properties are known as "traditional cultural properties" or TCPs. An ACHP guidance document explains that a TCP "is eligible for inclusion in the National Register because of its association with cultural practices or beliefs of a living community that (a) are rooted in that community's history, and (b) are important in maintaining the continuing cultural identity of the community." **St. Exh. 11.**

gas development on these TCPs. AR 16756-7. The FEIS for the RMPA merely states: "No

American Indian Religious sites or traditional cultural places have been identified within the

Planning Area." FEIS at 3-29.

Furthermore, in connection with the July 2005 lease sale of a tract on Otero Mesa,

BLM's efforts to contact interested Indian tribes were even more perfunctory. There is no

evidence in the Administrative Record that BLM made any effort whatsoever to contact any

tribes for information concerning TCPs within or adjacent to the lease sale tract, or within the

area of potential effects of the lease sale tract.

With respect to historical resources, various historic trails traverse the RMPA Project

Area, including routes of exploration and trade dating from the sixteenth to the nineteenth

century, including the Mormon Trail, the Battalion Trail, the Butterfield Trail, and the Jornada

del Muerto Trail. Governor Richardson noted that "[t]hese trails are of national significance and

could be part of larger cultural landscapes," and the trails are either listed on, or eligible for

listing on, the National Register of Historic Places. AR 16760.

## The Salt Basin Aquifer

The Salt Basin aquifer is a large fresh water aquifer that extends from southern New

Mexico into Texas. Much of the Salt Basin underlies the Otero Mesa and the Crow Flats area

immediately east of the Mesa, within the RMPA Project Area. **AR 18664; 18636; 18647.** The

Salt Basin is one of the last untapped aquifers in New Mexico. AR **18636**. It is estimated to

contain approximately 15 million acre-feet in recoverable fresh ground water. AR 18859;

18978. Greatly increased demand for the Basin's water is anticipated in the near future.

Applications for over 200,000 acre-feet per year ("afy") of ground water rights in the Salt Basin

are currently pending with the New Mexico State Engineer, one of which (for 90,000 afy) was filed by the New Mexico Interstate Stream Commission. **AR 18583.**

The Salt Basin aquifer has been identified by the State as a critical water source for the future that must be strongly protected. The State Water Plan emphasizes the importance of protecting this aquifer for future needs: "Steps must be taken to ensure that water from the basin is preserved to meet growing demands in southern New Mexico." **AR 17405.** Governor Richardson has issued an Executive Order calling for protection of the basin from contamination. **St. Exh. 9.** The New Mexico legislature in 2005 passed a Joint Memorial calling for an analysis of options "to conserve and protect Salt Basin ground water for the benefit and use by New Mexico communities." **St. Exh. 10.** And Senator Bingaman recently asked the U.S. Geological Service to assess the Salt Basin aquifer, noting that it is an untapped resource that could address many of the state's water needs. AR 20194. Noting the risk of contamination from oil and gas mining, Senator Bingaman stated, "we simply cannot take chances with a water supply as valuable as the Salt aquifer." Id.

It is well established that the aquifer is highly vulnerable to contamination from oil and gas drilling and production, due to large-scale faults and "intensely-fractured" limestone. **AR 17341-56; 18049-50; 18637; 18653.** Much of the aquifer is shallow, from less than 100 ft to 400 ft below ground; other parts of the aquifer are deep. **AR 17355 & 18637.** It is "geologically intermingled (both above and below) with the target oil and gas reserves." **AR 18637.** Furthermore, the geology allows for rapid spread of contaminants throughout the aquifer:

> In places, there exists heavy fracturing at the surface that provides an extensive matrix of potential pathways for aquifer recharge and the migration of contaminants. The fractured geologic formations also appear to have a high hydraulic conductivity.

**Id.** The aquifer recharge zone, with its heavy fracturing, is particularly sensitive to surface contamination. **Id.** Even BLM acknowledges that some aquifers in the Project Area "are considered highly vulnerable to contamination from surface water discharges." FEIS at 3-13.

Economists from the University of New Mexico examined the potential economic impacts to the State that would result from contamination of the aquifer from gas drilling in the Otero Mesa/Salt Basin aquifer area. **AR 18577-90**. Their analysis did not presume any contamination from spills or accidents. **AR 18639**. Rather, they simply used previously-calculated estimates of contamination that would be caused by injection of produced water resulting from the drilling  a standard industry practice that is anticipated in BLM's RMPA. FEIS at 4-3 (noting that one injection well per gas field will be drilled); **AR 18639-40**. They then assumed a water value of only $104/acre-foot/year (far below the true value of water in the future), and used a conservative methodology that likely under-estimated economic impacts. The economists found that the potential economic impact of contamination of the Salt Basin ground water from gas drilling ranges from nearly $2 million to 15 million per gas field, depending on the volume of water affected by the contamination. The RMPA anticipates development of three gas fields and three oil fields over the next twenty years, most likely in the Otero Mesa/Salt Basin area. FEIS at 4-3, A-8; AR 2518; FWS AR 45, 152.

**Oil and Gas Development and the Planning Process for the RMPA**

In 1997, an exploratory well located natural gas in the Bennett Ranch part of the Otero Mesa grassland area, within the RMPA Project Area. AR 20170; 20184. This gas find led the oil and gas industry to nominate 250,000 acres for BLM leases in the vicinity of Otero Mesa. AR 11684; **20170**. The industry's increased interest in the Otero Mesa and surrounding areas

caused BLM to decide to amend its 1986 Resource Management Plan for Sierra and Otero Counties to address oil and gas leasing over the next twenty years. Id.

At the time BLM began its planning process, it stopped issuing new leases pending the outcome of the planning process. DEIS p.1-1. Leases previously issued, including about 20,000 acres of leases on Otero Mesa, are not subject to restrictions in the new RMPA. AR 11706; 11684; **20170**.

The RMPA Project Area includes all of Otero and Sierra Counties. Within the 7 million acre Project Area, BLM administers approximately 1.8 million acres of surface land (FEIS at 1-3) and controls oil, gas, and geothermal leasing on just over 2 million acres. FEIS at 1-3. The Project RMPA identifies which of those areas will be available for oil, gas, and geothermal leasing, and the constraints that will be placed on fluid mineral activity through stipulations placed on leases. FEIS at S-1 & map 2-1; ROD App. A.

BLM began the planning and accompanying NEPA process for the RMPA in October 1998. In October 2000, the BLM issued the DEIS. Although the DEIS designated no place in the Project Area as "high potential" for oil or gas production, the January 2005 ROD stated that the Bennett Ranch Unit area on Otero Mesa showed high potential. ROD at 19; DEIS map 3-3.

The DEIS analyzed a no action alternative and two other alternatives. Alternative A was BLM's Preferred Alternative; Alternative B provided "a relatively greater emphasis on resource protection by imposing more constraints on fluid minerals leasing and development" than Alternative A. DEIS at 2-26.

While Alternative A opened up the vast majority of the Project Area to oil and gas leasing, it also contained a number of protections for grasslands, fragile soils, riparian areas, sensitive wildlife, water sources, cultural resources, and visual resources. Most important,

Alternative A designated 116,206 acres as Otero Mesa Desert Grassland Habitat Area, and 16,265 acres in the southernmost part of Sierra County, near Nutt, as the Nutt Desert Grassland Habitat Area. DEIS map 3-7 & p.A-VI-14. Those grassland habitat areas were subject to a "No Surface Occupancy" ("NSO") stipulation except within 150 meters of existing roads, in order "to limit further fragmentation of" that critically important habitat. DEIS 2-25 & A-VI-14; **AR 20172-73**. The BLM found that it was important to limit road construction in unroaded areas in order to provide habitat for pronghorn, aplomado falcon, and other animals that require large expanses of grasslands. DEIS 4-88.

In addition, many hundreds of thousands of acres were designated in Alternative A as Big Game or Bighorn Sheep Habitat areas (approximately 700,000 and 200,000 acres, respectively, with controlled surface uses to ensure adequate habitat. DEIS A-VI-19, 24; DEIS 4-87-88. A number of other special areas, such as watershed areas and other sensitive areas were also subject to special lease stipulations to limit disturbance caused by oil and gas operations. DEIS A-VI-22, 27, 31-33. Alternative A also contained a number of environmentally protective "best management practices" ("BMP") requirements. DEIS A-III-1-14. Nearly three hundred written and oral comments were submitted to BLM on the Draft RMPA/DEIS before the comment deadline. FEIS vol. II, Apps. G-1 & G-2; AR 11588 (BLM notes 188 comments received as of 4/27/01 and summarizes them). Hundreds more comments were submitted after the close of the comment period. See, e.g., various comments in AR 11489-14570.

The great majority of comments asked for limits on oil and gas activity to protect the greater Otero Mesa area and other sensitive areas. Most commenters supported more protections than were contained in any of the alternatives analyzed in the DEIS. See, e.g., FEIS letters 21, 23, 25, 27, 30, 38, 44, 45, 46, 48, 50, 52, 57, 58, 59, 60, 61, 64, 65, 67, 68, 69*, 71, 72, 73*, 78*,

79, 80, 81*, 83*, 85, 86*, 87, 88, 90*, 91, 92, 93, 94, 96*, 97, 98, 99, 100*, 102*, 103*, 106,

107*, 108*, 111*, 114*, 115*, 116*, 120, 125*, 129*, 131*, 134*, 135*, 136*, 138*, 139*,

140*, 143*, 144*, 147*, 148*, 151* (letters with asterisks requested more substantial added

protections).

The FWS commented that the Preferred Alternative (Alternative A) did not provide

sufficient protections for the endangered Northern aplomado falcon, and that more protections

were needed in the Otero Mesa and Nutt grassland area. FEIS at G-I-29-34. At the time of

FWS's comments, no falcon had been sighted on Otero Mesa since 1999. The recent sightings

of a falcon pair in the Bennett Ranch area underscores the problems noted by FWS.

NMDGF expressed concerns about habitat fragmentation and impacts on wildlife, noting

that Alternative A's NSO stipulations and other measures provided important protection against

such fragmentation. FEIS at G-I-145-52. Numerous other comments expressed concerns about

fragmenting grassland habitat on Otero Mesa and elsewhere, emphasizing the importance of not

allowing construction of any additional roads or pipelines. See comments cited above. Since

both action alternatives, A and B, prohibited new roads in the designated Otero Mesa and Nutt

grasslands, and imposed an NSO stipulation in those protected areas, **commenters did not**

**address the possibility that the BLM might choose an action that DID allow new roads,**

**pipelines, and other surface disturbance in those grassland areas.**

In 2001, a new administration took over BLM and began discussions on developing a

different approach to oil and gas leasing in the Otero Mesa area. AR 17500-01; 11824; 12582.

BLM decided that the NSO stipulation for Otero Mesa and Nutt grasslands included in

Alternatives A and B was too restrictive and would not allow full development of the six oil and

gas fields anticipated in the "Reasonable Foreseeable Development" ("RFD") scenario presented

in the DEIS, even though the DEIS claimed the contrary. Compare DEIS at 2-30-31 (stating that Alternative A imposed "the least restrictive constraints" that would still allow full development of the RFD) to AR 15446 & 11682 (BLM states its assumption in DEIS that RFD was achievable under Alternatives A & B "was an incorrect assumption"). By the end of 2001, BLM had developed a new proposal that, according to BLM, "differs significantly from" Alternative A, (and from the No Action alternative and Alternative B that were also analyzed in the DEIS). AR 11825.

BLM's new proposal was to replace the NSO stipulation that had been proposed for the Otero Mesa and Nutt grasslands with a different stipulation that would instead require oil and gas operators to limit surface disturbing activities to no more than 5% of the area of a leasehold unit at any one time. FEIS D-10. Roads and pipelines needed off of the leasehold would not be counted toward the 5% surface disturbance limit. AR 12600; 12584. Neither lands impacted by seismic exploration activities nor lands found to have been "reclaimed" would count toward the 5% disturbance limit either. AR 12584; 20909 (BLM official notes that an operator "can disturb > 5% for geophysical exploration"; AR 12186 (BLM notes that oil and gas operators "may disturb 10 percent or more of the lease as long as they do not disturb more than 5 percent at any one time"). Lessees would be required to form exploratory units prior to commencing drilling activities. ROD at 11.

Unlike Alternatives A and B, this new proposal did not prohibit construction of new roads and pipelines. As one BLM official explained, the new proposal "do[es] not get at directing the **location of disturbance** that the NSO alternative provided," unlike the original Preferred Alternative A, that confined new disturbance to areas adjacent to existing roads. AR 11795 (emphasis added).

In December 2003, BLM released its Proposed RMPA and Final EIS for the Project Area ("FEIS"). The FEIS presented the new alternative containing the 5% disturbance limit instead of the NSO stipulation for the Otero Mesa and Nutt grassland areas. The new alternative, labeled "Alternative A with modifications," also contained a number of other significant changes that were not in either Alternative A, Alternative B, or the No Action Alternative analyzed in the DEIS. (A chart comparing key provisions of Alternative A to Alternative A-modified is attached as Exh.A) The new 5% unitization stipulation was described briefly in the FEIS (FEIS 2-28-29), and a draft version of the new stipulation was included in the FEIS Appendices. FEIS D-10.

Compared to the original Alternative A, the new alternative made only one quarter as much land subject to an NSO stipulation (40,526 acres in Alternative A-modified versus 160,435 acres in Alternative A). Compare FEIS 2-24 to DEIS 2-28; ROD at 6. At the same time, the new alternative nearly doubled the amount of land subject to only standard lease terms and conditions ("SLTC") rather than special more protective limits or stipulations (1.4 million acres of SLTC in Alternative A-modified versus 779,000 acres of SLTC in Alternative A). Compare FEIS 2-24 to DEIS 2-28; ROD at 6. The new alternative eliminated stipulations for controlled surface use in several hundred thousand acres (including Watershed Areas, Big Game Habitat, Bighorn Sheep Habitat, Red Sands ORV Area, and Cuchillo Mountains Pinon Nut Collection Area), converting those lands to SLTC. See AR 22305 (BLM summary of differences in acreage of stipulations). The new alternative also greatly downgraded the protective measures specified as "Best Management Practices" that had been included in the DEIS. Compare DEIS A-III-8-44 to FEIS B-7-11.

In sum, the new Alternative A-modified eliminated the key provision in Alternative A addressing the most important environmental issue surrounding the RMPA: the NSO stipulation

that prohibited construction of new roads and pipelines and surface disturbance in undisturbed areas, thereby limiting fragmentation of the Otero Mesa and Nutt grasslands. In addition, the new Alternative A-modified significantly weakened a number of other important environmental protections that had been in Alternative A.

Even more surprising than BLM's substitution of its Preferred Alternative with a very different brand new alternative was **BLM's failure to include in the FEIS any analysis whatsoever of the environmental impacts of the new alternative**. In fact, one must read the FEIS extremely carefully even to discern what the new alternative entails. The FEIS fails to present anywhere the differences between the original Preferred Alternative A, and the new Preferred Alternative A-modified. Readers can determine these differences only by comparing the minutiae of numerous sections, pages, and appendices of the DEIS to the FEIS. And, rather than analyzing the environmental impacts of Alternative A-modified, the FEIS claims simply that the changes "are within the scope and analysis of the Draft RMPA/EIS and do not significantly alter the alternatives or analysis of the environmental consequences." FEIS, P-1. BLM also claims no environmental analysis of the new Alternative A-modified was necessary "primarily because the amount of disturbance was expected to be so small, under either proposal." Supp. FEIS at 16. Yet elsewhere, BLM contradicts its own conclusion, noting that the potential new road building allowed under Alternative A-modified "may have a cumulative effect on a previously undisturbed area" which "may be notable in terms of habitat fragmentation for larger wildlife." FEIS at S-4.

In February 2004, twenty-five protests of the RMPA/EIS were filed with the BLM Director. Protestants included several of the plaintiffs in these consolidated cases, several area ranchers, environmental groups, and concerned individuals, all of whom argued that Alternative

A-modified did not provide sufficient environmental protection for the land and water in the

Project Area. AR 15553-15716. The protests also pointed out numerous inadequacies in BLM's

NEPA review for the RMPA. In mid-August 2004, the BLM rejected all the protests. AR

16037-16133.

**Governor Richardson's Consistency Review and Recommended Plan**

Under FLPMA, 43 U.S.C. § 1712(c)(9) and 43 C.F.R. § 1610.3-2, the Governor of an

affected state has 60 days after issuance of a Proposed RMPA in which to identify

inconsistencies with federal, state, or local plans, policies, or programs, and provide written

recommendations to the State BLM Director. On March 5, 2004, Governor Richardson

submitted to Director Rundell a written review of the inconsistencies between the BLM's

Proposed RMPA and various New Mexico state plans, policies, and programs. **AR 16733-**

**16780**. Governor Richardson also presented an alternative plan that was consistent with New

Mexico and federal policies, plans and programs. **AR 16742 & 16764-79**.

The Governor's plan provided more protections for sensitive areas than were contained in

any of the three alternatives analyzed in the DEIS, although it also allowed more unrestricted oil

and gas development in certain areas. Compare **AR 16742 & 16764-79** to DEIS 2-26-36. The

Governor proposed that twelve stipulations be required in areas that, under the BLM's original

Alternative B, would have been open to leasing with less restrictive stipulations. DEIS, map 2-3;

**AR 16767-69**. The Governor also proposed establishment of a National Conservation Area for

the approximately 650,000 acres of grasslands on which he proposed either no leasing or an NSO

stipulation. **AR 16742 & 16779**. In addition, the Governor proposed mandatory BMPs to

protect against invasion of noxious weeds. **AR 16769**. The Governor's plan called for early and

comprehensive consultation with concerned Indian tribes and the State Historic Preservation

Officer concerning impacts to cultural and historic resources, including detailed consultation before final adoption of the RMPA. It also called for on the ground cultural resource surveys prior to leasing and exploration. **AR 16770-72**. The Governor's plan was not analyzed in either the DEIS or the FEIS.

Senator Bingaman wrote to BLM in support of the Governor's plan, and requested both that the BLM provide the public with the opportunity to comment on it and that BLM begin a dialog with the State and the public to develop a new RMPA proposal that would not generate as much opposition. AR 17232.

In May 2005, State BLM Director Rundell responded to the Governor, refusing to adopt his proposed plan and determining that there were no inconsistencies between the Proposed RMPA and federal, state, local or tribal policies or programs. AR 16969-87. The only minor change Rundell approved in the RMPA was to extend the time period of protection for the 36,000 acres of aplomado falcon "core habitat" in the Otero Mesa and Nutt grassland areas. AR 16969.

Simultaneously, Rundell issued a short "Supplement to Proposed RMPA and Final EIS" ("Supp. FEIS") that described the change in protection for falcon core areas and provided an abbreviated list of the changes made in the RMPA between the DEIS and FEIS stages, but contained no environmental analysis. BLM allowed public comment on the Final EIS Supplement, but it did not respond to any comments. BLM did not provide the Governor's plan and recommendations to the public; nor did it provide the public with an opportunity to comment on the Governor's plan and recommendation, even though members of the public requested such an opportunity. AR 17161; 17236. Governor Richardson then appealed Rundell's decision to the Director of the BLM. **AR 17157-17183**.

STATE OF NEW MEXICO'S OPENING CASE BRIEF  --  16

Senator Bingaman again wrote to the BLM objecting to the BLM's "unfortunate and illegal" decision not to provide the Governor's plan to the public for review and comment. AR 17234. The State submitted detailed testimony by State Oil Conservation Division experts and others concerning the substantial risks of contamination of the Salt Basin as a result of oil and gas mining in the Basin. **St. Exh. 2.**

On January 21, 2005, BLM Director Clarke rejected Governor Richardson's appeal. AR 22720. BLM State Director Rundell issued the Record of Decision approving the Final RMPA and EIS for the Project Area on January 24, 2005. AR 18151.

## Implementation of the RMPA on the Bennett Ranch Exploratory Unit

The Bennett Ranch area lies on Otero Mesa just north of the Texas border and west of the Alamo Mountain Area of Critical Environmental Concern. AR 17490. The Bennett Ranch area "is a rural ranch setting with few impacts from development" "that seldom has noise producing activities on the ground." **St. Exh. 3.** Human activities in the area consist generally of "infrequent ranch traffic and seasonal hunters." Id. at 4. Vegetation in the area is "substantially weed free" desert grassland "containing primarily black and blue grama grass." Id.

In 1997, shortly after Harvey E. Yates Co. ("HEYCO") filed with BLM the first Application for a Permit to Drill ("APD") on Otero Mesa, HEYCO entered into an agreement with BLM forming the 8,000 acre Bennett Ranch Unit ("BRU"). **St. Exh. 4.** At that time, HEYCO had already acquired oil and gas leases for all federal and state land within the BRU, except for a 1600-acre parcel west of Alamo mountain. AR 20168. BLM has repeatedly acknowledged that the BRU is the "most likely location for all" the oil and gas development projected for the Project Area in the RFD. AR 2518; FWS AR 45; 152.

HEYCO then drilled two wells (#1-Y and #25-1) on leased federal land within the BRU in 1997 and 2000, both of which produced significant gas shows. AR 17498 (showing history of oil and gas drilling on Otero Mesa); 20183-84; 18825-35. Well #1-Y was a "high output well, with the potential to produce natural gas at a rate 7 times faster than the average US gas well." AR 17493. BLM prepared Environmental Assessments ("EAs") and Findings of No Significant Impact ("FONSIs") on both APDs for these wells. In each case, the EA addressed only the exploratory well itself. Neither EA addressed any potentially associated facilities, such as pipelines, injection wells, or other facilities or actions that would ensue if oil or gas were located and developed. **St. Exh. 5**; AR 20071.

In 1999, a private contractor conducted a 3-D seismic survey of a 14,900-acre area that included the entire BRU. AR 17569. Such surveys are generally used to delineate the extent of the prospective oil and gas resource in an area. DEIS A-IV-7. An EA and FONSI was prepared addressing the direct impacts of the seismic survey and nothing else. AR 17568.

In late 2000, HEYCO submitted a Sundry Notice to BLM for construction of a 3.3 mile long 6" diameter gas pipeline to connect its BRU well #1-Y to the Texas state line, where it would connect with an as yet unbuilt 12 mile spur connecting to an existing pipeline in Texas. AR 17496; 20204-17; 20218. HEYCO stated at the time that the pipeline would be the "backbone" of a pipeline system servicing the entire BRU. AR 20179. HEYCO stated that BLM's estimate of 30 wells for the BRU was "low," and that HEYCO "expects to fill the [BRU] with wells, hopefully with oil wells on a 40-acre spacing." AR 20204. BLM estimated that a 6" pipeline would service 5-6 producing gas wells. AR 20115.

BLM prepared an EA, FONSI, and Decision Notice for the 6" gas pipeline. AR 20052. The EA addressed only the immediate impacts of construction of the New Mexico part of the

pipeline. The EA did not consider any impacts of potential oil and gas development within the BRU that would be served by the pipeline.

In March 2004, HEYCO submitted a second Sundry Notice to the BLM revising the proposed gas pipeline from 6" to 8" (capable of carrying nearly twice the volume of gas). AR 20207. BLM approved this Sundry Notice but the pipeline has not yet been constructed. AR 20202.

On May 18, 2005, BLM issued an EA on a proposal by HEYCO to flare gas at wells #1-Y and 25-1 to measure the quantities of gas and pressures of the gas field. AR 18822. Two days later, BLM issued a Notice of Competitive Lease Sale for the remaining unleased 1600-acre parcel within the BRU on Otero Mesa ("Otero Mesa Lease," designated as No. NM-200507-001). AR 18351-63; **AR 18342a** (map); AR 20168 (area in BRU shown as "unleased" is 1600-acre parcel). The proposed Otero Mesa Lease parcel, which consists of Chihuahuan Desert grasslands, was subject to an NSO stipulation in both Alternatives A and B of the Draft RMPA/EIS, and Governor Richardson's alternative plan. **AR 18536-58; 18460**; DEIS maps 2-2 & 2-3; **AR 16766**. However, BLM specified that it would not be subject to an NSO stipulation. Instead, the Otero Mesa Lease was offered with the less restrictive stipulations (including the 5% stipulation) set forth in Alternative A-modified. AR 18363.

Rather than conducting an environmental analysis for the Otero Mesa Lease, BLM prepared a document entitled "Documentation of Plan Conformance and NEPA Adequacy (DNA)." AR 18331. The DNA stated that no NEPA review was necessary because the Lease "conforms to the applicable land use plan" and "the existing NEPA documentation fully covers the proposed action and constitutes BLM's compliance with the requirements of NEPA." AR 18336.

The State of New Mexico Plaintiffs protested the Otero Mesa Lease to BLM State

Director Rundell, asserting that the Lease violated NEPA, NHPA, and FLPMA. AR 18520-27;

18528-20223. The Conservation Plaintiffs also protested the Lease sale. AR 18425-508.

At the July 20, 2005, Lease sale, HEYCO was the only bidder for the Otero Mesa lease,

bidding the minimum amount of $2.00/acre. AR 20197. On August 18, the BLM dismissed

both protests filed by Plaintiffs.

## ARGUMENT[3]

### I.  STANDARD OF REVIEW

The State's claims in this case are decided under the "arbitrary and capricious" standard.

Under that standard, agency action is overturned if it "fails to meet statutory, procedural or

constitutional requirements or if it was arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law." Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1574 (10th

Cir. 1994) (internal quotations omitted). The court must engage in a "thorough, probing, in-

depth review" and the "inquiry into the facts is to be searching and careful." Citizens to Preserve

Overton Park v. Volpe, 401 U.S. 402, 415-6 (1971). As the Tenth Circuit explains, the court:

> must ensure that the agency decision was based on a consideration of the relevant
> factors and examine whether there has been a clear error of judgment. We
> consider an agency decision arbitrary and capricious if the agency relied on
> factors which Congress had not intended it to consider, entirely failed to consider
> an important aspect of the problem, offered an explanation for its decision that
> runs counter to the evidence before the agency, or is so implausible that it could
> not be ascribed to a difference in view or the product of agency expertise.

Colorado Environmental Coalition v. Dombeck, 185 F.3d 1162, 1167 (10th Cir. 1999) (internal

quotations and citations omitted).

---

3       The State hereby adopts as its own and incorporates by reference those portions of the
Conservation Plaintiffs' Opening Brief that support State Plaintiffs' claims. In an effort to
reduce briefing duplication, the State relies entirely on the briefing presented on some issues by
Conservation Plaintiffs.

In reviewing challenges brought under NEPA, the court's role is "to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious." Utahns For Better Transportation v. U.S. Dep't of Transportation, 305 F.3d 1152, 1163 (10th Cir. 2002) (quoting Utah Shared Access Alliance v. U.S. Forest Service, 288 F.3d 1205, 1208 (10th Cir. 2002)). The court applies a "rule of reason" in determining whether the deficiencies in a Final EIS "are significant enough to defeat the goals of informed decisionmaking and informed public comment." Utahns, 305 F.3d 1163; Custer County Action Ass'n v. Garvey, 256 F.3d 1024, 1036, 1040 (10th Cir. 2001).

## II. BLM WAS REQUIRED TO PREPARE A SUPPLEMENTAL DRAFT EIS WHEN IT CHANGED ITS PREFERRED PROJECT TO A BRAND NEW ALTERNATIVE THAT WAS NOT ADDRESSED IN THE DRAFT EIS.

### A. NEPA Requires An Agency To Prepare and Circulate For Public Comment A Supplemental EIS When There Are Substantial Changes To the Proposed Project That Have Environmental Repercussions.

NEPA requires a federal agency to prepare a detailed environmental analysis that describes, inter alia, "the environmental impact of a proposed action." 42 U.S.C. § 4332(2)(C). A draft EIS "must fulfill and satisfy to the fullest extent possible" the requirements of Section 4332(2)(C). 40 C.F.R. § 1502.9(a). A draft EIS must "identify the agency's preferred alternative" if one exists at that time. 40 C.F.R. § 1502.14(e). A Final EIS must identify the agency's preferred alternative unless another law prohibits it from doing so. 40 C.F.R. § 1502.14(e). The EIS must "rigorously explore and objectively evaluate" both the preferred alternative and all reasonable alternatives. 40 C.F.R. § 1502.14(a). An agency must prepare a supplement to the draft EIS where, after issuance of the draft EIS, "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns." 40 C.F.R. § 1502.9(c)(1); see Dubois v. U.S. Dep't of Agriculture, 102 F.2d 1273, 1291-92 (1st Cir.

STATE OF NEW MEXICO'S OPENING CASE BRIEF  --  21

1996). A supplemental draft EIS must be circulated for public comment and filed in the same manner as an original draft EIS. 40 C.F.R. § 1502.9(c)(4).

A new alternative "that has not been disseminated previously in a draft EIS may be adopted in a final EIS, without further public comment, only if it is 'qualitatively within the spectrum of alternatives that were discussed' in the prior draft; otherwise a supplemental draft is needed." Dubois, 102 F.2d at 1292 (citing Forty Most Asked Questions Concerning CEQ's NEPA Regulations, 46 Fed. Reg. 18026 ("Forty Questions"), # 29b (1981)). According to BLM's NEPA Handbook H-1790-1, "[i]f the preferred alternative or proposed action is outside the scope and analysis in the draft EIS then a supplement must be prepared." H-1790-1, p.V-12. A supplement should be prepared if the draft EIS "does not fully cover a proposed action" or if there is a new alternative "not previously analyzed." H-1790-1, p. III-4. A supplemental EIS "should identify changes in the project." Id., p. III-5. For example, where a draft EIS on a housing project analyzes alternatives of constructing 2,000, 4,000, or 6,000 units, and the agency then decides to pursue a 5,000 unit alternative, because such an alternative is "within the spectrum of alternatives already considered," no supplemental draft EIS need be prepared. Forty Questions, #29b.

In Dubois, the First Circuit considered when changes to a project require preparation of a supplemental draft EIS. There, a ski company sought to expand its facilities on national forest land. The Forest Service developed a draft EIS that addressed five alternatives to meet added demand for skiing. 102 F.3d at 1278. The final EIS issued by the Forest Service set forth as its preferred alternative a new "alternative 6" not previously analyzed in the draft EIS. 102 F.3d at 1292. In response to plaintiffs' claims that a supplemental draft EIS was required, the Forest Service claimed that alternative 6 was merely a scaled-down modification of a previously

analyzed alternative that "would have been far larger and far more intrusive on the environment than the new preferred alternative." Id.

The court found that a supplemental draft EIS was required because the new preferred alternative "entails a different configuration of activities and locations," not just a reduced size. Id. Rather than expanding beyond the boundaries of the existing permit like the alternatives previously analyzed, the new preferred alternative would have condensed most of the expansion into the existing permit area. In view of these changes, "public commenters might have pointed out, if given the opportunity – and the Forest Service might have seriously considered    wholly new problems posed by the new configuration (even if some of the environmental problems present in the prior alternatives have been eliminated)." 102 F.3d at 1293. Thus, because the new preferred alternative did not fall within the spectrum of alternatives previously analyzed, the Forest Service was required to prepare a supplemental draft EIS.

A similar situation arose in California v. Block, 690 F.2d 753 (9th Cir. 1982). In Block, the State of California brought a NEPA challenge to a decision by the Forest Service to allocate roadless areas on national forests to three different management categories (wilderness, non-wilderness, and further planning). The court found the Forest Service violated NEPA where it failed to circulate for public comment a supplemental draft EIS describing the proposed action.

The court found that the alternative designated in the final EIS as the proposed action was "not roughly identical to any one set of allocation percentages considered in the earlier alternatives." Id. Also, the differences between the new proposed action and the alternatives considered in the draft EIS "seriously dilut[ed] the relevance of public comment on the draft EIS alternatives." 690 F.2d at 772. In addition, the proposed action "amalgamated so many different analytical techniques" used for draft EIS alternatives that the proposed action "could not be fairly

anticipated by reviewing the draft EIS alternatives." Id. Factors the court considered critical to its decision were:

> (1) whether the alternative finally selected by the Forest Service was within the range of alternatives the public could have reasonably anticipated the Forest Service to be considering, and (2) whether the public's comments on the draft EIS alternatives also apply to the chosen alternative and inform the Forest Service meaningfully of the public's attitudes toward the chosen alternative.

690 F.2d at 772.[1] See also NRDC v. Hughes, 437 F.Supp. 981, 990 (D.D.C. 1977) (where the proposed coal leasing program considered in the final EIS was "a significant departure" from the proposed program considered in the draft EIS, a new draft EIS was required because "neither the distinction between these two programs, nor the potential ramifications thereof, were adequately considered in the Final EIS").

Thus both NEPA and the case law emphasize the importance of circulating a new supplemental draft EIS for public comment whenever an agency changes its proposed alternative to an alternative not previously the subject of analysis in the draft EIS. As the Ninth Circuit underscored in Block, "NEPA's public comment procedures are at the heart of the NEPA review process," so an agency cannot insulate its choice of project from public scrutiny by switching to a new proposal after comments on the original proposal have already been received. 690 F.2d at 770-71. Where the changes made to the proposed project essentially deny the public a true opportunity to comment on the project, and where the changes to the project have environmental repercussions, a supplemental draft EIS is required.

---

[1]      The 1973 CEQ NEPA Guidelines that governed the Block decision were subsequently supplanted by the current CEQ NEPA Regulations. 690 F.2d at 763 n.5. The current regulations did not substantially change the requirements, however, and the court's decision and reasoning in Block applies with equal force under the current NEPA regulations.

**B. The New Proposed Action Presented in the FEIS (Alternative A-Modified) Is Fundamentally Different From Any of the Alternatives That Were Analyzed in the DEIS.**

BLM's actions in this case are a classic case of "bait and switch." In the DEIS for the RMPA, BLM presented two serious alternatives,[4] Alternatives A and B. Both of these alternatives required NSO stipulations through the Otero Mesa and Nutt grassland habitat areas beyond 150 meters from existing roads. DEIS at 2-25-27. As described above, Alternative A contained a variety of other environmentally protective measures; Alternative B contained all of those measures plus additional protections. DEIS 2-32-36.

BLM presented a brand new alternative in the Final EIS: Alternative A-modified. Alternative A-modified was not a compromise between Alternatives A and B, with some elements of each. Nor was it a minor "modification" of Alternative A. Rather, it presented an entirely new concept for attempting to protect the grasslands in the Project Area. As BLM proudly pointed out, in order to develop this new alternative, it called in experts from Wyoming, BLM headquarters, and New Mexico to consult with the Las Cruces Regional Office staff and "look at a new way of doing business" to allow oil and gas development in the area while protecting it. AR 15313; 15329. The new concept, the 5% unitization proposal, was never mentioned in the DEIS or anywhere in the administrative process leading up to issuance and circulation of the DEIS. Indeed, it was not even mentioned in any of the comments on the DEIS.

---

[4]     Although the DEIS contained a "No Action Alternative," that alternative was provided as a required baseline, not as a serious proposal for action as it failed to meet the fundamental objective of the BLM's planning process, which was to impose some management constraints to govern fluid mineral leasing in the Project Area. DEIS, p.S-1; AR 15313. BLM has admitted that the No Action Alternative was not a viable option because the existing management scheme did not comply with applicable requirements. FEIS at 2-26.

The unitization scheme not only had not been mentioned anywhere in the DEIS; it had "never been used by BLM as a tool for surface resource management and protection" anywhere in the country. AR 15314; 15329. The new alternative was so unprecedented that BLM State Director Rundell commented, "it's going to be interesting to see how it works out." AR 17160.

In support of its argument that no supplemental EIS was required to analyze the impacts of the new Alternative A-modified, BLM asserted that the amount of disturbance was trivial under both alternatives and that the new 5% unitization stipulation was "not a change to the intent of the proposed decision to allow environmentally responsible exploration and development in the Otero Mesa and Nutt grassland area." AR 15446; 21904; Supp. EIS at 16.   BLM's assertion is nothing short of astonishing. As hundreds of comments had emphasized to BLM, **the most important environmental issue raised by the RMPA was fragmentation of Chihuahuan Desert grasslands in the Project Area**. Federal agencies, state agencies, organizations and individual members of the public all had emphasized that this was by far the biggest environmental problem raised by opening the area to oil and gas development.

The biggest cause of fragmentation is new roads and pipelines. **AR 18772; 18782-99; 15504-5**. In recognition of this crucial concern, both alternatives analyzed in the DEIS had prohibited new roads and pipelines in the core grasslands of Otero Mesa and Nutt, and had required all surface disturbance to be no more than 150 meters from existing roads. As BLM stated repeatedly, the purpose of the grassland NSO stipulation was "to limit further fragmentation of that habitat" by limiting "road construction in unroaded areas." DEIS 2-25 & 4-88. While many commenters had urged more

protections against fragmentation than were provided by either Alternative A or Alternative B, virtually all had recognized that the NSO stipulation, and its prohibition against new road-building, marked an important step towards providing the needed protection against fragmentation.

In throwing the grassland NSO stipulation out the window and allowing oil and gas developers full "discretion of where [in the grasslands] to develop" so long as disturbance was kept below 5% at any given time, BLM discarded the draft RMPA's central protection against habitat fragmentation. AR 21904. Moreover, **BLM did so without any analysis of the environmental impacts of eliminating the prohibition against new roads and pipelines**. The DEIS's analysis of the impacts of Alternatives A and B had never considered the environmental impacts of construction of new roads and pipelines because those Alternatives did not allow such construction and fragmentation to occur. In short, the DEIS failed entirely to analyze the impacts of fragmentation of the grasslands of Otero Mesa and Nutt.

Because BLM made this change in the FEIS and refused to issue a revised DEIS with the new alternative, there was no opportunity for members of the public to comment on this dramatic change, and no requirement that BLM respond to any comments. The only channel open to members of the public was to file with BLM a formal protest to the Final EIS.

Nevertheless, the record in this case is replete with protests against this improper action by BLM. One of the most insistent critics of BLM's flip-flop (although its objections were never made public) was the U.S. Fish & Wildlife Service ("FWS"). In late 2002 and early 2003, BLM met with FWS to present and discuss the new 5%

alternative. **FWS AR ##'s 8-11, 13.** FWS biologists' notes reflect their unequivocal skepticism about the change from the NSO stipulation to the new 5% stipulation: "How will fragmentation be dealt with?" **FWS AR #13 at 216.** "Fragmentation analysis is totally lacking." **FWS AR #11 at 123.** "There are no estimates of roads besides access roads." **FWS AR #11 at 124.** "How much falcon habitat will be fragmented by this action?" **FWS AR #10 at 117.** "BLM should evaluate the effects of fragmentation on grassland bird species." **FWS AR #13 at 216.** "[F]ull reclamation takes a number of years, decades really. So 5% really doesn't mean much." **FWS AR #13 at 219.** "Send letter saying EIS should be open for comment again." **FWS AR #11 at 128.** In its private meeting with BLM, FWS also expressed frustration at being denied the opportunity to comment on the replacement of the NSO stipulation with the 5% stipulation. As BLM noted, "the NSO areas are probably not in the cards, **but that's what [FWS officials] said they would have commented on if they had been able to comment on the amended Proposed Action.**" AR 2509 (emphasis added).

Even though BLM did not invite or respond to comments on the FEIS, hundreds of persons, organizations, and agencies complained to the BLM about the "bait and switch" replacement of Alternative A with the new Proposed Action. They pointed out that their comments on the DEIS were rendered entirely obsolete by the replacement of Alternative A with the new Alternative A-modified because, among other things, the new alternative failed to address the all-important problem of grassland fragmentation. For example, NMDGF submitted a protest to BLM explaining in detail the reasons why it supported Alternative A, but it opposed Alternative A-modified because, unlike Alternative A, the new alternative did not address grassland fragmentation and also

eliminated many other valuable environmental protections that had been in Alternative A.
**AR 15607-15613**. NMDGF objected that BLM's drastic change in the Proposed Action
totally nullified NMDGF's comments on the DEIS and the Proposed Action therein, and
thereby deprived NMDGF and others of the chance to comment on the far more
deleterious Alternative A-modified. AR 15607-13. The N.M. Department of Energy,
Minerals & Natural Resources made similar arguments in its protest. **AR 15573-84.**

Later, NMDGF submitted a report from its habitat biologist that explained in
detail how Alternative A-modified would cause much greater habitat fragmentation and
adverse impacts to wildlife than Alternative A. AR 18771-801. NMDGF biologist Mark
Watson explained:

> The greatest threat to the persistence of wildlife populations and species globally
> is habitat loss from human development and habitat fragmentation, which is
> breaking up of large tracts of habitat into smaller patches. . . Roads are a major
> cause of habitat fragmentation because they divide large landscapes into smaller
> patches, increase the potential for roadkill, poaching and illegal collecting, and
> convert interior habitat into edge habitat. . . As additional road construction
> increases habitat fragmentation across large areas, populations of some species
> may become isolated, increasing the risk of local extirpations or extinctions. . .
> [W]e do not believe that the Final Alternative A Modified will provide sufficient
> protection to important wildlife and wildlife habitats in Sierra and Otero Counties
> from habitat fragmentation caused by oil and gas development.

**AR 18772-3**. Numerous other biologists and others provided similar comments. See,
e.g., **AR 17272-6; 17292-9; 17321-7; 15607-22**; 15628-30.

BLM's claim that its switch to Alternative A-modified did not require any
additional analysis because its impacts were de minimis is belied by its own analyses.
Although no analysis of the fragmentation impacts of the new alternative was provided in
the EIS, BLM did conduct such an analysis internally, and produced a detailed report that
was never provided to the public. **AR 15495-15522**.

That 27-page report, entitled "Review of Habitat Fragmentation with Respect to Habitat Change, Roads, and Future Land Use for White Sands RMPA Oil and Gas Amendment," is a devastating condemnation of Alternative A-modified that uncovers the fallacies that permeate BLM's claims that the new alternative will have no worse impacts than those of Alternative A. This report focuses on the "edge effects" of surface disturbance – particularly the surface disturbance of roads. The central thesis of the report is that the spatial layout of oil and gas fields, and the amount of roads and pipelines built to serve those fields, are crucial factors in determining environmental impacts.

BLM's report used a conservative assumption that roads cause significant wildlife disturbance through an area up to 400 meters from the roads. **AR 15497, 15504, 15509-10**. BLM explained that while disturbance to wildlife can extend much farther (500 meters to 2 kilometers for various species), 400 meters is an intermediate distance (**AR 15510; 20172**), and BLM has used that distance in numerous analyses of "edge effects" of surface disturbance caused by oil and gas mining. AR 11396; **20172**; 20100-1; 20057-58. With an estimated 400 meter "edge effect," BLM calculated that build-out of the oil and gas development projected in the RFD would result in direct and indirect impacts to wildlife and habitat totaling 34,000-36,000 acres. **AR 15498; 15518; 20172**. As BLM noted, "[s]patial analysis of roads on the landscape show an alarming effect. . . . Ultimately fragmentation due to roads leads to population declines of species susceptible to the adverse effects." **AR 15504-5**. Further, spatial analysis confirms that the decline of grasslands goes "beyond the simple loss of area." **AR 15505**. The report concludes:

> Addition of a commercial O & G program affecting 34,000 to 36,000 acres, as projected from the RFD, without mitigation of the fragmentation effects, would reduce the functional health and wildlife resource sustainability of desert grasslands within the planning area.

**AR 15518**.

Considering BLM's admission that build-out of the full RFD almost certainly will occur on Otero Mesa grasslands, the report's presumption that oil and gas development will occur in the grasslands is entirely reasonable. AR 2518; **15496**; FWS AR 45; 152; FEIS at A-8. Yet none of this critical information   perhaps the most important environmental analysis done by the BLM for the RMPA – appears anywhere in the FEIS or the FEIS Supplement. Instead, BLM simply reiterated its claim that the RMPA will cause short term surface disturbance of only 1589.5 acres and long term disturbance of only 872 acres in the Project Area. ROD at 9; FEIS at 4-3.

The difference in fragmentation effects between Alternative A and Alternative A-modified is graphically depicted in a report prepared by Ecos Consulting. **AR 17504-6**. The report presents figures showing the anticipated spatial layout of surface disturbance assuming RFD build-out in the Bennett Ranch area (thought by BLM to be the most likely scenario) under Alternative A versus Alternative A-modified, and shows that a great deal more habitat fragmentation would occur in Alternative A-modified.

Increased fragmentation was not the only new adverse impact associated with Alternative A-modified but not the original Alternative A. As discussed above, Alternative A-modified reduced or eliminated a number of other environmental protections contained in Alternative A, which changes also will cause increased environmental impacts. In comments to BLM. NMDGF's habitat specialist Watson detailed the adverse impacts to wildlife that would result from these changes. most particularly the elimination of stipulations that would restrict surface disturbance in areas important to particular big game and other sensitive wildlife species. **AR 18771-801**.

Other members of the public made similar comments. See AR 15553-15716; AR 17245-566. Even BLM employees expressed skepticism over the new Alternative A-modified. AR 11795 (the new stipulations "do not get at directing the location of disturbance that the NSO alternative provided" and therefore this employee favors the NSO alternative); **AR 15495-15521** (BLM's internal habitat fragmentation report).

In sum, BLM's transformation of its original proposed Alternative A into the dramatically different and less protective Alternative A-modified had overwhelmingly negative environmental repercussions that were never analyzed in any EIS. BLM eliminated the NSO stipulation – the central protection against the most threatening environmental impact of the RMPA, grassland habitat fragmentation    and replaced it with a brand new concept that had never been mentioned in the years of NEPA review for the RMPA and that had never been tested by BLM anywhere in the country. The public was sandbagged. Public comments on the DEIS were rendered irrelevant by the BLM's selection of the new alternative, and the public never was provided an opportunity to comment on the new alternative. Nor was the public ever provided any analysis of the environmental impacts of the new alternative, or any comparison of those impacts to the impacts of the other alternatives. Although the BLM did portions of such an analysis, it kept the analysis to itself, presumably because it revealed the substantial adverse impacts resulting from the switch to the new alternative.

NEPA, the NEPA regulations, and the case law all make clear that the BLM's failure to prepare a supplemental Draft EIS on the new Proposed Action was illegal. See 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.9, 1502.14(e); Forty Questions, #29b ; Dubois v. U.S. Dep't of Agriculture, supra; California v. Block, supra; NRDC v. Hughes,

supra. Both the changes made to the BLM's Proposed Action, and the resulting environmental impacts, are more substantial than the changes and impacts considered in Dubois, Block, and Hughes. And clearly the new Alternative A-modified is not "within the spectrum of alternatives already considered" in the DEIS. Forty Questions, #29b. Rather, Alternative A-modified presents a brand new concept with brand new environmental impacts never considered anywhere in the EIS. Therefore, BLM's failure to prepare a supplemental Draft EIS that analyzes the impacts of Alternative A-modified and compares them to the impacts of the three alternatives analyzed in the DEIS was arbitrary and capricious.

### III.     THE RMPA EIS IS UNLAWFUL BECAUSE BLM FAILED TO ADEQUATELY ANALYZE THE DIRECT ENVIRONMENTAL IMPACTS OF THE RMPA.

#### A.  NEPA Requires the BLM to Take a "Hard Look" At the Potential Environmental Consequences of It Proposed RMPA.

NEPA requires that an agency "take a 'hard look' at the environmental consequences of any major federal action." Park County Resource Council, Inc. v. U.S. Dep't of Agriculture, 817 F.2d 609, 620-21 (10th Cir. 1987). Agencies must evaluate "all reasonably foreseeable project impacts regardless of whether they are intentional." Utahns. 305 F.3d at 1175 (citing 40 C.F.R. §§ 1502.16(b), 1508.8(b)). An EIS must analyze both the direct and indirect impacts of a proposed action, as well as the cumulative impacts of "past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7; Custer County, 256 F.3d at 1036 (citing 40 C.F.R. §§ 1508.7 & 1507.8). Indirect impacts are caused by the action but "later in time or farther removed in distance, but ... still reasonably foreseeable." 40 C.F.R. § 1508.8(b).

STATE OF NEW MEXICO'S OPENING CASE BRIEF  -- 33

The scope of the environmental analysis in an EIS must be appropriate to the action in question. NEPA is designed not to postpone environmental analysis to the last possible moment, but rather "to require such analysis as soon as it can reasonably be done." Kern v. BLM, 284 F.3d 1062, 1072 (9th Cir. 2002). "If it is reasonably possible to analyze the environmental consequences in an EIS for an RMP, the agency is required to perform that analysis." Id.

The Tenth Circuit decision most relevant to the instant case is Utahns for Better Transportation v. U.S. Dep't of Transp., supra. In Utahns, plaintiffs challenged the adequacy of an EIS prepared in connection with a highway project proposed for the Salt Lake City area. Plaintiffs argued that the EIS violated NEPA by failing to consider impacts on wildlife habitat beyond 1000 feet from the highway right of way. 305 F.3d at 1179. The EIS limited its analysis even though the FWS had presented evidence "that roads can cause significant adverse effects to bird populations as far as 1.24 miles from roadways." Id. Federal agencies asserted that their action was proper because data they had did not show any statistical difference between using 1000 feet and using one mile.

The Tenth Circuit found the EIS deficient due to the agencies' use of the 1000 foot distance. 305 F.3d at 1179-80. The court reasoned that the agencies "effectively limited any assessment of wildlife use and value to smaller, less mobile species and ignored the primary concern of many public and private entities: impacts to the [Great Salt Lake] ecosystem and its ability to continue as a nationally and internationally significant wildlife use area, particularly for migratory birds." 305 F.3d at 1180. As a result, the court found, the FEIS was "inadequate to address the impact [of the project] on

migratory birds." 305 F.3d at 1180. See also Kern v. BLM, 284 F.3d at 1072-79 (finding EIS on BLM's RMP inadequate).

### B. The FEIS Fails To Adequately Analyze the Direct and Indirect Impacts of the Proposed Action.

#### 1. BLM Failed To Adequately Analyze the Potential Impacts of the Proposed RMPA on the Salt Basin Aquifer.

In the Statement of Facts above, the State described the Salt Basin aquifer that underlies Otero Mesa, its overwhelming value to the people of New Mexico, and the characteristics that make it extremely vulnerable to contamination from oil and gas development activities. In fact, contamination of the aquifer is a virtual certainty if natural gas is developed in the Salt Basin/Otero Mesa area, because contaminated produced water from the mining will be injected into the aquifer and will contaminate it. **AR 18635-43; 18015-9; 17341-56; 18652-3;** 18704-5. No matter where in the aquifer the produced water is injected, the highly fractured nature of the aquifer ensures that the produced water will migrate into the fresh water aquifer of the Basin. Id. Additional contamination is also possible from spills from surface facilities, and leakages from oil and gas wells. AR 18637.

Even though BLM was aware that the most likely location for all oil and gas development is the Salt Basin (which underlies the Otero Mesa portion of the Project Area), the DEIS and FEIS are devoid of any meaningful description of this aquifer, its size, its location, or its characteristics. **AR 17353-4.** The FEIS also fails to note its significance as a major future supply of fresh water in southern New Mexico, and its vulnerability to contamination from oil and gas development. See FEIS at 3-12-14; **AR 17408** (NM State Water Plan call for preserving the Salt Basin aquifer for future needs in

southern New Mexico). The FEIS only makes the general pronouncement that "portions of the aquifers" in the Project Area "are considered highly vulnerable to contamination ." FEIS at 3-13.

Although the FEIS acknowledges the vulnerability to contamination of fractured aquifers. it lacks any analysis of the potential adverse environmental impacts of implementation of the RMPA on the Salt Basin aquifer. Rather than acknowledging that gas development will cause contamination of the aquifer through injection of produced water and possible contaminant spills. the FEIS asserts simply that the potential for contamination from injection of produced water "is very low due to the casing and cement construction requirements in 40 C.F.R. 146.22." FEIS at 4-16. Similarly, the FEIS asserts that groundwater contamination will not be a problem because the N.M. Environment Department and the N.M. Oil Conservation Division ("NMOCD") will require any contamination beyond the legal limits to be abated by the operator. FEIS at 4-17. Yet information from both the Environment Department and NMOCD. as well as independent hydrologists. BLM confirms that the FEIS's assertion is false. Despite these agency's groundwater requirements. there have been many hundreds of instances of serious ground water contamination in New Mexico. many of which have involved oil and gas operations. AR 18007-13; **18018-9; St. Exh. 2**.

In sum, the FEIS failed to "take a hard look" at the impacts of Alternative A-modified on the Salt Basin aquifer. FEIS's consideration of impacts to that aquifer. which is critical to the State's future. is both deficient and misleading. The information necessary for the public and decisionmakers to assess the potential impacts on the aquifer is missing. and the BLM's assertions that the impacts will be minimal are false.

## 2. BLM Failed To Adequately Analyze the Impacts of Alternative A-Modified, Including Particularly the Impacts of Fragmentation and Surface Disturbance of Chihuahuan Desert Grasslands.

It is difficult to determine from the FEIS even what Alternative A-modified is, let alone what its environmental impacts might be and how they might differ from the impacts of Alternative A. Such an analysis is totally lacking from the FEIS, as described in detail above in Section II(B). And, although the FEIS and Supp. FEIS fail to analyze the impacts of the new alternative, they both indicate that the impacts could be different from those of Alternative A, and could be significant. FEIS at S-4 ("the cumulative effect may be notable in terms of habitat fragmentation for larger wildlife"); FEIS at 2-26 (if a substantial amount of the RFD were developed in the Otero Mesa and Nutt grasslands "significant impacts on that environment could result"); Supp. FEIS at 15 (Alternative A's NSO stipulation confined disturbance to "areas within close proximity of existing roads" but the 5% stipulation does not).

The State has detailed above the BLM's failure to analyze the fragmentation impacts to desert grasslands that would be caused by implementation of Alternative A-modified. The same facts that support the State's claim that BLM must prepare a supplemental Draft EIS also support the State's claim that the FEIS failed to adequately analyze the impacts of fragmentation of Chihuahuan Desert grasslands in the Project Area.

In addition to the failure of the EIS to address the all-important issue of habitat fragmentation, the FEIS contains other serious flaws that render its analysis of the potential adverse impacts to grasslands erroneous and legally inadequate. The FEIS makes the unfounded claim (reversing the DEIS) that the surface disturbance caused by

STATE OF NEW MEXICO'S OPENING CASE BRIEF  -- 37

seismic exploration should not be considered "surface disturbance" because it is "very temporary and typically ... minimally intrusive on the environment." FEIS at 4-3; compare DEIS at 4-3. As a result of that erroneous claim, the FEIS simply removed the anticipated 5,000 acres of surface disturbance due to seismic exploration from the FEIS (thereby reducing expected surface disturbance from 6,589.5 to 1,589.5 acres). Id.

Other BLM analyses not contained in the EIS explain why it was unreasonable and improper for the BLM to exclude surface disturbance caused by seismic exploration from the 5% stipulation and the overall (1589.5 acre) surface disturbance cap. BLM points out that recovery of grassland vegetation after seismic activities is expected to take up to two years, and shrub recovery "considerably longer." AR 15500; FWS AR #7 at 27. In addition, seismic activities can result in informal two track roads that result in damage to cultural resources. DEIS 4-47; AR 17585 (BLM Emergency Closure of area subject to BRU Seismic 3-D survey, noting that seismic work "left many tracks of mashed vegetation in the grassland. There is concern that future traffic could follow these tracks, damaging the grassland and creating undesired new roads"). Indeed, even the FEIS itself acknowledges that the impacts on vegetation and wildlife resulting from seismic exploration can be substantial. FEIS at 4-30 & 4-34. Nevertheless, BLM refused to consider these impacts "surface disturbance" in the FEIS, and misled the public by representing those impacts as "very temporary" and "minimally intrusive on the environment."

The other egregious error that caused BLM to wildly understate the adverse environmental impacts of its Proposed Action is the FEIS's perpetration of the myth that much of the surface disturbance of grasslands caused by oil and gas development will be

eliminated by reclamation. The FEIS and ROD imply that the RMPA includes mandatory requirements for reclamation of disturbed areas (AR 18168-70; FEIS at 4-4), and claim that over half of the 1590 acres expected to be disturbed will be reclaimed within three years. ROD at 9; FEIS at 4-3. BLM also asserts that some old well sites in grasslands have been successfully reclaimed. Whenever BLM pronounces a given area sufficiently reclaimed, that area will no longer count towards either the 5% disturbance limit or the 1589.5 acre total disturbance cap for the Project Area. AR 12186; 12584; 20909.

None of BLMs claims are true. The fact is that **nowhere in the RMPA are there any mandatory requirements for reclamation**. Instead, there are only "best management practices" that, according to BLM, "should not be construed as rigid requirements that would be applicable to every situation but, rather, are ideas and examples that have been successful, from which site-specific applications can be developed." FEIS at G-219. Indeed, the BLM's "reclamation" conditions imposed in the Otero Mesa area after adoption of the ROD did not include any effective reclamation requirements whatsoever. AR 20207-15 & 20052-66.[5]

And despite the ROD's claim that most of the disturbed land will be reclaimed within three years, BLM's own experts have pointed out that reclamation in desert grassland areas is "typically very slow," with "reclaimed" lands remaining "unusable for use by the Aplomado falcon for many years." AR 2518; 20057. FWS states that

---

[5]     The "reclamation" conditions applied to BLM's 2005 approval of an expansion of the BRU gas pipeline on Otero Mesa require only that "[s]eed must be certified relatively weed free," that there be up to three reseeding efforts, and that a seed mixture not representative of the native species be used. AR 20215. BLM did not require that reseeding be successful or that the area be restored to its pre-disturbance status, so the likelihood that the pipeline disturbance would be successful is virtually nil. See **AR 18458a & b**; 18536-42.

STATE OF NEW MEXICO'S OPENING CASE BRIEF  -- 39

reclamation takes "decades, really" and estimates soil recovery time at 5-375 years. **FWS AR #13 at 219 & #7 at 46-7.**

Biologists and botanists from NMDGF and elsewhere have assessed the supposedly "reclaimed" well sites on Otero Mesa and have found them to be not even remotely reclaimed. **AR 18776-7; 18540-41; 18458a-60.** As biology professor Walter Whitford states, BLM's claim in the FEIS that "'Grasslands generally recuperate relatively quickly while other vegetation types (e.g. pinon-juniper) grow more slowly' **is a completely unsubstantiated claim.** Chihuahuan Desert grasslands have not recuperated from the combined effects of grazing and drought even with re-seeding and removal of invasive shrubs." **AR 18458a** (emphasis added). Currently there is not even any source of commercial seeds for most of the grass species indigenous to Otero Mesa. **AR 18540.**

Thus, in the FEIS and ROD, BLM presented no analysis of the most important issue of fragmentation of desert grasslands, even though BLM prepared such an analysis for its own internal use. In addition, BLM misrepresented the severity of impacts from seismic exploration and downplayed the significance of impacts to grasslands by making "completely unsubstantiated" claims about successful reclamation. As a result, the FEIS's analysis of impacts to grasslands is utterly erroneous and misleading, does not constitute a "hard look" at impacts that adequately informs the public about these impacts, and thwarts the fundamental purposes of NEPA. See NRDC v. USFS, 421 F.3d 797, 806-13 (9th Cir. 2005) (Forest Service ROD, Land Management Plan, and EIS are arbitrary and capricious because of agency errors that inflated timber demand); Hughes River Watershed Conservancy v. Glickman, 81 F. 3d 437, 446-8 (4th Cir. 1996) (EIS that

inflated economic benefits of proposed plan is inadequate); see National Wildlife

Federation v. National Marine Fisheries Service, 235 F. Supp. 2d 1143, 1157 (W.D.

Wash. 2002) ("An EIS that relies upon misleading economic information may violate

NEPA if the errors subvert NEPA's purpose of providing decisionmakers and the public

an accurate assessment upon which to evaluate the proposed project").

**IV.    THE BLM DIRECTOR VIOLATED FLPMA BY ADOPTING AN
RMPA THAT CONFLICTS WITH FEDERAL AND STATE PLANS,
POLICIES, AND PROGRAMS, AND BY REFUSING TO DETERMINE
THAT GOVERNOR RICHARDSON'S RECOMMENDED PLAN
PROVIDES A REASONABLE BALANCE BETWEEN FEDERAL AND
STATE INTERESTS**

FLPMA requires that RMPs "be consistent with State and local plans to the

maximum extent [the Secretary of Interior] finds consistent with Federal law and the

purposes of [FLPMA]." 43 U.S.C. § 1712(c)(9). FLPMA regulations echo that

requirement and also require that RMPs, to the maximum extent practical, "be consistent

with officially approved and adopted resource related policies and programs of federal,

state, local and tribal governments. 43 C.F.R. § 1610.3-2(a) & (b). RMPs must also

comply with federal laws and regulations, and state pollution control laws and standards.

Id.

FLPMA's regulations provide a unique and elevated role for the Governor of an

affected state to play in relation to the RMPs. Prior to approval of an RMP, the Governor

may identify to BLM "any known inconsistencies with State or local plans, policies or

programs," and may recommend changes to the RMP. 43 C.F.R. § 1610.3-2(e). If the

BLM State Director does not accept the Governor's recommendations, the Governor may

appeal to the national BLM Director. The BLM Director must accept the Governor's

recommendations "if he/she determines that they provide for a reasonable balance between the national interest and the State's interest." 43 C.F.R. § 1610.3-2(e).

### A. The RMPA Conflicts With New Mexico Plans, Policies, and Programs.

As Governor Richardson detailed in his consistency review submitted to BLM, the RMPA conflicts with a number of State plans, policies, and programs. **AR 16733-80.** Most important are the various State plans that would be harmed or violated by the RMPA. Reports from expert hydrologists explained that the RMPA will cause substantial contamination of the Salt Basin freshwater aquifer, due largely to injection of contaminated produced water into the highly fractured limestone of the Basin. See Section III(B)(1) above. This result is directly contrary to the State Water Plan, which calls for protection of the aquifer, not contamination: "Steps must be taken to ensure that water from the [Salt] basin is preserved to meet growing demands in southern New Mexico." **AR 17405.** The Governor's Executive Order 2004-005 (issued 1/31/04) echoes the same State policy, calling for assurance of the "full protection of the groundwater resources of Otero Mesa." **St. Exh. 9.**

The RMPA also conflicts with two of the State's wildlife management plans for animals listed on the State's list of species of concern: the "Plan for the Recovery of Desert Bighorn Sheep in New Mexico 2003-2013" (August 2003), and "Conservation and Management Strategic Plan for Black-Tailed Prairie Dogs in New Mexico" (November 2001). **St. Exhs. 6 & 7.** The State, through NMDGF, has officially adopted both of these plans pursuant to the Wildlife Conservation Act and the general authority of the NMDGF. NMSA 1978, §§ 17-1-1, 17-1-1.5, 17-2-37-46. Pursuant to the Bighorn Sheep Plan, NMDGF and BLM originally agreed to the designation of a number of

STATE OF NEW MEXICO'S OPENING CASE BRIEF -- 42

Bighorn Sheep Habitat Areas in the RMPA. DEIS map 3-7. Alternative A in the DEIS

provided a stipulation to prohibit oil and gas activities during January-June (lambing

season) in these areas in order to protect the habitat for use by Bighorn Sheep.[6] DEIS at

A-VI-19. Alternative A-modified removed that stipulation, which will likely preclude

the State from introducing Bighorn Sheep populations into these areas of unoccupied

habitat at any point in the future after oil and gas exploration and development has begun

in those areas. The Bighorn Sheep Plan makes clear that reintroduction of populations of

Sheep into suitable unoccupied habitat, such as the Caballo Mountains and the Guadalupe

Mountains in the RMPA Project Area, is critical to the recovery of this species. **St. Exh.**

**6.**

Goals of the State's Black-tailed prairie dog plan are to protect existing habitat

and increase habitat by approximately 6.5% per year. **St. Exh. 7 at 12-13, 16; AR**

**16746**. The 22-23 prairie dog colonies in the RMPA Project Area are small and therefore

particularly vulnerable to isolation and harm. **AR 16746**. The RMPA, by allowing

surface disturbance up to ¼ mile from prairie dog colonies, interferes with the prairie dog

plan and attainment of its goals. ROD at B-7.

The RMPA is also inconsistent with several New Mexico laws and regulations.

By allowing substantial oil and gas development in desert grassland areas which are

largely free from invasive species, and by failing to impose mandatory controls that will

prevent invasion of noxious weeds, the RMPA is inconsistent with the State's Noxious

Weed Management Act, NMSA 1978, § 76-7D-1 et seq. **AR 16747-8**. As noted above,

BLM has already approved construction of a gas pipeline in the Project Area with no

_____  _____  _____  __

[6]     Some populations of Desert Bighorn Sheep are listed by the State as endangered;
others are listed as sensitive. < www.wildlife.state.nm.us/ conservation/
share_with_wildlife/documents/speciesofconcern.pdf >

requirements that would avoid introduction of noxious weeds into this weed-free part of

Otero Mesa.  AR 20066; 20215; **18536-42; AR 18458a & b**.  In addition, the RMPA

paves the way for oil and gas development in the highly-fractured Salt Basin area, which

development is certain to contaminate that freshwater aquifer in violation of the State's

Water Quality Control regulations and standards adopted pursuant to State law.  NMSA

1978, §§ 74-6-1 et seq. & 70-20-12(B)(20)-(22); 20.6.2 & 20.6.4 NMAC.  Contamination

of aquifers and surface waters has occurred in several areas of New Mexico due to oil and

gas development.  **AR 18018-9**.

### B. Overwhelming Evidence In the Record Confirms That the BLM Director Must Determine That Governor Richardson's Plan Provides A Reasonable Balance Between State and Federal Interests.

In his appeal of BLM's initial denial of his consistency review, Governor

Richardson detailed the many reasons why his plan provides a reasonable balance

between State and federal interests, whereas Alternative A-modified does not. **AR 17157-

83.** Although the BLM Director found otherwise, the evidence in the Record and BLM's

own earlier findings support the conclusion that the Governor's plan provides a

reasonable balance.

BLM claims that Governor Richardson's plan is similar to Alternative B, which

was analyzed in the DEIS.  AR 22734.  In the DEIS, BLM found that Alternative B

"would accomplish the same objectives as Alternative A [BLM's Preferred Alternative]"

(DEIS at 2-26), and that Alternative A would allow for full build-out of the RFD while

"implementing the least restrictive constraints that would provide adequate resource

protection."  DEIS at 2-30.  In other words, BLM has found that Alternative B would

accomplish the purposes of the RMPA, and that the Governor's plan is similar to that

Alternative. Yet BLM refused to adopt any aspect of the Governor's plan, finding that it "would make exploration activities difficult or impossible over a majority of the planning area." AR 22734. BLM cannot have it both ways.[7] BLM's decision contradicts its own finding that, at least to the extent that the Governor's plan is identical to Alternative B, it is fully consistent with federal interests.[8]

BLM claims that a number of the Governor's recommended stipulations resemble BLM's own BMP's, so there is no basis for a finding by BLM that those stipulations are contrary to federal interests. And, to the extent that BLM finds that any remaining portions of the Governor's plan conflict with national interests, the BLM could exclude those aspects of the plan from its approval. What BLM cannot do, however, is make a determination, without any basis in fact or in the Record, that the Governor's plan in toto fails to provide a reasonable balance between federal and state interests. See Colorado Environmental Coalition v. Dombeck, 185 F.3d at 1167. The BLM's rejection of the Governor's plan was not based "on a consideration of the relevant factors," and "runs counter to the evidence before the agency," and therefore is arbitrary and capricious. Id.

## V.    BLM VIOLATED FLPMA BY REFUSING TO PROVIDE THE PUBLIC THE OPPORTUNITY TO COMMENT ON GOVERNOR RICHARDSON'S PLAN.

---

[7]    The primary basis for BLM's conclusion that the Governor's plan would not allow a sufficient amount of oil and gas development was its claim that the NSO stipulation, by requiring directional drilling, would thwart development. AR 22735. However, there is abundant evidence in the Record establishing that the oil and gas resources in Otero Mesa could be developed with the use of directional drilling. AR 17172-6; 17592-625; 18566-76; **St. Exh. 8.**

[8]    BLM's finding in the DEIS that Alternatives A and B accomplish the goals of the RMPA conflicts with its later finding on the Governor's appeal that Alternative B would not accomplish the goals of the RMPA. If BLM stands by the later finding, then it must issue a new draft EIS which analyzes alternatives that the BLM agrees accomplish the goals of the RMPA. Clearly a DEIS that focused on two alternatives and a No Action alternative, none of which meet fundamental project objectives, is legally inadequate.

43 C.F.R. § 1610.3-2(e) requires BLM to "provide the public with an opportunity to comment on" the Governor's plan "[i]f the recommendation(s) of the Governor(s) recommend changes in the proposed [RMPA] which were not raised during the public participation process on that [RMPA]." In this case, BLM refused to provide Governor Richardson's plan to the public with an opportunity for comment on the plan. AR 22734. Instead, BLM released to the public only its 23-page Supplemental FEIS. Both the Governor and members of the public objected to BLM's refusal to present the Governor's plan for public review and comment. AR 17137-9; 17161.

The Supplemental FEIS does not present any description of the Governor's plan and does not invite public comment on the Governor's plan. Rather, its sole mention of the Governor's plan misleads the public by implying that his only recommendation was that the 36,000 acres of designated aplomado falcon "core habitat" be permanently closed to leasing. Supp. FEIS at 1. That proposal, however, was only a tiny aspect of the Governor's recommendations. **AR 16733-79** (and see pp. 15-16 & 44-45 above). A reader of the Supp. FEIS would have no idea what any of the important parts of the Governor's plan were.

BLM has claimed that it was not required to provide Governor Richardson's plan to the public for comment because the plan is similar to Alternative B. AR 22734. However, the Governor's plan differs from Alternative B in a number of important respects, including the stipulations he recommends, his inclusion of additional areas in the NSO stipulation, and his recommendation that a National Conservation Area be designated to protect the Chihuahuan Desert grasslands in the Project Area. **AR 17767-9; 16742; 16779**. None of these parts of his proposal were ever subject to public

STATE OF NEW MEXICO'S OPENING CASE BRIEF  -- 46

comment.  Moreover, even his NSO proposal differed significantly from that in

Alternative B, because it included areas not included by Alternative B, and it excluded

areas covered by Alternative B.  **AR 16766-7**.  Thus, his NSO proposal also was never

provided to the public for comment either.

FLPMA regulations require public comment on the Governor's plan in order for

BLM to adequately evaluate whether the Governor's proposals are feasible and/or

provide a reasonable alternative to Alternative A-modified.  By refusing to circulate the

Governor's plan to the public for comment, BLM short-circuited the required process and

thwarted the goals of FLPMA.  Moreover, BLM violated the plain mandate set forth in

43 C.F.R. § 1610.3-2(e).

## VI.   BLM VIOLATED SECTIONS 106 AND 110 OF THE NATIONAL HISTORIC PRESERVATION ACT IN APPROVING THE RMPA AND THE OTERO MESA LEASE.

### A.   Application of NHPA's Section 106 Consultation Requirements To Oil and Gas Leasing.

The purpose of NHPA is to preserve "the historical and cultural foundations of

the Nation . . . as a living part of our community life and development in order to give a

sense of orientation to the American people." 16 U.S.C. §470(b)(2).  NHPA preserves

historical and cultural resources through the Section 106 process, which requires federal

agencies to "take into account the effect of [a federal] undertaking on any district, site,

building, structure, or object that is included in or eligible for inclusion in the National

Register," 16 U.S.C. §470f, through consultation between federal officials, the SHPO,

and other interested parties such as Indian tribes. local governments, and the general public."[9] Pueblo of Sandia v. United States, 50 F.3d 856, 859 (10th Cir. 1995).

Section 106 has been characterized as a "stop, look, and listen" statute. Muckleshoot Indian Tribe v. U.S. Forest Service, 177 F.3d 800, 805 (9th Cir. 1999). Under Section 106, an agency must (1) make a reasonable and good faith effort to identify historic properties (36 C.F.R. §800.4(b)); (2) determine whether identified properties are eligible for listing on the National Register based on criteria in 36 C.F.R. §60.4; (3) assess the effects of an "undertaking" on any eligible historic properties found (36 C.F.R. §§800.4, 800.5, 800.9(a)); (4) determine whether the effect will be adverse (36 C.F.R. §§800.5, 800.9(b)); and (5) avoid or mitigate any adverse effects (36 C.F.R. §§800.8(e), 800.9).

Section 106 consultation must be performed at a time when the full range of avoidance and mitigation measures is still available to a federal agency proposing an undertaking. 36 C.F.R. §800.1(c). "[P]roject planning activities" that "restrict the subsequent consideration of alternatives to avoid, minimize or mitigate the undertaking's adverse effects on historic properties" can occur only after the Section 106 consultation is complete. Id. Therefore, the BLM must conduct a Section 106 consultation concerning the effects of oil and gas development on TCPs and historic trails in the RMPA project area at a time when the full range of leasing options, including not leasing certain lands within the RMPA Project Area at all, are still available to the BLM. See Montana Wilderness Ass'n v. Fry, 310 F.Supp.2d 1127, 1152-3 (D. Mont. 2004).

---

[9]     NHPA requires that agencies conduct Section 106 consultation "with any Indian tribe . . . that attaches religious and cultural significance to properties described in [16 U.S.C. §470a(d)(6)(A)]." 16 U.S.C. §470a(d)(6)(B).

STATE OF NEW MEXICO'S OPENING CASE BRIEF  -- 48

The RMPA determines which BLM lands will be "closed to leasing," which will be "open to leasing with stipulations," which will be "open to leasing with a lease notice," and which are "open with standard lease terms and conditions that were previously closed to leasing or had stipulations applied." ROD at 2-5. The RMPA is the final stage at which the BLM retains the discretion to designate lands within the Project Area as closed for leasing or subject to an NSO stipulation. Once an ROD on the RMPA is issued, the BLM must allow oil and gas development activities on those lands not designated as closed to leasing or subject to an NSO stipulation. 43 C.F.R. §3101.1-2; see also Conner v. Burford, 848 F.2d 1441, 1449 (9th Cir. 1988) (a non-NSO lease "does not reserve to the government the absolute right to prevent all surface disturbing activity").

**B. BLM Violated NHPA Section 106 In Connection with Its Approval of the RMPA and the Otero Mesa Lease.**

In this case, the State contends that BLM had an obligation under NHPA to complete a Section 106 consultation relative to TCPs and historic trails prior to issuing a ROD on the RMPA. BLM failed to do so, and thus violated NHPA because issuance of the ROD limited BLM's full range of discretionary authority to avoid or minimize adverse effects to TCPs and historic trails. Furthermore, the BLM also violated its Section 106 consultation obligations when it sold the 1600-acre Otero Mesa Lease without first completing Section 106 consultation on both TCPs and historic trails.

BLM's efforts to identify the presence of TCPs within the Project Area were patently inadequate, in that the BLM failed to pursue meaningful discussions with all the Indian tribes that have an affinity with the lands in the RMPA Project Area. See pp. 5-6, supra. The Tenth Circuit has held that a letter or a phone call to an Indian tribe does not

constitute the "reasonable and good faith" identification effort required by Section 106.
Pueblo of Sandia, 50 F.3d at 860 ("a mere request for information is not necessarily
sufficient to constitute the 'reasonable effort' Section 106 requires"). Thus, BLM
violated Section 106 when it concluded that certain tribes' failure to respond to its
perfunctory inquiry constituted a lack of interest in the RMPA.

Moreover, the information that the BLM did receive from Ysleta del Sur Pueblo
and the Mescalero Apache Tribe clearly triggered an obligation on the part of the BLM to
make further efforts to identify TCPs in the RMPA Project Area. Based on the
information that these two tribes provided to the BLM during the development of the
RMPA, there was a "sufficient likelihood" that the RMPA Project Area contains TCPs
and, accordingly, the BLM had an affirmative obligation to "make a reasonable effort to
identify historic properties." Id. at 861-62. In this case, BLM did not make any effort
whatsoever to identify TCPs after having learned of their likely presence in the Project
Area. Instead, despite all the evidence in the Administrative Record to the contrary,
BLM merely stated in the FEIS that "[n]o American Indian Religious sites or traditional
cultural places have been identified within the Planning Area." FEIS at 3-29. The lack
of a reasonable effort to identify TCPs at the stage of RMPA development clearly
violates Section 106.

To justify its failure to comply with Section 106, BLM states that leases in the
Project Area will include stipulations that permit BLM to comply with its NHPA duties at
a later stage of oil and gas development.[10] However, BLM's stipulations do not preserve

---

[10]     With respect to TCPs, the Otero Mesa Lease included the following stipulation:
"This lease may be found to contain historic properties and/or resources protected under
the National Historic Preservation Act . . . . The BLM will not approve any ground
disturbing activities that may affect any such properties or resources until after it

its ability to conduct a full and meaningful Section 106 consultation with respect to TCPs or historic trails later on.

The TCP stipulation does not release BLM from its Section 106 obligations for a number of reasons. Most importantly, by their very nature TCPs are often not amenable to site-specific mitigation measures -- such as the relocation of drilling activities within a lease sale tract -- that can be imposed at the lease sale stage of oil and gas development. TCPs can be very large properties covering literally tens of thousands of acres, and the integrity of the geographic setting of a TCP setting can be essential to maintenance of the property's eligibility for listing on the National Register. See Pueblo of Sandia 50 F.3d at 857 (entire canyon had cultural and religious significance). Oil and gas development on a lease sale tract can have an adverse effect on a TCP that is not located on the lease sale tract but that is within the viewshed or noiseshed of the lease sale tract.[11] Thus, the BLM's TCP stipulation, which only contemplates Section 106 consultation with respect to those TCPs found completely within the lease sale tract, does not protect TCPs that are located only partially on the lease sale tract or that are not within the boundaries of the

---

completes its obligations under applicable requirements of the NHPA and other authorities. The BLM may require modification to exploration or development proposals to protect such properties, or disapprove any activity that is likely to result in adverse effects that cannot be successfully avoided, minimized or mitigated." The lease stipulation concerning historic trails states: "New disturbance will be minimized as follows: (1) No surface-disturbing activities within 0.25 mile from each side of the trails (entire length), (2) Existing disturbance points could be used to cross trails." ROD at 27 & B-6.

[11]   "An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." 36 C.F.R. §800.5(a)(1). One example of an adverse effect is: "Introduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features." 36 C.F.R. §800.5(a)(2)(v).

STATE OF NEW MEXICO'S OPENING CASE BRIEF  -- 51

tract at all. Moreover, BLM may not have retained sufficient discretion to mitigate impacts to TCPs even if they are located entirely within a lease sale tract.

BLM Instruction Memoranda, issued at both the national and state levels, recognize that the unique nature of TCPs requires that Section 106 consultations on TCPs occur at the RMP stage of oil and gas development. A national BLM Instruction Memorandum states: "Because of the scale and sensitivity of some properties of traditional cultural and religious importance to tribes . . . [the RMP stage] is the appropriate stage at which to initiate consultation with tribes regarding concerns that may conflict with one or more of the other land uses under consideration." **St. Exh. 12.** A New Mexico BLM Instruction Memorandum also makes the same point: "In general, the New Mexico BLM will emphasize consultations with Indian Tribes for the purpose of identifying, evaluating, and protecting sacred sites and places of traditional religious or cultural importance (TCPs) at the stages of resource management plan (RMP) formulation or updating." **St. Exh. 13.** Thus, BLM clearly failed to comply with Section 106 because it relinquished its discretion to mitigate impacts to cultural and historic properties before it completed all consultation steps mandated by Section 106 at the RMPA stage.

BLM's violation of Section 106 at the RMPA stage was compounded when it sold the 1600-acre Otero Mesa Lease without conducting a Section 106 consultation. Indeed, BLM's violation of Section 106 at the lease sale stage is even more stark than the RMPA stage violation. In Instruction Memorandum NM-2005-037, BLM concedes that leasing is an "undertaking" that triggers the requirements of Section 106 and that, therefore, the agency "will consult with Indian Tribes that might know of and be concerned regarding

the effects of development upon TCPs or sacred sites." **St. Exh. 13.** Furthermore, the Instruction Memorandum requires BLM to "make a Determination of Effect" as to whether or not development activities on a lease tract will affect National Register-eligible TCPs. **Id.** There is no evidence in the Administrative Record that BLM complied with these affirmative duties. At the lease sale stage, BLM did not contact any Indian tribes to inform them of lease sale plans or to solicit their input and did not make any effort to assess the potential effect of surface-disturbing activities on TCPs. Thus, BLM violated Section 106 at the lease sale stage, as well as the RMPA stage of oil and gas development.

The lease sale stipulation concerning historic trails is flawed in the same manner as the TCP stipulation. The historic trails stipulation imposes an arbitrary prohibition of surface-disturbing activity within 0.25 miles of the trail alignment, except where there is an existing "disturbance point" on the trail. However, as with TCPs, the context and the integrity of the setting of an historic trail is important to its National Register eligibility, and surface-disturbing activities within the vicinity of the trail – even more than 0.25 miles away from the alignment of the trail – can have an adverse effect on the trail. Because the historic trails stipulation does not preserve BLM's discretionary authority to impose all those development restrictions that might be necessary to protect the trails from adverse effects, BLM cannot rely on this stipulation to justify its failure to conduct a Section 106 consultation at the RMPA stage (and at the lease sale stage) of oil and gas development in the project area.

## C. BLM Also Violated Section 110 of NHPA In Connection with Its Approval of the RMPA.

Section 110 of NHPA (16 U.S.C. § 470h-2) requires that all federal agencies undertake an effort to weave historic preservation concerns into the fabric of agency decision-making. In National Trust for Historic Preservation v. Blanck, 938 F.Supp. 908, 922 (D.D.C. 1996), the court held that "[t]he Section 110 Guidelines require the development by agencies of historic preservation plans and list a variety of factors that agencies 'should consider' in establishing such plans and in managing historic properties."[12] In Blanck, the court determined that the Section 110 obligation requires an agency to "engage[] in a deliberate, considered decisionmaking process to assess, consider and plan for the preservation needs" of lands within the agency's management jurisdiction." Id. at 925. In this case, there is no evidence anywhere in the Administrative Record that BLM has engaged in such an effort in the White Sands Resource Area in general, or in the RMPA Project Area specifically. Accordingly, BLM has violated Section 110.

## VII.   BLM'S APPROVALS OF A 1600-ACRE LEASE AND A 3.3 MILE GAS PIPELINE ON THE BENNETT RANCH UNIT ON OTERO MESA VIOLATED NEPA.

### A.   BLM Has Unlawfully Failed to Analyze the Cumulative Impacts of the Anticipated Oil and Gas Development in the Bennett Ranch Unit Area In Connection With the Otero Mesa Lease and the Gas Pipeline on the Unit.

As noted above, the BLM conducted no environmental analysis whatsoever in connection with its approval of the 1600-acre "Otero Mesa Lease" on the BRU. Instead, it issued a "DNA," claiming that no NEPA review was necessary because the lease was consistent with the RMPA and ROD, and therefore was covered by the FEIS for the RMPA. AR 18331-6. A DNA is not a NEPA document. Pennaco Energy, Inc. v. U.S.

--------

[12]   The referenced Section 110 Guidelines are found at 53 Fed.Reg. 4728 (Feb. 17, 1988).

STATE OF NEW MEXICO'S OPENING CASE BRIEF  --  54

Dep't of Interior, 377 F.3d at 1162. Therefore, BLM's argument is that the FEIS for the RMPA contains the requisite "hard look" at the environmental impacts of implementing the 1600-acre lease.

BLM's NEPA review of the proposed gas pipeline to serve wells in the BRU was approved pursuant to an EA and FONSI originally, and a Categorical Exclusion for the expansion from 6" to 8". AR 20052; 20202. The EA for the pipeline addressed the direct physical impacts of constructing the 3.3 miles of pipeline in Texas, as well as the indirect "edge" effects extending 400 meters to either side of the pipeline (unlike the RMPA FEIS which did not analyze these edge effects). AR 20057-8. The EA did not, however, address the impacts of gas development and production from multiple wells that would be served by the pipeline, even though such development is a necessary predicate for operation of the pipeline. Nor did the EA consider construction of the additional twelve miles of pipeline in Texas that would be necessary to connect the new pipeline to an existing pipeline. AR 17496.

Contrary to BLM's assertion in the Otero Mesa Lease DNA, the RMPA FEIS did not analyze the impacts of the lease and the anticipated gas and oil development on the lease. The RMPA FEIS contains virtually no information that would inform the public as to the particular environmental impacts associated with oil and gas development on the lease. See Montana Wilderness Ass'n v. Fry, 310 F.Supp. 2d at 1145-6 (RMP EIS did not adequately analyze impacts of oil and gas lease sale). Unlike the lease considered in Park County Resource Council v. USDA, gas and oil development on the Otero Mesa Lease is not an unlikely outcome; it is a virtual certainty. 817 F.2d at 623 (court notes that NEPA segmentation argument "would have more force in this context if full field

development were likely to occur and could be specifically described at the leasing stage").

BLM has repeatedly emphasized that the BRU area is the most likely place for development of all of the gas and oil wells anticipated in the RFD. AR 2518; 15496; FWS AR 45, 152; FEIS A-8. HEYCO has been even more emphatic, claiming at times that it would develop more than thirty wells the BRU area (AR 20204) and expanding its original proposed gas line from a 6" line that would serve 5-6 producing wells to an 8" line that would serve nearly twice as many wells and would be the "backbone" for the gas field. AR 20179. Not only is HEYCO's high-producing well 1-Y located within a mile of the Otero Mesa Lease, but HEYCO bid for the new lease after obtaining the results of 3-D seismic exploration, which provided HEYCO with substantial information about the nature of oil and gas deposits there. **AR 18342a.**

With HEYCO's successful bid on the Otero Mesa Lease, HEYCO now owns all oil and gas leases on the BRU. AR 20168. It is ready to move ahead on commercial development of the proven reserves there, as soon as this litigation is completed. Yet, remarkably, **BLM still has never done any environmental review of oil and gas development on the BRU and the surrounding area, even though the BRU area is one of the most sensitive and vulnerable parts of Otero Mesa and even though everyone knows that is the location where major development will definitely occur.** The FEIS's only mention of the BRU is a sentence in the RFD noting that the BRU area is the most likely location for oil and gas development. FEIS at A-8. The FEIS contains no environmental analysis directly relevant to the BRU.

BLM's NEPA analyses of each action taken by HEYCO in furtherance of its oil and gas development of the BRU is a classic case of an agency putting on blinders and chopping up an action into little bits and reviewing each bit, without ever considering the whole undertaking. BLM did this for the 3-D seismic exploration, the two well APDs (wells #1-Y and 25-1), both the original and the expanded gas pipeline, flaring of gas at wells #1-Y and 25-1, and now the Otero Mesa Lease. In each case, BLM considered only the precise physical action proposed, without considering how that action interrelated with other actions and the bigger picture. AR 17568; 18823; 20052; 20071; 20218; **St. Exh. 10**. For the gas pipeline, BLM did not even consider the parts of the pipeline that would have to be built in Texas in order for the pipeline to operate. The ironic result is that, notwithstanding the BLM's six years of review and the resulting mountain of documents, BLM still has never done an environmental analysis of likely adverse impacts to the key environmentally sensitive area in which most or all oil and gas development is expected to occur. BLM's failure is stunning.

Thus, not only did BLM fail to take a "hard look" at the direct impacts of the Otero Mesa Lease, it failed to analyze the indirect and cumulative impacts of the lease. 40 C.F.R. § 1508.7; see **AR 18453-61; 18463-4a-d; 18536-57; 18771-808**. The Otero Mesa Lease DNA, in conducting no cumulative impacts analysis, relies on the RMPA FEIS for its cumulative impacts analysis. The RMPA FEIS, however, contains only three uninformative pages on cumulative impacts, which are devoid of any meaningful analysis. FEIS at 4-61-4. Instead, it claims that the required cumulative impacts analysis will be provided in subsequent environmental analyses, including for leases:

> Past, present, and potential reasonably foreseeable future actions are addressed
> generally here and subsequent actions, such as lease nominations and APDs, will
> be reviewed and evaluated to ensure compliance with NEPA.

FEIS at 4-61.  Obviously, BLM did no cumulative impacts analysis in connection with

the new lease, even though there was every reason to take that opportunity to analyze the

impacts of full oil and gas field development in the BRU area.

Nor did BLM conduct any cumulative impact analysis in connection with the

pipeline expansion.  The EA for the 6" pipeline contains three substance-free paragraphs

(AR 20059) that do not address full development of oil and gas in the BRU area, even

though such development would have to occur for the pipeline to have any use, and

would certainly qualify as "reasonably foreseeable."  As the court stated in Klamath-

Siskiyou Wildlands Center v. BLM, 387 F.3d 989, 994-5 (9th Cir. 2004), "[a] proper

consideration of the cumulative impacts of a project requires some quantified or detailed

information; general statements about possible effects and some risk do not constitute a

hard look absent a justification regarding why more definitive information could not be

provided." (internal quotes and citations omitted).  See NRDC v. USFS, 421 F. 3d at 814-

6  (Forest plan's cumulative impacts analysis inadequate due to failure to consider

impacts of reasonably foreseeable related actions).

Full oil and gas field development in the BRU area is "reasonably foreseeable" by

any measure.  BLM's failure to analyze the impacts of development of the BRU area in

connection with either the RMPA, the Otero Mesa Lease, or the BRU gas pipeline,

clearly violates NEPA.  See Kern v. BLM, supra (inadequate analysis of cumulative

impacts renders EIS for RMP legally inadequate); Klamath-Siskiyou, 387 F.3d at 997-8

(where timber sale EAs were tiered to RMP EIS, cumulative impacts were not adequately

addressed in either EAs or EIS because analysis was too general and was "devoid of specific, reasoned conclusions"); Sierra Club v. Peterson, 717 F.2d 1409, 1414-5 (D.C. Cir. 1983) (NEPA requires agency to analyze direct, indirect and cumulative environmental impacts at the oil and gas leasing stage).

**B. The Otero Mesa Lease, the Gas Pipeline, and the Gas Flaring at Wells 1-Y and 25-1 Are Connected Actions That Must Be Analyzed in a Single Environmental Document.**

The gas pipeline, gas flaring, and new Otero Mesa Lease are all connected actions that should be analyzed in one NEPA document, rather than being reviewed in separate NEPA documents, none of which mentions any of the others. These actions constitute "cumulative actions" that when viewed together, "have cumulative significant impacts and should therefore be discussed in the same impact statement." 40 C.F.R. § 1508.25(a)(3). They are "interdependent parts of a larger action and depend on the larger action for their justification," and the gas pipeline "[c]annot or will not proceed unless other actions [i.e., development of producing gas wells on the BRU] are taken previously or simultaneously." Id.; see Park County, 817 F.2d at 623 (actions should be analyzed in same EIS where they are "so interdependent that it would be unwise or irrational to complete one without the others"); Airport Neighbors Alliance, Inc. v. United States, 90 F.3d 426, 430 (10th Cir. 1996) (same); Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1215 (9th Cir. 1998) (agency must prepare EIS on five timber sales because the projects were "part of a coordinated . . . recovery strategy"). Therefore, they must be analyzed in a single NEPA document.

## CONCLUSION

For all the reasons stated herein, the State of New Mexico respectfully requests that the Court enter judgment in their favor on all claims in Case No. 05-460, set aside the RMPA ROD and FEIS, and enjoin all actions by BLM in furtherance of the RMPA.

Respectfully submitted this **17** day of October, 2005.

_____
Alletta Belin
Steven Sugarman
Special Assistant Attorneys General
BELIN & SUGARMAN
618 Paseo de Peralta
Santa Fe, New Mexico  87501
Ph:  505-983-8936
Fax:  505-983-0036

PATRICIA A. MADRID, ATTORNEY GENERAL

_____
Stephen R. Farris
Frances C. Bassett
Assistant Attorneys General
P.O. Drawer 1508
Santa Fe, New Mexico  87504-1508
Ph:  505-827-6010
Fax:  505-827-4440

Attorneys for State of New Mexico *ex rel.*
Governor Bill Richardson; Attorney General
Patricia Madrid; New Mexico Energy, Minerals
& Natural Resources Department; New Mexico
Department of Game & Fish; New Mexico
Environment Department; and Katherine Slick

## CERTIFICATE OF SERVICE

I hereby certify that on October 17, 2005, copies of the foregoing pleading were served by U.S. mail on the following counsel of record:

Andrew A. Smith
U.S. Department of Justice
Environment & Natural Resources Division
c/o U.S. Attorney's Office
P.O. Box 607
Albuquerque, NM 87103

Alison Roberts, Esq.
William Perry Pendley, Esq.
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, Colorado 80227

Patrick J. Rogers, Esq.
Earl E. DeBrine, Jr., Esq.
Modrall, Sperling, Roehl, Harris & Sisk, P.A.
500 Fourth St. NW
Albuquerque, NM 87103-2168

Jason Bowles
Bowles & Crow
600 Central SW, Ste. 111
Albuquerque, NM 87102

Robert A. Stranahan, IV
Katherine M. Moss
Christopher G. Schatzman
New Mexico State Land Office
310 Old Santa Fe Trail
P.O. Box 1148

James S. Angell
Earthjustice
1400 Glenarm Place #300
Denver, CO 80202

David L. Plotsky
122 Girard Ave., SE
Albuquerque, NM 87106

Alletta Belin