# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| THE STATE OF NEW MEXICO ex rel. | ) | |
| GOVERNOR BILL RICHARDSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civ. No. 05-0460 BB/RHS and |
| | ) | |
| BUREAU OF LAND MANAGEMENT, et al., | ) | |
| | ) | |
| Federal Defendants. | ) | |
| | ) | |
| NEW MEXICO WILDERNESS ALLIANCE, | ) | |
| et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civ. No. 05-0588 BB/RHS (cons.) |
| | ) | |
| LINDA RUNDELL, et al., | ) | |
| | ) | |
| Federal Defendants. | ) | |
| | ) | |

## FEDERAL DEFENDANTS' RESPONSE TO STATE PLAINTIFFS'

## OCTOBER 17, 2005 "OPENING CASE BRIEF" [DOC. NO. 59]

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

**TABLE OF ACRONYMS AND ABBREVIATIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . viii

**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**BACKGROUND AND STANDARD AND SCOPE OF REVIEW** . . . . . . . . . . . . . . . . . . . 6

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**I.    A SUPPLEMENTAL DRAFT EIS WAS NOT REQUIRED** . . . . . . . . . . . . . . . . . . 6

    **A.    Modification Of Alternative A Was Not A Substantial Change** . . . . . . . . . . 6

        **1.    Habitat Fragmentation Effects** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        **2.    Other Modifications To Alternative A** . . . . . . . . . . . . . . . . . . . . . . . . 15

    **B.    Allowing And Considering Public Input On The Final EIS Before Issuing The ROD FulFilled The Purpose Of A Supplemental Draft EIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**II.    THE DRAFT EIS AND FINAL EIS FOR THE RMPA REASONABLY ANALYZE RELEVANT POTENTIAL ENVIRONMENTAL IMPACTS** . . . . . . . 23

    **A.    Salt Basin Aquifer** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    **B.    Habitat Fragmentation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    **C.    Seismic Exploration** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    **D.    Grasslands Reclamation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**III.    THE RMPA IS CONSISTENT WITH ALL RELEVANT STATE PLANS, POLICIES, AND PROGRAMS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    **A.    Consistency With State Plans** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

        **1.    State Water Plan And Executive Order** . . . . . . . . . . . . . . . . . . . . . . 33

        **2.    Wildlife Plans** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

        3.     **Weed Control Statute And Water Quality Regulations** . . . . . . . . . 37

   B.    **BLM Director's Discretionary Review Of The Governor's Plan** . . . . . . . . 39

**IV.**   **BLM WAS NOT REQUIRED TO CIRCULATE THE GOVERNOR'S PLAN FOR PUBLIC COMMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**V.**   **BLM COMPLIED WITH THE NHPA IN APPROVING THE RMPA AND THE BENNETT RANCH UNIT LEASE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

   A.    **The National Historic Preservation Act** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

   B.    **BLM's Phased Consultation Approach Complies With Section 106** . . . . . . 45

        1.     **Phased Consultation In Land Management Planning Is A Rational Approach For Compliance With The NHPA** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

        2.     **BLM Consulted With The Tribes Prior To Issuing The ROD And Prior To Offering The Lease For The Bennett Ranch Unit Parcel** . . . . . . . . . . . . . . . . . . . 48

   C.    **BLM Is In Compliance With Section 110 Of The NHPA** . . . . . . . . . . . . . . 51

**VI.**  **THE BENNETT RANCH UNIT LEASE SALE AND GAS PIPELINE CONSTRUCTION WERE APPROVED IN ACCORDANCE WITH NEPA** . . . . . 53

   A.    **Plaintiffs' Challenges To The Lease Are Not Ripe** . . . . . . . . . . . . . . . . . . . 53

   B.    **Plaintiffs' NEPA Challenges To The BRU Lease Are Without Merit** . . . . . 55

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

## TABLE OF AUTHORITIES

**FEDERAL CASES**

Airport Neighbors Alliance v. Norton,
    90 F.3d 426 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 59

Apache Survival Coalition v. United States,
    21 F.3d 895 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Arizona Cattle Growers Assn. v. Cartwright,
    29 F. Supp.2d 1100 (D. Az. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Auer v. Robbins,
    519 U.S. 452 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Bar MK Ranches v. Yuetter,
    994 F.2d 735 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 30

Burke v. Board of Governors,
    940 F.2d 1360 (10th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

California v. Watt,
    683 F.2d 1253 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

California v. Watt,
    464 U.S. 312 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

City of Carmel-By-The-Sea v. U.S. Dept. of Transp.,
    123 F.3d 1142 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Colorado Environmental Coalition v. Dombeck,
    185 F.3d 1162 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16

Dubois v. U.S. Dept. of Agriculture,
    102 F.3d 1273 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Friends of the Bow v. Thompson,
    124 F.3d 1210 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Marsh v. Oregon Natural Resources Council,
    490 U.S. 360 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-7, 11

Morris County Trust for Historic Preservation v. Pierce,
    14 F.2d 271 (3d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,
    463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

National Indian Youth Council v. Watt,
    664 F.2d 220 (10th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

National Trust for Historic Preservation v. Blanck,
    938 F. Supp. 908 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51-52

National Wildlife Fed. v. Burford,
    871 F.2d 849 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Norton v. Southern Utah Wilderness Assn.,
    542 U.S. 55 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Okanagan Highlands Alliance v. Williams,
    236 F.3d 468 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Oregon Environmental Council v. Kunzman,
    817 F.2d 484 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Park County Resource Council, Inc. v. U.S. Dept. of Agriculture,
    817 F.2d 609 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . 5, 29, 51, 55-56, 58-59

Pennaco Energy, Inc. v. U.S. Dept. of the Interior,
    377 F.3d 1147 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57-58

Pueblo of Sandia v. United States,
    50 F.3d 856 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Robertson v. Methow Valley Citizens Council,
    490 U.S. 332 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Sierra Club v. Froehlke,
    816 F.2d 205 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

South Dakota v. Andrus,
    614 F.2d 1190 (8th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Southern Utah Wilderness Alliance v. Norton,
        277 F. Supp.2d 1169 (D. Utah 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

State of California v. Block,
        690 F.2d 753 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-18

Thomas Jefferson Univ. v. Shalala,
        512 U.S. 504 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Tribal Village of Akutan v. Hodel,
        869 F.2d 1185 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

United States v. 162.20 Acres,
        639 F.2d 299 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Village of Los Ranchos de Albuquerque v. Marsh,
        956 F.3d 970 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Weinberger v. Catholic Action Project,
        454 U.S. 139 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Western Radio Services v. Espy,
        79 F.3d 896 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Wyoming Outdoor Council v. Forest Service,
        165 F.3d 43 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 53, 54

## FEDERAL STATUTES

Administrative Procedure Act ("APA")

        5 U.S.C. § 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

        5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Federal Land Management and Policy Act ("FLPMA")

        43 U.S.C. § 1712(c)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 41

Federal Onshore Oil and Gas Leasing Reform Act of 1987 ("FOOGLRA")

    30 U.S.C. § 226(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

National Environmental Policy Act ("NEPA")

    42 U.S.C. § 4332(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

National Historic Preservation Act ("NHPA")

    16 U.S.C. § 470, *et seq*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 45

Other Federal Provisions

    16 U.S.C. § 460uu-21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

    43 U.S.C. § 1456(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## **FEDERAL REGULATIONS**

36 C.F.R. § 800.4(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

40 C.F.R. § 1500.2(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

40 C.F.R. § 1502.2(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

40 C.F.R. § 1502.9(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

40 C.F.R. § 1503.4(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

43 C.F.R. § 3120.1-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

43 C.F.R. § 1610.3-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 32

43 C.F.R. § 1610.3-2(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

43 C.F.R. § 1610.3-2(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30-31, 32, 41

43 C.F.R. § 1610.5-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

43 C.F.R. § 3162.3-1(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

**<u>STATE STATUTES</u>**

N.M. Stat. Ann. §§ 76-7D-1 to 77-7D-6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

N.M. Stat. Ann. §§ 77-15-1 to 77-15-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## TABLE OF ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| ACEC | Area of Critical Environmental Concern Designated by BLM |
| ACHP | Advisory Council on Historic Preservation |
| APD | Application for Permit to Drill |
| AR [#] | Administrative Record Citation to Document Page in U.S. Bureau of Land Management Administrative Record, Lodged with the Court on August 31, 2005 (See Doc. No. 42, Exhibit A) |
| BLM | U.S. Department of the Interior Bureau of Land Management |
| BRU | Bennett Ranch Unit |
| DNA | Documentation of Plan Conformance and NEPA Adequacy |
| Doc. No. [#] | Reference to the Court's Docket Number for Particular Filing |
| Draft EIS (or DEIS) | BLM's October 2000 "Draft Resource Management Plan Amendment and Environmental Impact Statement for Federal Fluid Minerals Leasing and Development in Sierra and Otero Counties," AR 10687 |
| EIS | Environmental Impact Statement |
| Final EIS (or FEIS) | BLM's December 2003 "Proposed Resource Management Plan Amendment and Final Environmental Impact Statement for Federal Fluid Minerals Leasing and Development in Sierra and Otero Counties," AR 14606 |
| FLPMA | Federal Land Management and Policy Act |
| FOOGLRA | Federal Onshore Oil and Gas Leasing Reform Act of 1987 |
| FWS | U.S. Department of the Interior Fish and Wildlife Service |
| FWS AR [#] | Administrative Record Citation to Document Page in U.S. Fish and Wildlife Service Administrative Record, Lodged with the Court on August 31, 2005 (See Doc. No. 42, Exhibit B) |
| HEYCO | Harvey E. Yates Company |
| IBLA | Interior Board of Land Appeals |

| | |
|---|---|
| NCA | National Conservation Area |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| NMDGF | New Mexico Department of Game and Fish |
| NMOCD | New Mexico Oil Conservation Division |
| NSO | No Surface Occupancy |
| Planning Area | Area of BLM Surface and Sub-Surface Jurisdiction Covered by RMPA |
| Pls. Br. | The State of New Mexico Plaintiffs' October 17, 2005 "Opening Case Brief," Doc. No. 59 |
| RFD | Reasonable Foreseeable Development |
| RMP | BLM's 1986 Resource Management Plan for Sierra and Otero Counties |
| RMPA | BLM's January 2005 "Resource Management Plan Amendment for Federal Fluid Minerals Leasing and Development in Sierra and Otero Counties," AR 18151 |
| ROD | BLM's January 2005 "Record of Decision and Resource Management Plan Amendment for Federal Fluid Minerals Leasing and Development in Sierra and Otero Counties," AR 18151 |
| SAR [#] | Administrative Record Citation to Document in U.S. Bureau of Land Management Supplemental Administrative Record, Lodged with the Court on or about December 14, 2005 |
| SEIS | Supplemental Environmental Impact Statement (or Supplemental EIS) |
| Supp. FEIS | BLM's May 2004 "Supplement to Proposed Resource Management Plan Amendment and Final Environmental Impact Statement for Federal Fluid Minerals Leasing and Development in Sierra and Otero Counties," AR 17096 |
| St. Exh. [#] | Exhibits Attached to State of New Mexico Plaintiffs' October 17, 2005 "Motion to Supplement Administrative Record" [Doc. No. 58] |
| TCP | Traditional Cultural Property |

Federal Defendants respectfully respond to the State of New Mexico Plaintiffs' October 17, 2005 "Opening Case Brief" [Doc. No. 59] as follows:

## INTRODUCTION

The Record of Decision ("ROD") adopting the Resource Management Plan Amendment ("RMPA") that Plaintiffs challenge in this litigation does not cause adverse effects to the environment or cultural resources. The RMPA does not authorize any oil and gas development, nor does it give any party permission to undertake any ground-disturbing activity. As the Supreme Court recently explained, Bureau of Land Management ("BLM") management plans "are a preliminary step in the overall process of managing public lands" and approval of such a plan is "a policy determination, not an implementation decision." Norton v. Southern Utah Wilderness Assn., 542 U.S. 55, 69-70 (2004). Instead of authorizing ground-disturbing activities, the RMPA simply amends BLM's Resource Management Plan ("RMP") for Sierra and Otero Counties, placing additional restrictions on future-- but as of yet unknown--oil and gas developments. Before any new implementation activity may occur under the RMPA, BLM must identify an acceptable area to lease, offer the lease for bidding by the public, award the lease to the high bidder, review an Application for Permit to Drill ("APD") from the lessee, and then--if BLM finds the proposal acceptable--approve and issue the permit. Only after a permit is issued may the lessee construct wells and take associated actions disturbing federal lands.

Because the location and precise nature of specific oil and gas development activities are not known until the lessee proposes them in an APD--and, indeed, often never occur even after leases are issued--the analysis of potential environmental and cultural resource effects at the RMPA adoption stage is necessarily based on only *potential* future actions, and hence is a broader and more general assessment than can be completed when specific proposals for ground-disturbing activities are made.

When actual proposed activities are subsequently presented in an APD, BLM is armed with information sufficient to assess specifically how those activities may affect environmental and cultural resources, as well as how those effects can and should be mitigated. Because of the considerable distance between adoption of an RMPA and approval of an APD, context is key in reviewing BLM's compliance with federal law in making these distinct administrative determinations.

Plaintiffs fail to acknowledge the context under which they bring their challenges to the RMPA, and this failure flaws their legal arguments under the National Environmental Policy Act ("NEPA"), the Federal Land Management and Policy Act ("FLPMA"), and the National Historic Preservation Act ("NHPA"). For example, Plaintiffs repeatedly and mistakenly assert that the RMPA will have deleterious environmental effects because it "opens" Otero Mesa grasslands to oil and gas development, when in fact the RMPA does not authorize a single project on Otero Mesa and serves only to *close* Otero Mesa lands to oil and gas development. When BLM approved the pre-Amendment RMP in 1986, it exercised its discretion to close 14,838 acres of the overall Planning Area to oil and gas leasing. ROD at 6. The RMPA, however, modifies the RMP to discretionarily close 65,887 acres to leasing, including--at the Governor's suggestion--35,790 acres of the more pristine Nutt and Otero Mesa desert grassland habitat. Id. at 1, 3, 6. And, on lands that remain open to leasing, the RMPA imposes a "no surface occupancy" stipulation on 40,526 acres and "controlled surface use" stipulations on an additional 484,135 acres, compared to only 9,911 acres subject to a "no surface occupancy" stipulation and *zero* acres subject to "controlled surface use" stipulations under the pre-Amendment RMP. Id. at 6. The RMPA did not open a single acre to oil and gas leasing as Plaintiffs assert, but instead closed an additional 51,049 acres and to add significant restrictions (in the form of mandatory stipulations) to oil and gas leasing on another 514,750 acres--

-2-

closures and restrictions that apply to every acre of the Otero Mesa and Nutt grasslands.

Plaintiffs also ignore that the RMPA places a 1,589-acre "cap" on the total amount of surface disturbance under the RMP.  ROD at 7.  This acreage, which represents the "Reasonable Foreseeable Development" ("RFD") that BLM predicts may occur over the next 20 years in the two-county Planning Area, see ROD at 6, represents 0.076 percent of the 2.1-million-acre Planning Area and only 1.5 percent of the Otero Mesa grasslands that remain open for leasing.  Supp. FEIS at 15.  Moreover, leases that may be issued for areas in the Nutt and Otero Mesa grassland habitats are subject to the additional stipulations that multiple leases must be consolidated into "units" before development may occur and that only 5 percent of the leased areas in the units may be disturbed at any one time. ROD at 4.  In conjunction, the closure of 35,790 acres of Nutt and Otero Mesa grassland areas, the 1,589-acre limit on surface disturbance, the unitization and 5 percent stipulations, and additional restrictions that BLM will impose during development of leases and in approving APDs will greatly reduce the amount of potential effects from oil and gas development under the RMP as amended-- even if all of this hypothetical development were to occur in the grasslands.

When viewed in this proper context, the procedures that BLM followed under NEPA, FLPMA, and the NHPA before adopting the RMPA were eminently reasonable for reviewing the potential environmental and other effects that may occur under a plan-level decision and for disclosing those effects to the public for comment.  BLM responded to public comment on the Draft Environmental Impact Statement ("Draft EIS") by modifying its proposed "Alternative A" to better meet the management objective of the Amendment to allow limited oil and gas development to occur in an environmentally sensitive manner.  Because "Alternative A Modified" as analyzed in the Final EIS did not substantially alter anticipated environmental effects, BLM reasonably determined

that it was not required to prepare a supplemental Draft EIS for public comment.  Nonetheless, BLM

did afford the public an opportunity to comment on the Final EIS and the changes to Alternative A

through a Supplement to the Final EIS, and the agency reviewed and addressed those comments

before issuing the ROD.  Moreover, given the uncertainty of whether, when, and where activities may

occur under the RMPA, BLM's analysis and presentation of potential environmental impacts from

Alternative A Modified on underground aquifers, habitat fragmentation, and reclamation was more

than sufficient to meet the goals of NEPA.

BLM's review of the Governor's "consistency determination" under FLPMA was equally

thorough, probing, and thoughtful at both the BLM State and National levels.  As BLM reasonably

determined, the Governor did not identify any actual inconsistencies with State laws, plans, or

policies, and the Governor's proposed plan did not differ significantly from any of the proposals set

before the public in BLM's NEPA documents.  BLM therefore appropriately adopted Alternative A

Modified in lieu of the Governor's plan in compliance with FLPMA.

BLM also complied with the NHPA in adopting the RMPA.  BLM sought input from all

Indian Tribes with interests in the two-county area, and none of these Tribes identified any specific

cultural properties that might be affected under the RMPA that could not be addressed when project-

level APD decisions were approved.  BLM further insured that cultural resources could be protected

at the APD stage by adding a stipulation for all future leases under the RMPA that retains BLM's

discretion to modify or disapprove any activity proposed in an APD that is likely to result in adverse

effects to historic properties and resources.  ROD at 27.  Because the actual location of future oil and

gas developments is not known when BLM adopts an RMPA, BLM rationally deferred additional and

more detailed NHPA consultations and mitigation measures until the APD stage, at which point

focused site-specific surveys for resources in the development area can be conducted.  In contrast, Plaintiffs' formulation of the NHPA would have BLM engage in a highly impractical exercise and expend massive time and resources by surveying and identifying all cultural resources in the 2.1-million-acre Planning Area, even though only 0.076 percent of those acres might be disturbed during the 20-year life of the RMPA.

As with their challenges to the RMPA, Plaintiffs' claims that BLM violated NEPA and the NHPA in offering and awarding the Bennett Ranch Unit lease ignore the context under which an oil and gas lease is issued.  In accordance with the Tenth Circuit's holdings in Park County Resource Council, Inc. v. U.S. Dept. of Agriculture, 817 F.2d 609 (10th Cir. 1987),[1] because development activities are still unknown and only tentative at the lease stage, BLM properly relied on its Final EIS for the RMPA to authorize the lease sale.  Pursuant to the agency's staged decision-making and analysis for oil and gas development, BLM will conduct a specific assessment of environmental and cultural resource impacts--in satisfaction of both NEPA and the NHPA--if and when specific activities are proposed in an APD for development under the lease.

Through FLPMA and other federal law, Congress has mandated that federal public lands under BLM's jurisdiction be used for multiple purposes, including recreation, wildlife, and oil and gas development.  The discretion of how to balance these often competing and conflicting uses rests with BLM, and the RMPA strikes that balance by allowing limited oil and gas development to occur while doing so in an environmentally sensitive manner.  Over the more than six-year planning process for the RMPA, BLM heavily involved the public in the decision-making process, and the ultimate

---

[1] Overruled on other grounds, Village of Los Ranchos de Albuquerque v. Marsh, 956 F.3d 970 (10th Cir. 1992).

-5-

decision adopting the RMPA responds to and reflects that public participation. The goals of NEPA, FLPMA, and the NHPA are to ensure an informed public and an informed agency decision, and it is difficult to imagine how the BLM could have provided the public a greater or more influential role than it did in the decision-making process that the agency followed in developing the RMPA. Plaintiffs' complaints that BLM did not comply with the mandates of these statutes are without merit and should be denied.

**BACKGROUND AND STANDARD AND SCOPE OF REVIEW**

Because of the overlapping issues between this case and the consolidated case, Civ. No. 05-0588 BB/RHS, in an effort to reduce briefing duplication, Federal Defendants hereby incorporate by reference the "Background" and "Standard and Scope of Review" sections from "Federal Defendants' Response to Wilderness Plaintiffs' October 21, 2005 'Opening Brief' [Doc. No. 65]," which will be filed on or about December 13, 2006, as if fully set forth herein.

**ARGUMENT**

**I.    A SUPPLEMENTAL DRAFT EIS WAS NOT REQUIRED**

**A.    Modification Of Alternative A Was Not A Substantial Change**

A federal agency need not supplement an EIS unless it "makes *substantial* changes in the proposed action that are *relevant to environmental concerns*." 40 C.F.R. § 1502.9(c)(1) (emphasis added). To prevail on their supplemental EIS ("SEIS") claim, Plaintiffs must demonstrate that BLM's decision not to supplement the Draft EIS is "arbitrary and capricious." Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 375 (1989). As the Supreme Court stated, "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decisionmaking intractable, always awaiting updated information only

to find the new information outdated by the time a decision is made." Id. at 373. Accordingly, a SEIS is necessary only "if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or *to a significant extent not already considered*." Id. at 374 (quoting 42 U.S.C. § 4332(C); emphasis added). Thus, "not every new circumstance, however small, requires filing a SEIS; the new circumstance must present a *seriously* different picture of the environmental impact of the proposed project from what was previously envisioned." Sierra Club v. Froehlke, 816 F.2d 205, 210 (5th Cir. 1987).

Plaintiffs fault BLM for changing Alternative A from the Draft EIS to "Alternative A Modified" in the Final EIS. Pls. Br. at 21-33. However, not only is change acceptable under NEPA, it is precisely the type of responsive agency decision-making that NEPA envisions. NEPA does not require that alternatives listed in a Draft EIS remain static through the preparation of the Final EIS, as "the very purpose of a draft and the ensuing comment period is to elicit suggestions and criticisms to enhance the proposed project." City of Carmel-By-The-Sea v. U.S. Dept. of Transp., 123 F.3d 1142, 1156 (9th Cir. 1997). Indeed, when preparing the Final EIS, the agency must respond to comments on a Draft EIS in one of several ways, including by "modify[ing] alternatives including the proposed action" and by "develop[ing] and evaluat[ing] alternatives not previously given serious consideration by the agency." 40 C.F.R. § 1503.4(a). Consistent with these mandates, BLM responded to comments and information during the development of the Final EIS by modifying Alternative A to better balance reasonable oil and gas development with environmental protection.

### 1.    Habitat Fragmentation Effects

Plaintiffs' argument focuses on a single provision of Alternative A in the Draft EIS that would have required a "No Surface Occupancy" ("NSO") stipulation in the Otero Mesa and Nutt grassland

habitat areas greater than 150 meters from existing roads.  Pls. Br. at 25.  In the Final EIS, this provision was modified to a "Controlled Surface Use" stipulation, requiring leases to be joined into "units" and limiting surface disturbance to 5 percent at any one time.  FEIS at 2-27, D-10.  Plaintiffs contend that this modification will increase habitat fragmentation in the desert grassland areas.  Pls. Br. 25-31.  BLM, however, looked at this issue and concluded that Alternative A Modified would not significantly change the potential for habitat fragmentation.

The intent of the NSO stipulation was "to protect remaining desert grassland habitat from further degradation," DEIS at 4-36, but it did not portend to eliminate the possibility of new roads or pipelines being created in these areas, or to prevent all potential fragmentation effects.  Instead, the Draft EIS contains detailed discussions of fragmentation concerns, recognizing effects both from construction of roads and pipelines, and from the use of new *and* existing roads.  DEIS at 4-33 to 4-40.  The New Mexico Department of Game and Fish ("NMDGF") applauded this analysis as "an in-depth discussion of the effects of habitat fragmentation on wildlife."  FEIS at G-I-150.  The Draft EIS explains that the NSO stipulation "would help *reduce* adverse effects resulting from new road construction where roads are already in existence," but that the "effectiveness of this stipulation is dependent on the location of the prospective wells relative to existing roads," and fragmentation impacts "associated with increased noise and activity levels would not be reduced."  DEIS at 4-88 (emphasis added).  Thus, Plaintiffs' premises that Alternative A prohibited construction of roads and pipelines and "did not allow such construction and fragmentation to occur," and that "the DEIS failed entirely to analyze the impacts of fragmentation of the grasslands of Otero Mess and Nutt," Pls. Br. at 27, are demonstrably false.

Commenters on the DEIS--including Plaintiffs--agreed with BLM that the NSO stipulation

would not eliminate or reduce all potential fragmentation effects. For example, Plaintiff NMDGF acknowledged that "[c]umulative direct and indirect effects for big game and other wildlife will occur primarily from habitat fragmentation, *regardless of which alternative is selected*." FEIS at G-I-150 (emphasis added; citing DEIS at 4-110); see also FEIS at G-I-209 (Defenders of Wildlife stating that "[t]he impacts common to all of the alternatives considered would increase habitat loss and fragmentation through the construction of numerous well pads, pipelines, and many miles of new roads"). Plaintiff New Mexico Wilderness Alliance took this view even further, stating that "Alternative A's stipulation of NSO except within [150 meters] of existing roads within the remnant grasslands does not adequately protect these critical areas [from fragmentation effects]." FEIS at G-I-164. Numerous other commenters questioned how existing roads would be identified. See, e.g., FEIS at G-I-164, G-I-143.

While these commenters agreed with BLM's analysis that the NSO stipulation did not eliminate all fragmentation effects, other commenters indicated that the NSO stipulation was unnecessarily restrictive and would severely limit oil and gas development in a Planning Area. A representative from the New Mexico Bureau of Mines and Mineral Resources stated that "[i]n frontier exploration areas such as Sierra and Otero Counties, exploration and initial development must be accomplished through the drilling of vertical, and not horizontal, wells." FEIS at G-I-45. Likewise, HEYCO and other industry representatives emphasized that "oil and gas exploration, development, and production on federal lands, through directional drilling from existing roads, is NOT feasible," and hence the NSO stipulation would have the unintended effect of closing those areas to leasing. FEIS at G-I-9. A representative from Burlington Resources added that BLM's assumption that "industry can directionally drill from existing roads to reach minerals under NSO

stipulated surface in an exploratory scenario" was incorrect because "directional drilling is used to develop fields rather than drilling exploratory wells."  FEIS at G-I-180 to 181.  See also FEIS at G-I-14, G-I-195, G-I-212, G-II-6 to 9, G-II-14 to 15, G-II-30, G-II-39, G-II-64.

Because the intent of the NSO stipulation was not to close all Otero Mesa and Nutt grassland habitat areas to oil and gas development, but rather to allow such development to occur while minimizing adverse environmental impacts, BLM adjusted the stipulation to better accomplish the agency's intent.[2]  BLM therefore modified Alternative A by replacing the NSO stipulation with a Controlled Surface Use stipulation requiring unitization (i.e., consolidation of leases into exploratory units) and limiting disturbance to 5 percent of each such unit.  See FEIS at D-10.  The purpose of the new stipulation remained the same as the purpose of the NSO stipulation: "to protect remnant Chihuahuan Desert grassland habitat and associated special status species of wildlife through greater planning of future oil and gas development."  FEIS at 2-29.

BLM carefully considered whether modification of Alternative A would require a supplemental Draft EIS.  Based on industry practices in other areas, BLM determined that a 5 percent surface disturbance limitation was feasible and would "protect the unique area while developing it in

_____

[2] Plaintiffs allege that BLM's modification of Alternative A between the Draft EIS and Final EIS is "a classic case of 'bait and switch,'" and that the "public" (at least the public supporting Plaintiffs' position) was "sandbagged."  Pls. Br. at 25, 32.  These hyperbolic allegations imply that BLM deliberately and in bad faith withheld its intentions at the Draft EIS stage.  As the discussed above, however, the Administrative Record demonstrates that the idea and decision to modify Alternative A arose only after the Draft EIS was reviewed by the public. While Plaintiffs may have preferred BLM to accept only their suggestions and to turn a deaf ear to development interests, concerns, and ideas, BLM is charged with managing federal public lands under a multiple-use mandate.  BLM's decision to allow limited development to occur under substantial restrictions to protect environmental values is consistent with that mandate and responsive to voices on both sides of the debate.  As the protests to the Final EIS demonstrate, BLM's Alternative A Modified pleased neither side, suggesting that it may have been the best decision after all.

a way that was environmentally responsible" by "co-locating infrastructure, and minimizing road and well pad dimensions." AR 15329. BLM also noted that the environmental benefits of unitization would include fewer well pads, roads, and pipelines, and thus overall less disturbance. AR 15338; see also AR 15329 (noting that unitization would "allow for greater planning" and would "avoid the disturbance that comes from the duplication of wells, pipelines, roads, etc."). In addition, Alternative A Modified also included a proposal to defer leasing on approximately 28,000 acres of the best Otero Mesa habitat. AR 15329-30. BLM concluded that "[t]he combination of these two decisions will protect the Chihuahuan Desert Grassland habitat areas" and would "provide for the level of protection . . . analyzed in the Draft RMPA/EIS." AR 15330-31. Because modification of Alternative A did not change the assessment of environmental effects disclosed in the Draft EIS "to a significant extent not already considered," Marsh, 490 U.S. at 374, BLM reasonably determined that a supplemental Draft EIS was not necessary.

BLM also explained this determination in the Supplement to the Final EIS, which was provided to the public for review and comment. BLM described how unitization and the 5 percent limit would reduce surface disturbance. Supp. FEIS at 14. Applying Best Management Practices ("BMP"), as well as "conditions of approval" developed during the APD review stage, would further reduce "[w]ildlife habitat fragmentation" under Alternative A Modified "by limiting the number of well pads, roads, pipelines, utility corridors, production facilities, and average daily traffic stemming from oil and gas operations." Supp. FEIS Addendum at 1. Indeed, the 1,600 (1,589) acres of surface disturbance anticipated under the RFD during the life of the RMPA was based on "traditional oil field practices," whereas "[a]pplication of current and anticipated new BMPs in combination with the 5 percent maximum disturbance and mandatory unitization stipulation would reduce the 1,600 acre

disturbance area *by at least two-thirds*."  Supp. FEIS Addendum 1-2 (emphasis added).  The Supplement also notes that approximately 36,000 acres of core habitat areas in the Otero Mesa and Nutt grasslands were now being proposed as closed to oil and gas development, providing even greater protections to these areas than the NSO stipulation.  Supp. FEIS at 15.

BLM also recognized that because the analysis of potential environmental impacts was occurring at the RMP-level stage, "there is no assurance that all of the disturbance would occur in the grassland habitat, as the RFD describes projected development over a two county area."  Supp. FEIS at 16.  Taking into account this factor and the limited 1,600 acres of surface disturbance anticipated under the RFD (which was subsequently converted into a "cap" by stipulation in the ROD), and "[b]ecause the amount of disturbance is expected to be so small under either alternative," BLM reasonably determined "that there were no appreciable differences between the impacts of the proposal in the Draft EIS and the Final EIS."  Supp. FEIS at 16.

None of the materials Plaintiffs cite undermine this conclusion.  The U.S. Fish and Wildlife Service ("FWS") notes record nothing more than preliminary discussions concerning Alternative A Modified, and do not reflect an actual assessment of Alternative A Modified or the analyses in the EIS.  Plaintiffs' snippets do not suggest that the change from Alternative A was significant, only that FWS may have had questions about how the 5 percent and unitization stipulation would reduce fragmentation.  Indeed, some of the notes that Plaintiffs suggest are FWS opinions appear to be simply issues raised by Plaintiff New Mexico Wilderness Alliance and other interested parties.  See FWS AR 223 (attendees at meeting memorialized in the notes found at FWS AR 216-22).

The "declaration" of the NMDGF biologist is dated July 19, 2005, see AR 18777, six months after issuance of the ROD, and thus is not part of the Administrative Record for the RMPA decision,

but was submitted with Plaintiffs' protest of the July 2005 Bennett Ranch Unit lease sale.  Even were this declaration properly before the Court on Plaintiffs' supplemental Draft EIS claim, it provides no detailed assessment of the differences between Alternative A and Alternative A Modified as Plaintiffs assert.  The declaration does not even mention the 5 percent, unitization, and 1,600-acre cap stipulations and other measures, or why these measures would or would not protect the Otero Mesa and Nutt grassland habitats in much the same way as the NSO stipulation.  AR 18771-77.  And, even were the declaration not devoid of such a comparison, BLM is entitled to rely on its own expert opinion which actually *explains* the lack of difference between Alternative A and Alternative A Modified in terms of environmental effects.[3]

The BLM biologist's draft habitat fragmentation report also rests on numerous flawed propositions.  Plaintiffs portray the report as a final BLM analysis, but the paper is plainly identified as a "Draft Internal BLM Working Document," AR 15495, indicating that it was never finalized or peer reviewed, and thus does not provide a definitive assessment of potential impacts of the RMPA.  Plaintiffs assert that "no analysis of the fragmentation impacts of the new alternative was provided in the EIS," Pls. Br. at 29, when in fact a discussion of fragmentation effects relating to Alternative A Modified is one of the most extensive sections and mirrors much of the draft fragmentation report.  FEIS 4-32 to 4-39 (discussing fragmentation impacts associated with Alternative A Modified,

---

[3]As the Tenth Circuit has emphasized, a dispute among experts cannot be the basis for overturning federal agency action:

> [T]he fact that Appellants cite an expert who agrees with their position and alleges a lack of analysis is not dispositive.  It merely reflects the crux of their complaint--they disagree with the Forest Service's decision.  Our job is not to question the wisdom of the Forest Service's ultimate decision or its conclusion concerning the magnitude of [environmental] impacts.

Colorado Environmental Coalition v. Dombeck, 185 F.3d 1162, 1176-77 (10th Cir. 1999).

including indirect and edge effects).  Moreover, the draft fragmentation report does not present any comparison of effects of Alternative A versus Alternative A Modified, but instead assesses the numbers projected in the RFD, *which remained constant throughout the NEPA process*.  The report thus is not relevant to the issue of whether the change in Alternatives triggered a need for a supplemental Draft EIS.

Another flaw is that the draft report is based on assumptions that are not supported by the Administrative Record.  For instance, the report *assumes* that a well field is "a total disturbance area," AR 15497, and based on this flawed assumption calculates that "[t]otal disturbance of 3 RFD fields plus wildcat wells would be 34,436.5 ac. to 36,358.5 ac."  AR 15498.  In fact, the RFD provides a detailed, concrete assessment of potential disturbance that reveals only small portions of the well fields will be disturbed, such that the total disturbance under the RFD will be only 1,589.4 acres, FEIS at 4-3, and far less than that when unitization, the 5 percent disturbance limit, and BMPs are taken into account.  Supp. FEIS Addendum at 1-2; FEIS at A-1 to A-10 (explaining how RFD was calculated).  Not only is the draft report based on a seriously erroneous assumption about surface disturbance levels (which, in turn, results in exaggerated calculations of indirect and edge effects), but it places those effects soley in the Otero Mesa grasslands, even though the Planning Area is actually 2.1 million acres spread over two counties.

The draft fragmentation report was never completed, never adopted by BLM, and contained substantial technical defects on issues that BLM had properly addressed in the Draft and Final EISs. In <u>Friends of the Bow v. Thompson</u>, 124 F.3d 1210, 1218-19 (10th Cir. 1997), the Tenth Circuit rejected a similar supplemental NEPA claim based on a study that was "an internal Forest Service document" that "had substantial technical defects," "was never completed, and was never formally

approved by the agency," and thus was "precisely the sort of document the <u>Marsh</u> Court concluded an agency may discount based on its substantial expertise and subsequent consideration of the relevant issues." Plaintiffs have failed to meet their burden of demonstrating that BLM's decision not to produce a supplemental Draft EIS was arbitrary and capricious.

### 2.    Other Modifications To Alternative A

In addition to their fragmentation claim, Plaintiffs assert that Alternative A Modified "reduced or eliminated a number of other environmental protections contained in Alternative A, which changes also will cause increased environmental impacts." Pls. Br. at 31. Plaintiffs' assertion is wrong, as BLM explained that the changes are largely logistical and will result in almost no change in potential impacts. <u>See</u> Supp. FEIS at 12-20.

For example, Plaintiffs assert that "the elimination of stipulations that would restrict surface disturbance in areas important to particular big game and other sensitive wildlife species." Pls. Br. at 31. In the Draft EIS, Alternative A included a stipulation of Controlled Surface Use to protect habitat for big game species. Draft EIS at 2-25 and A-VI-24. This stipulation, however, only required that "[e]ach exploration and development project [when proposed in an APD] will be scrutinized carefully for potential effects on species and habitat" and that "[n]ew disturbance will be minimized to reduce loss, fragmentation of, and edge effect in the habitat (e.g., use of existing roads and utility corridors; minimization of cross-country placement of roads and utility corridors, pipelines, and other rights-of-way)." Draft EIS at A-VI-24. As BLM explained, this stipulation served only to identify an objective and "did not provide industry any more than a general indication that they should minimize new disturbances in much of the planning area in response to the objective of protecting habitat for big game species." Supp. FEIS at 13. Because "any necessary modifications

-15-

[for this big game habitat objective] can be applied in the form of Conditions of Approval" at the APD stage, the resulting protections will be the same even under standard lease terms and conditions as set forth in Alternative A Modified.  Supp. FEIS at 13.  "Therefore, there is no change to the impacts of the big game habitat areas associated with oil and gas leasing and development."  Supp. FEIS at 14.

BLM addressed each modification to Alternative A, explaining why none constituted a substantial change in terms of actual environmental impacts.  Supp. FEIS at 12-20.  Nonetheless, because acreages involved are so large (for instance, the Big Game Habitat Areas covers almost 1.2 million acres), portraying the acreages changed from "Controlled Surface Use" to standard lease terms and other such nominal modifications can appear misleadingly substantial when presented in isolation, as Plaintiffs have done.  See Pls. Exh. A.  As discussed in the Supplement to the Final EIS, however, any such change is illusory, and will not result in a significant change in environmental impacts once the RMPA is implemented through project-level decisions.

In sum, BLM rationally concluded that the potential impacts of Alternative A and Alternative A Modified were not "seriously different."  The Tenth Circuit has held that a federal court "must uphold the [federal agency's] decision to forego a supplemental environmental impact statement so long as the record demonstrates the [federal agency] reviewed the proffered supplemental information, evaluated the significance--or lack of significance--of the new information, and provided an explanation for its decision not to supplement the existing analysis."  Colorado Environmental Coalition v. Dombeck, 185 F.3d 1162, 1178 (10th Cir. 1999).  BLM evaluated the significance of the potential change in environmental impacts, and explained its reasoning for not producing a supplemental Draft EIS.  Plaintiffs cannot establish that BLM's decision was arbitrary and capricious.

-16-

Finding no support in Tenth Circuit case law, Plaintiffs turn to other circuits, but none of these cases provide persuasive authority for Plaintiffs' supplementation claim.  In Dubois v. U.S. Dept. of Agriculture, 102 F.3d 1273, 1291-93 (1st Cir. 1996), the Forest Service was required to supplement a Draft EIS because a new alternative in the Final EIS for expansion of a ski area authorized ground-disturbing activities that were not presented in other alternatives--widening ski trails; building a 28,500-square-foot lodge; developing ski trails, access roads, and lifts on land in a woodland buffer; and requiring four million gallons more water annually for snowmaking.  In contrast, as a plan-level decision, Alternative A Modified does not authorize *any* ground-disturbing activities and modified Alternative A in ways that would not qualitatively change the potential impacts of future oil and gas developments under the RMPA.  See Dubois, 102 F.3d at 1292 (stating that "an additional alternative that has not been disseminated previously in a Draft EIS may be adopted in a Final EIS, without further public comment, only if it is 'qualitatively within the spectrum of alternatives that were discussed' in the prior draft") (quoting CEQ's Forty Questions #29b).

Plaintiffs' reliance on State of California v. Block, 690 F.2d 753, 769-72 (9th Cir. 1982), is misplaced because the court did not conduct its review under the deferential "arbitrary and capricious" standard articulated by the Supreme Court in Marsh.  Applying the wrong standard of review, the Block court made its own determination of the significance of the change in alternatives and did not assess whether the agency's determination was reasonable.  Because the court substituted its assessment of the significance on the change in alternatives for that of the agency, the Block court's assessment of the facts  is not persuasive authority on whether a federal agency should supplement an EIS.  See  Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). (holding that "a court is not to substitute its judgment for that of the agency").

Moreover, <u>Block</u> is distinguishable because the court found that the Forest Service's decision to designate 62 million acres of roadless areas as either "wilderness," "nonwilderness," or "future planning" would have real environmental consequences.  <u>Id</u>. at 762.  Thus, because the new alternative's "allocation [of roadless areas] between [sic] the three designated categories differed substantially from the allocation percentages generated by the alternatives considered in the Draft EIS," and because the formula for applying decisional criteria on how areas should be designated changed significantly, the <u>Block</u> court concluded that "circulation of a draft supplement for public comment was in order."  <u>Id</u>. at 772.[4]  In contrast, BLM's modifications to Alternative A will not significantly change how or which areas might be affected by future oil and gas developments, because BLM retained the same discretion under both Alternatives to address environmental concerns at the leasing and APD stages.

**B.    Allowing And Considering Public Input On The Final EIS Before Issuing The ROD FulFilled The Purpose Of A Supplemental Draft EIS**

Plaintiffs complain that the changes to Alternative A were never clearly identified in the Final EIS, that the potential environmental effects of Alternative A Modified were never analyzed in the Final EIS, and that the public therefore never had an opportunity to provide input on Alternative A Modified, thereby thwarting the purposes of NEPA.  <u>See, e.g.</u>, Pls. Br. at 32.  These complaints have no merit and, in fact, demonstrate that even if this Court determines that BLM should have produced a supplemental Draft EIS, it accomplished the equivalent of that process by

---

[4] Because the <u>Block</u> court failed to apply the "arbitrary and capricious" standard, it reached its own conclusions as to the significance of these changes, and did not address whether the Forest Service's conclusions on significance were also reasonable, as it should have.  <u>Compare</u> <u>National Wildlife Fed. v. Burford</u>, 871 F.2d 849, 855 (9th Cir. 1989) (holding that under the arbitrary and capricious standard the agency's determination "need be only a reasonable, not the best or most reasonable, decision").

-18-

obtaining public review of the Final EIS and Supplement to the Final EIS, and responding to input from the public in the ROD.

The modifications to Alternative A are identified in simple, bullet format up front in the Final EIS.  FEIS at P-2 to P-3.  All changes between the Draft EIS and Final EIS, including changes resulting from the modifications to Alternative A, are highlighted in **bold** type throughout the Final EIS.  FEIS at P-2.  Chapter 2 lays out the specifics of Alternative A Modified in detail, and compares the provisions of Alternative A Modified to the other alternatives in narratives, tables, and graphs.  FEIS at 2-1 to 2-30.  Appendices C and D provide additional presentations of Alternative A Modified, organized by resource concerns and identify how the Proposed Plan would amend the RMP.  FEIS at C-1 to C-16, D-13.  Alternative A Modified is also displayed graphically through maps.  FEIS, Appx. "Maps" (following Chapter 5).

Chapter 3 of the FEIS sets forth the affected environment which, because there was no change in the areas or resources affected as a result of the modifications to Alternative A, is substantially the same as in the DEIS.  FEIS at 3-1 to 3-40.  Chapter 4 provides an extensive analysis of the potential environmental impacts that could result under the RMPA, with a particular focus Alternative A Modified, "the Proposed Plan."  FEIS at 4-1 to 4-64.  Chapter 5 explains the consultation and coordination processes that BLM followed in developing the Final EIS.  FEIS at 5-1 to 5-9. Chapter 5 also sets out key issues raised in public comments on the Draft EIS, and BLM responds to those comments, including how and why the agency modified Alternative A and what the ramifications of that modification might be.  FEIS at 5-10 to 5-19.  In addition, Volume II of the Final EIS reproduces all public comment letters and hearing transcripts on the Draft EIS, with BLM's responses presented side-by-side.  FEIS Vol. II, Appx. G-I and G-II.

Following publication of this detailed analysis of Alternative A Modified in December 2003, BLM waited until January 2005 to complete the ROD, allowing BLM more than a year to accept public review and input on the Final EIS.  These additional opportunities for public input included a public protest period, a consistency review and proposed plan by the Governor, and an additional public comment period.

During the protest period, BLM received 26 protests from the public, including several from Plaintiffs.  AR 15553-716.[5]  Many of the issues raised in the protests related to changes to Alternative A, fragmentation concerns, and other environmental impacts.  BLM extensively reviewed and assessed these protests, AR 15718-16035, and responded in writing to all substantive protest points on August 13, 2004.  AR 16037-16131.  BLM also received the Governor's "Consistency Review of and Recommended Changes to [the Proposed RMPA and Final EIS]," dated March 5, 2004.  AR 16733.  As discussed below in response to Plaintiffs' FLPMA arguments, BLM expended substantial effort in reviewing the issues and proposals raised by the Governor.

Because several protests and the Governor alleged that the modifications to Alternative A and environmental impacts under Alternative A Modified that were not provided to the public for review in the Draft EIS, BLM issued the Supplement to the Final EIS for public review and comment in May 2004.  The Supplement detailed the changes to Alternative A and why BLM determined that they were not substantial, and it also announced that BLM was considering closing 35,790 acres of the Otero Mesa and Nutt grassland habitat in response to the Governor's recommendation.  Supp. FEIS at 1.  The Supplement extensively references the analysis of Alternative A Modified in

_____

[5] In addition, many of the protests were from industry representatives and other citizens complaining that the proposed RMPA was overly restrictive.  AR 15585-603.

the Final EIS, which had been released to the public, and provides specific page citations covering essentially the entire Final EIS. The Supplement invited the public to comment on these analyses in an official 30-day comment period. Supp. FEIS at 20-21. BLM received and reviewed thousands of comment letters on the FEIS and Supplement. AR 17137.

Further demonstrating its commitment to a meaningful NEPA process, BLM addressed input from the protests, the Governor, and public comment on the Final EIS and Supplement in the ROD by adding protective stipulations, responding to key issues, and clarifying how the RMPA would be implemented. BLM added two new stipulations to further protect environmental and cultural resources. One stipulation turned the 1,589 acres of surface disturbance estimated in the RFD into an absolute cap, clarifying that additional disturbance not authorized under the RMPA. ROD at 7. The other stipulation advised that BLM would not approve any ground disturbing activities proposed in APDs affecting cultural resources until the agency completed it obligations under the NHPA. ROD at 27. The ROD also closes to oil and gas development the 36,000 acres of the "more pristine portions of the Nutt and Otero Mesa desert grassland habitat," as requested by the Governor. ROD at 3. BLM also added a number of mitigation and monitoring commitments to help ensure that the environment is protected consistent with the analysis in the Final EIS. ROD 8-14. In addition to these changes, the ROD summarizes and responds to key issues raised in the comment letters on the Supplement to the Final EIS. ROD at 18-25.

The extensive public review and input that BLM received on the Final EIS and Supplement, and incorporation of that input into meaningful responses and changes to the RMPA in the ROD, accomplished the same goals as publication of a supplemental Draft EIS. The public had extensive opportunities to voice concerns with the proposed RMPA, and BLM took those concerns seriously

in reaching a final decision that fulfills the goals of NEPA.

In reviewing federal agency action under the Administrative Procedure Act ("APA"), federal courts "are limited to determining whether the agency *substantially* complied with statutory and regulatory procedures." Burke v. Board of Governors, 940 F.2d 1360, 1365 (10th Cir. 1991). Moreover, the APA dictates that "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706; Bar MK Ranches v. Yuetter, 994 F.2d 735, 740 (10th Cir. 1993) (applying harmless error test). Here, even if this Court determines that BLM should have produced a supplemental Draft EIS, allowing and reviewing input on the Final EIS through protests, the Governor's review, and an additional public comment period on the Supplement before issuance of the ROD accomplished the same result. Any error was harmless, as BLM at least substantially complied with NEPA procedures and there is no reason to set aside the RMPA. See National Indian Youth Council v. Watt, 664 F.2d 220, 228 (10th Cir. 1981) (holding various NEPA documents, taken together, "adequately inform[ed] the Secretary [of the Interior] of the [mining] project's potential effect on the human environment" and, therefore, there was no "substantial procedural" reason to set aside the Secretary's decision).

The facts and circumstances here are closely analogous to Arizona Cattle Growers Assn. v. Cartwright, 29 F. Supp.2d 1100 (D. Az. 1998). In Cartwright, the plaintiffs claimed that the Forest Service had failed to prepare a supplemental Draft EIS for a Forest Plan Amendment covering 19 million acres of public lands in Arizona and New Mexico. Although alternatives considered in the Draft EIS contained livestock grazing provisions only to protect the Northern goshawk, the Final EIS included new objectives and a new preferred alternative to protect *all* declining species. Id. at 1116. The court concluded that a supplemental Draft EIS was warranted because the new alternative in the

Final EIS constituted a "sea change," since goshawk habitat areas were a mere fraction of the area covered under the new alternative.  Id. at 1116-17.  Nonetheless, the Cartwright court declined to find a NEPA violation, because "[t]he Final EIS allowed extensive additional time for comment, which in turn resulted in additional changes [in the ROD] and insured an informed decision," and thus "no prejudice resulted from any error that may have occurred" from the lack of a supplemental Draft EIS.  Id. at 1117.  As the Forest Service did in Cartwright, BLM here provided the public with meaningful opportunities to influence the agency decision after the Final EIS was issued, even though the changes to Alternative A were far less substantial here.

Although Plaintiffs may disagree with BLM's ultimate decision to meet its multiple-use mandate by allowing the potential for severely limited oil and gas development on Otero Mesa--a balancing decision that rests with the discretion of the agency--Plaintiffs' complaints about the NEPA process ring hollow.  The goals of NEPA were plainly satisfied.  See Weinberger v. Catholic Action Project, 454 U.S. 139, 143 (1981) (stating that the twin aims of NEPA are "to inject environmental considerations into the federal agency's decisionmaking process" and "to inform the public that the [federal] agency has considered environmental concerns in its decisionmaking process").  Potential environmental impacts were disclosed extensively to public, and BLM was informed of the public's concerns and meaningfully responded to those concerns by improving the NEPA documentation *and* by modifying the proposed RMPA.  NEPA demands no more.

## II.   THE DRAFT EIS AND FINAL EIS FOR THE RMPA REASONABLY ANALYZE RELEVANT POTENTIAL ENVIRONMENTAL IMPACTS

Plaintiffs argue that BLM failed to take a "hard look" at the potential environmental impacts of oil and gas development under the proposed RMPA with regard to four issues: 1) contamination

of the Salt Basin Aquifer; 2) habitat fragmentation under Alternative A Modified; 3) the effects of seismic exploration activities; and 4) the notion that disturbed grassland areas can be reclaimed. Pls. Br. at 35-41.  As with Plaintiffs' supplemental Draft EIS arguments, each of these "hard look" arguments is based on flawed premises, and each is refuted by substantial evidence in the Administrative Record.

### A.   Salt Basin Aquifer

Plaintiffs' argument that BLM failed to take a "hard look" at the potential impacts of the proposed RMPA on the Salt Basin aquifer is based on Plaintiffs' allegation that "contamination of the aquifer is a virtual certainty if natural gas is developed in the Salt Basin/Otero Mesa area, because contaminated produced water from the mining will be injected into the aquifer and will contaminate it."  Pls. Br. at 35.  This allegation rests on five documents that Plaintiffs have put into the Administrative Record (three of which post-date the ROD and are not properly part of the Record for Plaintiffs' challenge to the RMPA), that ignore the plain language of the Final EIS.

Plaintiffs' statement that "natural gas" development will lead to injection of contaminants is flawed because "natural gas wells make little water and the water produced can be disposed of through use of evaporation ponds." FEIS at 4-16.  Instead, it is *oil* wells that tend to generate water that--depending on its quality--may be disposed of in various ways, only one of which is through injection wells.  FEIS at 4-16.  The discovery that led to the increased interest in the Planning Area was a gas show, not oil.  FEIS at 1-1.

Nonetheless, because oil development and injection wells are a possibility, BLM analyzed their potential effects on groundwater resources throughout the Planning Area.  Key points, that Plaintiffs overlook, are that the target aquifer for disposal cannot be the source or potential source of drinking

water and must contain water of *poorer* quality than water being injected.  FEIS at 4-16.  Rather than

contaminating the target aquifer, injection wells may degrade *injected* water by mixing it with poorer

quality water in the disposal aquifer.  FEIS at 4-16.

Plaintiffs also complain that the NEPA documents lack any "meaningful" description of the

Salt Basin Aquifer, its significance as a supply of fresh water,[6] or its vulnerability to contamination.

The Final EIS, however, discloses such information, noting for example an increasing need for

groundwater in the Planning Area and that the State Engineer has declared underground water basins

to protect groundwater, including "the area located in southeastern Otero County," which the

referenced map plainly identifies as the Salt Basin aquifer.  FEIS at 3-12; Map 3-6 (FEIS Appx.).  The

FEIS provides specific information concerning the conditions of the aquifers in the Planning Area,

including depths, issues affecting conductivity, and--as Plaintiffs note--that some aquifers in the

Planning Area are considered highly vulnerable to contamination because of their highly fractured

nature.  FEIS at 3-12 to 3-13.  Although Plaintiffs would have the Final EIS provide a highly

technical, incredibly specific description of the Salt Basin aquifer, NEPA contains no such

requirement and, in fact, eschews lengthy, hyper-technical analyses.  See, e.g., 40 C.F.R. § 1500.2(b)

(stating that an EIS "shall be concise, clear, and to the point"); id. § 1502.2(a) (stating that an EIS

"shall be analytic rather than encyclopedic" and that impacts "shall be discussed in proportion to their

significance").  The analysis of groundwater impacts, which are expected to be minimal, was more

---

[6] Although Plaintiffs tout the Salt Basin aquifer as a great, pure water source, the evidence
is not so supportive.  See, e.g., DEIS at C-1 (identifying the Salt Basin aquifer (which at the time was
an "Undeclared Basin") as having high alkalinity, "Saline Water," "High Sulfate, Chloride, and Nitrate
levels," and "impotable water").

than sufficient to alert the public and the decision-maker to the relevant issues[7] and referred the more sophisticated reader to the sources for that analysis.  See Oregon Environmental Council v. Kunzman, 817 F.2d 484, 494 (9th Cir. 1987) (holding that "an EIS must be organized and written so as to be readily understandable by governmental decisionmakers and by interested non-professional laypersons likely to be affected by actions taken under the EIS").

BLM also properly relied on compliance with New Mexico Oil Conservation Division ("NMOCD") and other State oversight and regulations to conclude that groundwater contamination was unlikely to be a concern under the RMPA.  See FEIS at 4-16 to 4-17.  "The fact that the EIS acknowledges that the project will be forced to comply with pollution permitting requirements is not, by itself, arbitrary or capricious."  Okanagan Highlands Alliance v. Williams, 236 F.3d 468, 477 (9th Cir. 2000).  Plaintiffs oddly assert that BLM's conclusion that the State's own agency will require compliance with the legal limits for contamination in New Mexico to be "false" because the agency's regulations do not adequately protect groundwater.  Pls. Br. at 36.  As noted above, however, even were Plaintiffs' slighting of their own regulations accurate,[8] BLM takes a number of its own steps to ensure protection of groundwater resources.

Even though BLM does not anticipate any significant impacts to groundwater because of stringent measures to mitigate these impacts, the Final EIS contains a detailed analysis of potential

---

[7] This conclusion is particularly true at the RMPA stage, where it is unknown precisely where and how actual development might take place.  Moreover, a number of steps are taken at the APD stage to "preclude contamination."  ROD at 23-24.  The steps include using fresh water for drilling holes, and "in areas with scarce data concerning occurrence of fresh water, such as Otero Mesa," running tests before drilling deeper wells "to determine if and where fresh water aquifers occur" so that any additional measures may be taken to protect those aquifers.  Id.

[8] NMOCD recently developed new regulations that will allow injection of produced water on Otero Mesa only after compliance with stringent requirements to protect the aquifer.

effects on groundwater, including the Salt Basin aquifer. BLM took the requisite "hard look" at groundwater resources.

### B.    Habitat Fragmentation

Plaintiffs offer no new argument as to how BLM failed to take a "hard look" at habitat fragmentation, other than to repeat their flawed premise that the Final EIS does not analyze the effects of Alternative A Modified. Pls. Br. at 37. As discussed above, the focus of the analysis of potential environmental effects under the RMPA is on Alternative A Modified, including the habitat fragmentation analyses. See, e.g., FEIS at 4-32 to 4-39 (wildlife effects of Alternative A Modified, with a detailed emphasis on habitat fragmentation). BLM's extensive look at fragmentation throughout the Final EIS (and elsewhere in the Administrative Record) satisfies NEPA's "hard look" requirement.

### C.    Seismic Exploration

Plaintiffs assert that BLM "removed the anticipated 5,000 acres of surface disturbance due to seismic exploration from the FEIS." Pls. Br. at 38. The Final EIS, however, contains an assessment of the impacts from seismic exploration under every resource topic analyzed for impacts under the RMPA where such exploration might have a relevant effect, under the heading "preliminary exploration investigations." See FEIS at 4-8 (Minerals); 4-11 (Soils); 4-14 (Groundwater); 4-19 (Surface Water); 4-23 to 4-24 (Air Quality); 4-27 (Noise); 4-30 (Plants); 4-34 to 4-35 (Wildlife); 4-42 (Rangeland); 4-44 (Cultural Resources); 4-47 (Visual Resources). For example, under "Vegetation," the Final EIS explains that "[t]he use of vehicles for off-road travel, *such as for seismic exploration*, could compact soils, increase soil bulk density, change thermal conductivity, and increase soil erosion," changes that "can influence plant growth." FEIS at 4-30 (emphasis added).

-27-

Although BLM excluded the 5,000 acres of potential disturbance from seismic exploration from the RFD, those acres still formed the basis for "assessing impacts as a potential associated action" in the Final EIS. FEIS at 4-3 n.3. Seismic exploration was removed from the RFD because it is approved under a different permit system than oil and gas leasing, and the effects of such exploration are typically far less intrusive and long-lasting than drilling and field development. Id. This change in the RFD was essentially a technical/policy choice for BLM on how to categorize seismic exploration, and resulted in no change to the NEPA analysis. All of the potential effects are disclosed in the Final EIS, and BLM plainly did not "refuse[] to consider these impacts 'surface disturbance' in the FEIS" as Plaintiffs assert.

### D.    Grasslands Reclamation

Plaintiffs argue that BLM failed to address reclamation issues adequately because of the "FEIS's perpetuation of the myth that much of the surface disturbance of grasslands caused by oil and gas development will be eliminated by reclamation" and because "nowhere in the RMPA are there any mandatory requirements for reclamation." Pls. Br. at 38-39. Plaintiffs are mistaken on both counts.

BLM recognizes that grassland reclamation is difficult, and does not hide that fact. See, e.g., FEIS at 4-37 ("Reclamation efforts of surface disturbances in the arid Southwest are not always successful due to the variable climate and presence of non-native species that are able to colonize a disturbed area."). In fact, this concern was a central impetus behind the unitization and 5 percent disturbance stipulation. See, e.g., FEIS at 4-34; ROD at 12, 21-22. Because no more than 5 percent of a lease unit may be disturbed at any one time, lessees will have an incentive to minimize disturbances as well as to ensure successful reclamation. Contrary to Plaintiffs' arguments, however, reclamation is mandatory, ROD at 12-13, and BLM has clearly defined criteria to determine when

an area may be considered reclaimed: "Reclamation will be considered successful when healthy, mature perennials are established with a composition and density that closely approximates the surrounding vegetation as prescribed by BLM, and the reclamation area is free of noxious weeds." ROD at 13; see also ROD at 22-23 (stating that "industry will be required to ensure reclamation, even when climatic conditions make it difficult" and that BLM will monitor reclamation effectiveness to inform future decisions and to improve future reclamation activities).  BLM has presented a reasonable approach to the reclamation issue.

In sum, the Final EIS contains a reasonable analysis of the potential environmental consequences.  Although Plaintiffs would have BLM speculate in excruciating detail about the theoretical impacts of actions that may or may not occur under the 20-year life of the RMPA, NEPA contains no such requirement.  Requiring an EIS to "analyz[e] possible future actions postulated in a twenty-year Master Plan that are far from certain would result in 'a gross misallocation of resources, would trivialize NEPA and would diminish its utility in providing useful environmental analysis for major federal actions that truly affect the environment.'"  Airport Neighbors Alliance v. Norton, 90 F.3d 426, 431 (10th Cir. 1996) (quoting Park County, 817 F.2d at 623).  BLM's compliance with NEPA was neither arbitrary nor capricious and should be upheld.

## III.   THE RMPA IS CONSISTENT WITH ALL RELEVANT STATE PLANS, POLICIES, AND PROGRAMS

Plaintiffs assert that denial of Governor Richardson's administrative appeal by the BLM Director was "arbitrary and capricious."  Pls. Br. at 45.  To the contrary, the Director responded to the appeal in a clear and reasoned manner, SAR 1, and is entitled to deference under the APA.  See Tribal Village of Akutan v. Hodel, 869 F.2d 1185, 1190 (9th Cir. 1988) ("Even if [the court] agreed

that the Governor's recommendations were reasonable, we could not conclude the Secretary was arbitrary or capricious simply because he chose to reject them.").  While other outcomes may have been possible, the Director's response was clearly not arbitrary, capricious, or an abuse of discretion.

FLPMA instructs the Secretary of the Interior to coordinate with other officials and to try to avoid inconsistencies with State and local land use plans.  43 U.S.C. § 1712(c)(9).  Congress did not, however, provide State officials with a veto over land management decisions on federally owned land.  Rather, under FLPMA, the Secretary assists in resolving inconsistencies "to the extent practical."  Id.  While State officials are authorized to offer "advice," the ultimate decision regarding the consistency of federal and State plans rests with the Secretary.  Id.; cf. California v. Watt, 683 F.2d 1253, 1264 (9th Cir. 1982) (construing the coastal zone management consistency under 43 U.S.C. § 1456(c) and holding that final authority for the consistency determination "must reside in the Executive Branch of the federal government"), rev'd on other grounds 464 U.S. 312, 320 n.5 (1984) (holding that the initial consistency review was not even required).

The Secretary has delegated this authority to BLM, and BLM's land use planning regulations address consistency issues.  43 C.F.R. § 1610.3-2.  BLM is entitled to "substantial deference" regarding the interpretation and application of its own regulations.[9]  Under these regulations, a Governor may "identify any known inconsistencies with State or local plans, policies or programs" and "provide recommendations in writing to the State Director."  43 C.F.R. § 1610.3-2(e).  This

_____

[9] See Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994); Wyoming Outdoor Council v. Forest Service, 165 F.3d 43, 52 (D.C. Cir. 1999) (applying principle in a similar mineral leasing context); Auer v. Robbins, 519 U.S. 452, 461 (1997) ("Because the . . . test is a creature of the Secretary's own regulations, his interpretation of it is . . . controlling unless 'plainly erroneous or inconsistent with the regulation.'") (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359 (1976)); Bar MK Ranches, 994 F.2d at 738 (holding that "an agency's interpretation of its own regulations, including its procedural rules, is entitled to great deference").

consistency review document goes first to the BLM State Director, with the option of a later appeal to the BLM Director.  Id.  If the Governor has identified valid inconsistencies, the BLM Director "shall accept the recommendations of the Governor(s) if he/she determines that they provide for a reasonable balance between the national interest and the State's interest."  Id.

Here, Governor Bill Richardson delivered a consistency review document to New Mexico BLM State Director Linda Rundell setting forth a number of alleged inconsistencies.  AR 16733-79.  Many allegations were general in nature, discussed issues of federal law, or relied on incorrect assumptions about BLM's proposed RMPA.  See AR 16738-64.  Rather than providing recommendations to address each alleged inconsistency, the Governor included a broad proposed alternative that drew from Alternative B in the Draft EIS and public calls for more environmental protection of the Otero Mesa area.  AR 16764-72.  Compare AR 10958 (map of Alternative B) with AR 16764-66 (Governor's map and discussion of Alternative B).  The Governor argued that his alternative would protect certain cultural and natural resources better than the proposed RMPA, AR 16772-78, but few, if any, attempts were made to connect individual aspects of the recommended alternative with particular alleged inconsistencies.

The State Director considered the consistency review document and acted on the Governor's request to propose more permanent protections for 35,790 acres of prime grassland habitat.  AR 16969, 16733-34.  As discussed above, this proposal was outlined in the Supplement to the Final EIS and provided to the public for comment.  AR 16969.  The State Director reviewed the Governor's other comments and found no inconsistencies that required a change to the proposed RMPA.  AR 16969-86.

The Governor appealed to the Director of BLM.  AR 17157-83.  The Director's response

-31-

individually addressed each alleged inconsistency, SAR 1 at 4-11, but several alleged inconsistencies did not even address State resource plans, policies, or programs. See e.g., AR 16755, 16760 (citing NEPA and NHPA). In instances where State plans were actually cited in the consistency review document, the references were often quite general and did not identify clear inconsistencies. See e.g., AR 16748-52 (discussing State Water Plan but including only one non-specific quote from Plan itself). In preparing the appeal response, however, the underlying State plans were reviewed to determine if an actual inconsistency existed. SAR 1 at 5; AR 21359-71; AR 16139-84; AR 16561-637; AR 16638-729. The Director concluded that no actual inconsistencies had been raised, but she did instruct BLM to take actions in furtherance of State plan goals. SAR 1 at 7, 8, 11, 17.

The Director's conclusion that no actual inconsistencies existed between BLM's proposed action and State plans, policies, and programs was itself sufficient to deny the Governor's appeal. Logically, recommendations should be tailored to address specific actual inconsistencies. 43 C.F.R § 1610.3-2(e) (the Governor shall "identify inconsistencies and provide recommendations to the State Director."). Despite the lack of actual inconsistencies, or even clear connections between recommendations and the alleged inconsistencies, the Director included a discretionary review of the Governor's full recommended alternative. SAR 1 at 11-17. The Director determined that the alternative proposed by the Governor did not provide for a reasonable balance of all the relevant federal and State interests, and she declined to substitute the Governor's alternative for the BLM proposed action. SAR 1 at 17. The BLM Director's written decision was delivered to the Governor and published in the Federal Register. 70 Fed. Reg. 3550-57 (Jan. 25, 2005).

## A.    Consistency With State Plans

Plaintiffs correctly note that, among the Governor's many alleged inconsistencies, items

dealing with State plans are "[m]ost important." Pls. Br. at 42; see 43 C.F.R. § 1610.3-2 (RMPs shall be consistent with "officially approved or adopted resource related plans, and the policies and programs contained therein"). The Governor included numerous items that merely discussed the application of federal laws or simply noted the existence of a State statute without alleging an inconsistency. Given the terms of the regulation, discussions of State plans were certainly more appropriate than these other items. Ultimately, the Director reasonably determined that the proposed RMPA was consistent with all the State plans identified.

### 1.    State Water Plan And Executive Order

Plaintiffs rely one sentence from a "State Water Plan" appendix to support their claim that the proposed RMPA would be inconsistent: "Steps must be taken to ensure that water from the [Salt] basin is preserved to meet growing demands in southern New Mexico." Pls. Br. at 42. On its face, the statement does not indicate an inconsistency with the proposed RMPA-which included numerous "steps" to protect groundwater supplies. FEIS at 2-5 to 2-7. No specific conflicts between the proposed plan and the unnamed State "steps" are noted in either Plaintiffs' brief, the Governor's consistency review, or his appeal to the Director. AR 16748-53; 17165-68.

When read in context, this provision is concerned not with oil and gas operations, as Plaintiffs imply, but with undesirable utilization of the water by Texas:

> The Salt basin is being considered by some entities as a water source to augment supplies in southwest Texas. Steps must be taken to ensure that water from the basin is preserved to meet growing demands in southern New Mexico.

AR 17408. The State Water Plan as a whole contains only broad goals and very general implementation strategies. In general, there is little discussion of hard choices raised by competing water uses. In particular, the Plan makes no mention of oil and gas activities. See AR 16638-727.

In short, there is nothing in the Plan itself to support Plaintiffs' claim that the BLM's proposed action created an actual inconsistency.

Curiously, Plaintiffs argue that an inconsistency may exist because of possible aquifer pollution "due largely to injection of contaminated produced water . . . into the Basin." Pls. Br. at 42. Later, Plaintiffs assert, without factual support, that such contamination is "certain." Pls. Br. at 44. Plaintiffs cite to the Governor's Executive Order calling for "full protection of the groundwater resources of Otero Mesa" as a source of this inconsistency. Pls. Br. at 42. Again, the full context is informative:

> [NMOCD] shall prepare and propose regulations to implement produced water re-injection standards and controls to assure full protection of the groundwater resources of Otero Mesa.

St. Exh. 9 (Jan. 31, 2004 Executive Order). This executive order was issued after the proposed RMPA was released, and the contemplated State regulations were not issued until after the State Director had responded to the Governor's consistency review document. Yet, as noted in the State Director's reply, the BLM Director's appeal response, and the Final EIS, BLM has consistently recognized that operators must adhere to these and other relevant State regulations. AR 16974, 16975, 18169-70; SAR 1 at 9-10; FEIS at 1-10, 2-5 to 2-7.

Plaintiffs' logic appears to be that the RMPA is somehow inconsistent with the Governor's call for new State regulations on injection wells because those State regulations will be inadequate. As with every other alleged inconsistency, the Director directly addressed the issue in her response. SAR 1 at 9-10. Clearly, Plaintiffs have not raised a serious question regarding the Director's consistency findings, much less shown that this decision was arbitrary or capricious.

-34-

### 2.    Wildlife Plans

Plaintiffs argue that the Director acted arbitrarily and capriciously when she determined that the State plans for desert bighorn sheep and black-tailed prairie dogs did not create actual inconsistencies with the BLM's proposed alternative. Pls. Br. at 42-43, 45. The issue merited only three paragraphs in the Governor's consistency review document and has received similar treatment in Plaintiffs' Brief. AR 16745-46. Nonetheless, the Director addressed the wildlife plans at some length, and in both cases made a reasoned decision that there was no actual inconsistency, but she did direct additional actions be taken to assist in reaching the State plan goals. SAR 1 at 5-8.

According to NMDGF's Bighorn Sheep Plan, there is no occupied desert bighorn habitat in the RMPA Planning Area, FEIS at 3-23, AR 16630, and only three areas of currently unoccupied historic range--the Caballo, Guadalupe, and Sacramento Mountains. AR 16581, 16585, 16627-28; FEIS at 3-23. Under the RMP, the vast majority of these areas have been open to leasing under standard conditions since 1986. AR 282-86, 318. The Bighorn Plan states that it "is intended as a broad scale document and as such is not specific in nature." AR 16566. Although limited by its lack of specificity, the Director discussed the Plan at some length and concluded that there was no inconsistency. SAR 1 at 6. Additionally, the State Director agreed to defer any leasing for five years throughout the Caballo Mountains--the one range in the Planning Area with high quality habitat and no other sheep or goat species that would preclude transplants, and all other areas were not recommended by transplant via the Plan. SAR 1 at 7; ROD at 5; AR 16585, 16627-28. Additionally, the Sacramento Mountain and Cornudas Mountain ACECs; the Brokeoff Mountain Wilderness Study Area; and nominated ACEC areas in the Caballo and Sacramento Mountains were all closed to leasing under the RMPA. FEIS at D-2 to D-4, 2-15 to 2-16, 2-25, 3-33 to 3-34.

The Plan's goal is to remove the animal from the State endangered species list by having 500 bighorn sheep in at least three geographically distinct populations.  AR 166615.  In 2003, there were 304 bighorn sheep located in *six* different locations--none of which are in the RMPA Planning Area. AR 16571.  Only one area is specifically described as "critical" for recovery, and it is outside of the Planning Area.  AR 16580.  Thus, contrary to Plaintiffs' argument, the BLM Planning Area is not critical to the Bighorn Plan's success.

Oil and gas activities are discussed for only one paragraph in the Bighorn Plan, where it states that bighorn sheep "may temporarily abandon habitat while it is being mined."  AR 16602.  As previously noted, however, there is no occupied habitat in the Planning Area, and steps were taken to ensure that adequate time exists to work towards a potential transplant in the Caballo Mountains. The State Plan noted that, outside the BLM Planning Area, in the Big Hatchets (occupied habitat) and Alamo Huecos Mountains (unoccupied potential habitat), "State Trust land in the area is already leased for exploration."  Id.

Given (1) the limited objective of the State Plan; (2) the availability of sufficient existing habitat; (3) the availability of more suitable potential habitat; (4) the presence of oil and gas leasing on State lands with existing and potential bighorn habitat; (5) the historically low interest in the Guadalupe and Sacramento Mountains for both bighorn transplants as well as oil and gas leasing, and (6) the minimum five-year leasing deferral in the Caballo Mountains; the Director concluded that maintaining the existing possibility of future leasing was not inconsistent with the State plan.  See SAR 1 at 5-7.  While Plaintiffs may disagree with this assessment, it was a reasonable decision under the circumstances and was clearly not arbitrary or capricious.

With regard to the State's Prairie Dog Plan, the Director noted that it described itself as a

-36-

"working plan," and not a "final conservation and management strategy." AR 16140; SAR 1 at 7.

BLM was a member of the "working group" that helped craft this interim plan, and BLM has supplied

"substantial assistance" with survey efforts. AR 16162, 16177. The Plan calls for a "balance of

conservation and management" on State and federal lands, AR 16149, but contains no discussion of

oil and gas activities, nor did it highlight Sierra or Otero Counties as areas of heightened concern.[10]

Yet, the Director directed BLM to maintain special status species protections for the prairie dog,

despite a FWS decision that would have normally removed these protections. SAR 1 at 8. Further,

the ROD mandated a 1/4 mile buffer zone around all existing prairie dog colonies in the Planning

Area. ROD B-7. No such protection exists on State or private lands, but Plaintiffs now inexplicably

argue that this insulating buffer somehow "interferes with the prairie dog plan," Pls. Br. at 43, in spite

of the fact that NMDGF specifically recommended a 1/4 mile buffer zone in its formal written

comments. AR 15078. In sum, the RMPA is consistent with the State Prairie Dog Plan, and the

BLM Director was not arbitrary or capricious for so finding.

### 3.      Weed Control Statute And Water Quality Regulations

Plaintiffs briefly argue that there was an inconsistency between the BLM proposed action and

the Noxious Weed Management Act and State Water Quality Control regulations. Pls. Br. at 43-44.

These claims of inconsistency are without merit. At all stages, the Governor has done no more than

raise the existence of these items before making a great logical leap to BLM's supposed

---

[10] This balance, however, did not include calling for an immediate end to the "rodent pest" legal status that allows year-round shooting and poisoning of prairie dogs within New Mexico. AR 16152-53, 16163; 16145-46; N.M. STAT. ANN. §§ 77-15-1 to 77-15-5; AR 20690-95; AR 16134-36 ("Prairie Dog Control in New Mexico"). Plaintiffs, in a bold application of a double standard, now appear to argue that any *federal* action that may in any way impact *unoccupied* potential habitat is inconsistent with the Prairie Dog Plan.

inconsistency.  AR 16747, 16753, 17165, 17166.  The BLM consistency review regulations clearly require written notification of an inconsistency, and merely highlighting the existence of a statute or regulation before expressing displeasure at a federal policy choice is not adequate notification.  See 43 C.F.R. § 1610.3-2(c).

An actual inconsistency with water quality regulations might exist if RMPA permitted a less protective total dissolved solid concentration, but that is clearly not the case.  SAR 1 at 9 ("BLM agrees that water quality standards should not be exceeded."); FEIS at 2-5 (discussing State water regulations); FEIS at 4-15 to 4-16.  The New Mexico Environment Department's formal comments stated that "staff's review has not identified any significant environmental concerns or conflicts with existing State water quality regulations."  FEIS at G-I-167.  Further, where minor corrections were suggested to reflect updated regulations, BLM incorporated those into the FEIS.  FEIS at G-I-167 to G-I-170.  As previously discussed, Plaintiffs' litigation inconsistency theory now appears to assume that the State's own regulatory efforts will fail in the future because they have failed in the past.  Pls. Br. at 44.  Clearly, the State cannot create an inconsistency based on its own shortcomings, and BLM's mitigation measures will protect water quality even if State regulations do not.

The Noxious Weed Management Act does not ban any particular practices or activities.  N.M. STAT. ANN. §§ 76-7D-1 to 77-7D-6; AR 21640-62.  The Act does, however, encourage cooperative agreements, and BLM has entered into agreements with local and State agencies to cooperatively battle invasive weeds.  Id. § 76-7D-6(D); AR 20697-716.  Under these agreements, BLM has consistently provided thousands of dollars for weed control efforts in Otero County.  AR 20697, 20701, 20707.  The Director correctly dismissed all these claims of inconsistency and in no way does her response merit reversal.  SAR 1 at 8.

**B.     BLM Director's Discretionary Review Of The Governor's Plan**

Building on the flawed assumption that actual inconsistencies were raised, Plaintiffs next argue

that the BLM Director was *required* to accept the Governor's recommendations.  Pls. Br. at 44-45.

As shown above, the Governor's recommendations did not require review because they were not tied

to actual inconsistencies with State resource related plans, policies, and programs.  Nonetheless, the

Director reviewed the Governor's recommended alternative and determined that it did not present

a reasonable balance between federal and State interests.  SAR 1 at 11-17.  Only if the Court finds

that the Director's consistency determination was arbitrary and capricious should the Court consider

the Director's discretionary treatment of the Governor's recommended alternative.  The Director,

however, carefully considered all aspects of the Governor's plan and made a reasoned decision in

determining that the Governor had not presented a balanced alternative in light of the relevant federal

and State interests was clearly not arbitrary and capricious.  SAR 1 at 11-17.

Plaintiffs focus their argument on the similarities between the Governor's alternative and

Alternative B in the Draft EIS.  Pls. Br. at 44-45.  Plaintiffs appear to argue that (1) BLM thought

Alternative A would allow enough oil and gas development to meet the RFD; (2) BLM said

Alternative B would "accomplish the same objectives as Alternative A;" (3) BLM said the Governor's

alternative is similar to Alternative B; and (4) therefore, the Governor's alternative will meet the RFD

level and should have been implemented by the Director.  Pls. Br. at 44 (quoting DEIS at 2-26).

There are several flaws in this logic.  First, Plaintiffs rely on the Draft EIS, which by its nature

was made to be commented upon and potentially modified.  As previously outlined, BLM's initial

view that Alternative A could accomplish the RFD level was called into question by industry

representatives, State officials, and academics.  <u>See e.g.</u>, AR 15124, 15177-81, 14974-75.  Further,

Plaintiffs use a quote from the Draft EIS referencing the "objectives" of Alternative A, but they do

not quote the full objective itself:

> The objective of Alternative A is to modify the existing management direction to respond to legislative or regulatory requirements and/or management objectives that otherwise would be achieved on a case-by-case basis under the No-action Alternative (Existing Management). Alternative B also responds to legislative or regulatory requirements and/or management objectives, but provides a relatively greater emphasis on resource protection by imposing more constraints on fluid minerals leasing and development.

DEIS at S-2; see also DEIS at 2-25. Certainly both Alternative A and B accomplished this general

objective--both moved from the existing management's default "open" status under the 1986 RMP,

with leasing choices made mainly on a case-by-case basis, to a situation where more leasing guidance

is given. Meeting any particular level of development is not a stated "objective" nor is that mentioned

in the Purpose and Need section of the Draft EIS. DEIS at 1-1 to 1-3. In fact, the Draft EIS

acknowledged the following:

> [T]he increased amount of land closed to leasing in Alternative B would limit the spatial area in which to explore for and develop fluid minerals in certain locales. This potentially could reduce the opportunity and/or increase the cost to achieve the RFD estimated for oil and gas.

DEIS at 2-30. The objective of the planning process was to produce a document that better clarified

the possibility of future fluid minerals activity within the Planning Area. Both Alternative B and the

Governor's alternative meet this limited objective, but meeting that objective says very little about the

ultimate balancing of interests undertaken before a final decision is made.

Alternative B was an appropriate alternative to analyze in the EIS because it represented a

land management option available to the BLM. This did not mean that any similar alternative

required adoption if presented by the Governor. As noted elsewhere, the examination in the

Draft EIS and the public reaction to it helped BLM to understand that choosing this option might reduce the ability to recover mineral resources. FEIS at S-5, 5-11; AR 15109 (Response C); Supp. FEIS at 14. Knowing this, BLM could have still adopted Alternative B, but a judgment was made that the relevant factors pointed in another direction. ROD at 7. Similarly, the Director determined that the Governor's similar alternative did not provide for a reasonable balance of the federal and State interests.

## IV.   BLM WAS NOT REQUIRED TO CIRCULATE THE GOVERNOR'S PLAN FOR PUBLIC COMMENT

BLM's decision not to provide a special comment period on the Governor's recommendations was not arbitrary or capricious. As explained below, the Governor's recommended alternative drew from Alternative B in the Draft EIS and contained other measures that had previously been placed before BLM and the public through scoping, public hearings, and written public comments. As such, no special comment period was required.

Recommendations need only be opened for formal public comment if the Governor "recommend[s] changes in the proposed plan or amendment which were not raised during the public participation process on that plan or amendment." 43 C.F.R. § 1610.3-2(e). Because this provision this is solely a regulatory creation and no comment period, nor even any particular consistency review process, is mandated by FLPMA, see 43 U.S.C. § 1712(c)(9), BLM is entitled to substantial deference regarding its interpretation and application.

BLM determined that no formal comment period was required on the entirety of the Governor's plan, AR 16969; ROD at 19; SAR 1 at 15, but did hold a public comment period after it proposed a change requested by the Governor concerning closing some 36,000 acres of Otero Mesa

and Nutt grasslands.  AR 16969, 17100.  Many comments relating to other aspects of the Governor's alternative were received during this time.  See, e.g., AR 17006-10; 17132-55; ROD at 19-25; SAR 1 at 15.  These comments were considered in the final decision making process and acknowledged in the ROD.  ROD at 19-25.  Additionally, the Governor distributed information about his recommended alternative through official channels, and its contents were widely reported through various media outlets.  Thus, any suggestion that the public was denied practical access to the Governor's alternative rings hollow.

Plaintiffs acknowledge similarities between the Governor's alternative and Alternative B, but assert that a comment period was required because of recommendations for additional stipulations, additional acres under an NSO stipulation, and designation of a National Conservation Area ("NCA").  Pls. Br. at 46.  Plaintiffs seem to suggest that the Governor had unlimited ability to raise any recommendations he wished, and BLM was required to allow a public comment period if any single element of his plan was even mildly unique.  This is not correct, and as previously demonstrated, actual inconsistencies with State resource related plans, policies, and programs did not exist.  Furthermore, these issues had been sufficiently raised through the public participation process so that a formal public comment period was not required.

The Governor's proposed stipulations did not trigger the comment period requirement.  See AR 16767-68 (Governor's 12 stipulations).  While it is certainly true that no one had presented this *exact* list, the underlying issues were already well discussed through the extensive public participation process.  For instance, the Stipulation 1 was similar to the lambing timing stipulation put forward in the Draft EIS, DEIS at A-VI-19, and concerns about the timing of exploration and development activities had been raised through public comment and hearings.  AR 15134, 15208, 15209-10,

-42-

15213, 15076; FEIS at B-5. Stipulations 2 and 4 addressed the scale of potential development by limiting well-site density and requiring the creation of exploratory units. Obviously, the scale of potential development was an important issue in the planning process and exploratory units were an important part of the BLM's proposed alternative. FEIS at S-2, 2-27, D-10. Well-site spacing had previously been discussed in public comments and hearings. AR 14959, 15065, 15199; FEIS at A-8.

The proposed stipulation regarding maximizing road usage followed earlier requests from the public and was nearly identical to BLM's existing BMP encouraging "the use of existing roads to the maximum extent practical." FEIS at B-5, 5-13, B-9; AR 15051-52, 15067, 15207, 15038, 15105, 14973. Stipulation 5 addressed noise issues and electric power conduit placement, even though no alleged consistency over these issues had been raised. Both issues had been noted by the public and BLM previously. FEIS at 4-27 to 4-30, B-8; AR 14961, 15062-63, 15138, 15154, 14993, 14986. Vegetation reclamation, noxious weeds, and traffic minimization-- Stipulations 6, 7, and 12--had been raised numerous times. FEIS at B-9 to B-11, 3-31, 2-3, 5-16 to 5-17, 3-5 to 3-6; AR 15150-51, 14959, 15207, 15037, 15035, 15160, 15154, 15092-93, 15034, 15138, 15105.

Similarly, the water related concerns of Stipulations 8, 9, 10, and 11 were not new to the public discussion. FEIS at 2-5 to 2-7, Map 3-6, 3-12 to 3-14; AR 15134, 15208-209, 15096-98, 15118, 15134, 15096-99, 15089, 15163. Further, a cement casing program similar to that outlined in the Governor's Stipulation 9 was discussed in the Draft EIS at 4-16 and Final EIS at 4-15. See also FEIS at B-2 (citing Onshore Order #2). As previously noted, BLM had also consistently recognized that lessees must adhere to State regulations regarding injection wells and well pits.

Likewise, a request for more acres under NSO was not new to the public participation process. Obviously, the option of using a NSO stipulation over large tracts was before the public in

the Draft EIS and Final EIS for both Alternatives A and B.  See e.g., AR 11062-71 (outlining NSO areas); AR 10770, 14672 (charts with NSO and closure allocations); 10958 (Map of Alternative B). Also, a "Comprehensive No Surface Occupancy" alternative was considered but eliminated from detailed review.  FEIS at 2-17 to 2-18.  Further, numerous groups and individuals called for expanded areas where no surface disturbance would occur.  FEIS at 5-1 to 5-19 (discussing wilderness proposals); AR 15051, 15092-94, 14966-67, 15157, 15033-34, 15036, 15067, 15095, 15100, 15101, 14954, 15155.  Given this extensive prior public discussion, the Governor's modifications to the Alternative B map did not require a new comment period.

Finally, the possible designation of an NCA did not require a special comment period because NCA designation was not a legal option available to BLM.  Similar to a National Wilderness or National Park, an NCA can only be created by Congress.  See e.g., 16 U.S.C. § 460uu-21 (establishing Malpais NCA in New Mexico in 1987); AR 16742 (Governor acknowledging need for congressional action).  BLM has no statutory authority to establish an NCA through the RMP amendment process.  The Governor had other means available to advocate for this legislative change, but a formal BLM public comment period in association with the RMP amendment process would not have been appropriate.  In addition, several comments had been previously received calling for the area to be designated as a protected wilderness area.  See e.g., AR 15012, 15040.  Thus, the issue of additional congressional protections was not appropriate for a BLM planning decision, and it had already been raised through the public participation process.

BLM did not act arbitrarily or capriciously when it decided that an additional comment period was not required on the Governor's alternative.  In short, the proposed stipulations were not linked to actual inconsistencies in need of recommendations, and they did not raise new issues or

-44-

significantly new mitigation strategies that had not been raised through previous public participation.

A new public comment period was not required simply because these concerns were now re-packaged

into a list of possible stipulations.  Each of Plaintiffs' FLPMA claims is without merit.

## V.   BLM COMPLIED WITH THE NHPA IN APPROVING THE RMPA AND THE BENNETT RANCH UNIT LEASE

### A.   The National Historic Preservation Act

The NHPA, 16 U.S.C. § 470, *et seq*., is designed to identify potential conflicts between

historic preservation concerns and the needs of federal undertakings, and to provide a mechanism for

resolving such conflicts in the public interest.  Like NEPA, the NHPA is strictly a procedural statute,

requiring that agencies "stop, look and listen" before proceeding with an action.  Apache Survival

Coalition v. United States, 21 F.3d 895, 906 (9th Cir. 1994).  The NHPA confers no substantive

rights and does not under any circumstance dictate a particular outcome.  Morris County Trust for

Historic Preservation v. Pierce, 714 F.2d 271, 278 (3d Cir. 1983); United States v. 162.20 Acres,

639 F.2d 299, 302 (5th Cir. 1981).  As approved pursuant to a programmatic agreement with the

Advisory Council on Historic Preservation ("ACHP"), which has the responsibility to administer the

process implementing Sections 106, 110(f), and 111(a) of the NHPA, BLM implements the NHPA

through policies and procedures contained in the BLM Manual.  SAR 2.  Therefore, further

compliance with the ACHP regulations is not warranted in this case.

### B.   BLM's Phased Consultation Approach Complies With Section 106

BLM properly used a phased approach Section 106 compliance in its decision-making process

for the RMPA.  As discussed above, an RMP is a generalized planning document which, in and of

itself, has no impact on any resource--historic or otherwise.  BLM will complete a site-specific

analysis and additional consultation under the NHPA if and when a lessee submits an APD, at which point more detailed information about a particular development and its potential impacts will be known.  Nonetheless, although actual identification of traditional cultural properties ("TCPs") will be more meaningful at the APD stage, BLM undertook consultation with the Tribes during the administrative process for approving the RMPA, as well as in holding the lease sale for the parcel adjacent to the Bennett Ranch Unit ("BRU").  Accordingly, Plaintiffs' NHPA claims lack merit and should be rejected.

1.     **Phased Consultation In Land Management Planning Is A Rational Approach For Compliance With The NHPA**

To address the situation where, as here, a federal agency first conducts general planning in advance of site-specific decisions, the NHPA regulations authorize federal agencies to meet their Section 106 consultation requirements through a phased approach.  "Where alternatives under consideration consist of corridors or large land areas . . . the agency official may use a phased process to conduct identification and evaluation efforts."  36 C.F.R. § 800.4(b)(2).  "As specific aspects or locations of an alternative are refined or access is gained, the agency official shall proceed with the identification and evaluation of historic properties in accordance with paragraphs (b)(1) and (c) of this section."  Id.  In addition:

> The agency official may also defer final identification and evaluation of historic properties if it is specifically provided for in a memorandum of agreement executed pursuant to Sec. 800.6, a programmatic agreement executed pursuant to Sec. 800.14(b), or the documents used by an agency official to comply with [NEPA] pursuant to Sec. 800.8.

36 C.F.R. § 800.4(b)(2).

BLM's decision to amend the RMP plainly qualifies under several of these criteria for phased Section 106 compliance.  Specifically, the total surface area covered by the RMPA consists of a

-46-

"large land area," more than 2 million acres.  FEIS at 1-3.  Moreover, BLM estimated that there could be "a total of approximately 130,000 archaeological and historical sites in the Planning Area."  FEIS at 3-29.  Thus, final identification and evaluation of all cultural and historic properties prior to adoption of the RMPA would have been impractical and, likely, impossible.  See FEIS at 3-29 (estimating that under the current rate of survey "it would take about two centuries to complete the inventory of Sierra and Otero Counties").  In contrast, even if all development under the RFD occurred, BLM estimates that only 100 to 200 of these sites might be affected, with "a high potential for satisfactorily mitigating impacts" when actual site-specific projects are proposed.  FEIS at 4-44.

BLM's deferral of its final identification and evaluation of cultural and historic properties was also specifically discussed in its NEPA documentation.  BLM explains that further consultation pursuant to the NHPA will occur with the Tribes and other interested parties, all of whom will have an opportunity to participate in the process prior to site-specific approvals. ROD at 26-28.  "At the APD stage of development, BLM will ensure that identification strategies are carried out" and will consult with the Tribes if it determines that "traditional cultural properties may be affected by the proposed undertaking."  ROD at 28.  To put potential lessees on notice of its NHPA obligations, BLM added a stipulation indicating that "BLM will not approve any ground disturbing activities that may affect [historic] properties or resources until it completes its obligations under applicable requirements of the NHPA and other authorities."  ROD at 27.  Moreover, "BLM may require modification to exploration or development proposals to protect such properties, or disapprove any activity that is likely to result in adverse effects that cannot be successfully avoided, minimized or mitigated."  ROD at 27.

In light of the tremendous number of acres and cultural resource sites involved, from a

-47-

practical perspective BLM's decision to complete its detailed evaluation under the NHPA of potential impacts from site-specific activities using a phased approach was eminently reasonable.  Given many years and an unlimited budget, BLM possibly could identify all historic and cultural properties and evaluate their significance, but it would be clearly impossible for BLM to also assess whether adverse effects on those properties would occur as a result of oil and gas development.  The RMP is simply a general planning document that by itself has absolutely no effect on any historic property.  Moreover, at this juncture BLM can only speculate as to where a site-specific action will take place; BLM will not know this information definitively unless and until a lessee submits an APD.  Accordingly, BLM appropriately determined that a phased analysis approach was needed, and tailoring the analysis to conform to that phased approach was neither arbitrary nor capricious.  See Southern Utah Wilderness Alliance v. Norton, 277 F. Supp.2d 1169 (D. Utah 2003) (deferring to BLM's phased approach where project covered 1.9 million acres and BLM would complete NHPA process before work began).[11]

### 2.    BLM Consulted With The Tribes Prior To Issuing The ROD And Prior To Offering The Lease For The Bennett Ranch Unit Parcel

The Administrative Record demonstrates that BLM made reasonable efforts to engage potentially interested Indian Tribes in consultation concerning potential effects on cultural resources in the Planning Area.  In accordance with its policy guidance, BLM initiated the consultation process

---

[11] Plaintiffs state that the BLM NHPA internal guidance memoranda dictate *completion* of consultation at both the RMP and lease stages. Pls. Br. at 52-53. The memoranda themselves plainly refute this statement. See St. Exh. 12 at 2 (National memorandum stating that the RMP level "is the appropriate stage at which to *initiate* consultation with tribes") (emphasis added); St. Exh. 13 (State memorandum indicating that leasing parcels for oil and gas development are undertakings "requiring *initiation* of steps needed to meet this agency's obligations under Section 106") (emphasis in original). In any event, BLM's internal memoranda are policy positions that are not legally binding on the agency. See, e.g., Western Radio Services v. Espy, 79 F.3d 896, 901 (9th Cir. 1996).

early on in the development of the RMPA, in May 1999 before the Draft EIS was issued, describing the most likely scenario for development and seeking input from the Tribes for identifying TCPs and sacred sites. ROD at 26-27. In 2002, after the Draft EIS was provided to the Tribes, BLM engaged a mediator to visit the two tribes that had expressed the most interest in the proposed RMPA, Ysleta del Sur and Mescalero Apache. Id. at 27. Although the Mescalero Apache did not respond to additional BLM inquiries, BLM conducted several face-to-face meetings with representatives for Ysleta del Sur. Id. Ysleta del Sur provided BLM with a historical report, but did not identify specific TCPs or impact concerns. Id.

Following issuance of the Final EIS, BLM provided numerous Tribes with the Final EIS and the Supplement to the Final EIS, and made numerous attempts to contact the Tribes to obtain information or to hold additional face-to-face meetings. ROD at 26; see also SAR 4 (BLM notes of some of the contact efforts). None of the Tribes provided any additional information or requests. ROD at 26. After the ROD was issued, BLM again contacted the Tribes in May 2005 to discuss the anticipated BRU lease offering, providing them with detailed information about the location of the proposed parcel. SAR 5. All of the Tribes that responded indicated that they had no concerns with the proposal, including Ysleta del Sur, which stated that "we would like to inform you that we believe these projects will not adversely affect traditional, religious or culturally significant sites to our Pueblo and have no opposition to them." SAR 6. If and when the lessee submits an APD for this parcel, BLM "will ensure that identification strategies are carried out in a manner sufficient to identify historic properties with[in] the area of potential effect for the undertaking" in accordance with the stipulation preserving BLM's discretion to reject or modify APD proposals that may affect cultural resources, and the "identification effort will include again soliciting information form tribes with a

-49-

historical relationship with the area."  ROD at 28.[12]

BLM's phased approach to consultation from RMPA to lease to APD provides a realistic and meaningful process for compliance with Section 106 of the NHPA, and Plaintiffs' reliance on Pueblo of Sandia v. United States, 50 F.3d 856 (10th Cir. 1995), to attack BLM's consultations is misplaced. In Sandia, the canyon at issue "contains many shrines and ceremonial paths of religious and cultural significance to the Pueblo" and was used by tribal members to gather plant materials "for use in significant private and public cultural ceremonies" and "for traditional healing practices." Id. at 857. The Forest Service proposed action included "realignment and reconstruction of the Las Huertas Canyon Road and additional improvements to the area, including the rehabilitation and expansion of several picnic grounds and the installation of sanitary facilities at other locations."  Id. at 858. Because the Forest Service had been provided with specific information that its proposed activities could adversely affect TCPs in the canyon, the Tenth Circuit faulted the agency for not making greater efforts to consult with the Pueblo to identify TCPs.  Id. at 860-62.[13]  Here, in contrast, BLM's repeated contacts with the Tribes did not yield substantial evidence that there is any possible concentration of TCPs in any particular area or any landscape-level site of significance that was not

---

[12] Although Plaintiffs contend that the stipulation is not adequate to protect historic properties at the APD stage because it applies only to TCPs "found completely within the lease sale tract," Pls. Br. at 51, BLM plainly does not interpret the stipulation so narrowly.  Moreover, even without the stipulation, BLM retains discretion to adjust developments in an APD to avoid or mitigate adverse impacts to historic properties regardless of their location with respect to the actual lease parcel boundaries.

[13] Plaintiffs cite Sandia for the proposition that a federal agency must always do more than send a letter of inquiry to satisfy its consultation obligations, but the actual quotation is that "a mere request for information is not *necessarily* sufficient to constitute the 'reasonable effort' section 106 requires." 50 F.3d at 860 (emphasis added).  Under some circumstances, such as BLM encountered here for some Tribes with no affiliation with the areas of concern, a lack of response to a request for information is reasonably interpreted as an indication of a lack of interest.

already closed to leasing or that could not be addressed with a further amendment to the RMP if identified during the life of the RMPA.  Moreover, the RMPA does not authorize any ground-disturbing activities, and so the nature and location of potential activities relative to cultural properties is not readily determined prior to implementation, unlike the Forest Service proposal in Sandia that authorized well-defined ground-disturbing activities that could be meaningfully assessed for effects.

The Administrative Record thus supports BLM's phased approach to consultation and the reasonableness and good faith of its efforts at each stage of the process.  In this regard, Plaintiffs' Section 106 claim is no different than their NEPA claim concerning lease issuance, which the Tenth Circuit rejected in Park County, as discussed below.  817 F.2d at 624 (holding that it was rational for BLM to defer preparation of more detailed analyses of impacts until the APD stage).  BLM has satisfied and continues to satisfies its consultation obligations under Section 106 of the NHPA.[14]

## C.    BLM Is In Compliance With Section 110 Of The NHPA

Plaintiffs claim that BLM violated Section 110 of the NHPA because Plaintiffs could not find evidence in the Administrative Record that BLM had "engaged in a deliberate, considered decisionmaking process to assess, consider and plan for preservation needs."  Pls. Br. at 54 (quoting National Trust for Historic Preservation v. Blanck, 938 F. Supp. 908, 925 (D.D.C. 1996)).  As the Blanck court held, "Section 110 is to be read in conjunction with Section 106 which constitutes the main thrust of the NHPA," and "embod[ies] the requirement that agencies thoroughly consider preservationist goals in all aspects of agency decisionmaking," but "does not itself affirmatively

---

[14] Plaintiffs also conclusorily assert--without reference to any evidence in the Administrative Record--that the 1/4 mile buffer stipulation to protect historic trails does not retain in BLM sufficient discretion to mitigate adverse effects.  Pls. Br. at 53.  Plaintiffs' assertion ignores that the 1/4 mile buffer has been in place since adoption of the RMP in 1986, and there is no evidence in those 20 years that this distance is not sufficient to protect the historical values of the trails.  FEIS at D-11.

mandate the preservation of historic buildings or other resources." 938 F. Supp. at 925. Therefore,

Section 110 does not require a federal agency "to undertake any preservation beyond what was

necessary to comply to the fullest extent possible with, and in the spirit of, the Section 106

consultation process." Id.

BLM's decision-making process easily meets this standard, as preservation considerations are

infused into the process from the highest levels in the agency down to the APD stage of oil and gas

development. Among numerous other things, BLM at the National level has entered into a

Programmatic Agreement with the ACHP and the National Conference of State Historic Preservation

Officers to meet its responsibilities under the NHPA, and "has developed policies and procedures

through its directives system (BLM Manual Sections 8100-8160) to help guide the BLM's planning

and decision making as it affects historic properties and other cultural properties." SAR 2 at 1. At

the State level, BLM has entered into a "Protocol Agreement" with the New Mexico SHPO to inject

preservation considerations in all decision-making processes, SAR 3, and by issuing Instruction

Memoranda on how to maximize this objective. St. Exh. 13.

At the RMPA level, BLM complied with Section 110 by infusing cultural resources

preservation into the decision-making process by taking a "hard look" at such resources in the NEPA

process, see, e.g., DEIS at 2-14 to 2-15, 3-33 to 3-37, 4-45 to 4-48; FEIS at 2-12 to 2-13, 3-26 to

3-29, 4-43 to 4-45; ROD at 26-28; and by consulting with potentially affected Tribes, as discussed

above. Moreover, BLM went beyond the "process" required under Section 110, and actually took

substantive steps at the RMP level to preserve historic resources in the Planning Area. For instance,

in the 1986 RMP, BLM set aside and limited activities in several areas "to protect particularly

significant cultural resources." FEIS at 2-12 and 2-13 (Table 2-5 identifying "existing management

decisions for cultural resources").  And in the RMPA process itself, BLM discretionarily closed thousands of acres to protect cultural and other resources in six existing and eight nominated Areas of Critical Environmental Concern ("ACECs"), FEIS at D-3 to D-4; imposed NSO stipulations to protect several cultural resource areas, FEIS at D-5, D-8; imposed a Controlled Surface Use stipulation of no surface-disturbing activities within 0.25 miles of several historic trails, FEIS at D-11; and imposed a stipulation to clarify the agency's retention of authority to require surveys and impose conditions to protect cultural resources at the APD stage, ROD at 27.

Rather than lacking evidence as Plaintiffs assert, the Administrative Record is replete with evidence that BLM infused protection of cultural and historic resources into a preservation plan here. BLM's compliance with Section 110 of the NHPA therefore was not arbitrary and capricious.

## VI.  THE BENNETT RANCH UNIT LEASE SALE AND GAS PIPELINE CONSTRUCTION WERE APPROVED IN ACCORDANCE WITH NEPA

### A.  Plaintiffs' Challenges To The Lease Are Not Ripe

Plaintiffs' NEPA (and NHPA) claims regarding the leasing of the 1,600 acre BRU parcel (that Plaintiffs identify as the "Otero Mesa lease") are premature because, in accordance with the stipulation of the parties, no lease has been executed.  Pls. Br. at 49, 54; Doc. No. 15.  In Wyoming Outdoor Council, 165 F.3d at 50, as in the present case, the plaintiffs filed suit before any leases had been issued, and the court held that a NEPA compliance claim would not ripen until "the leases had actually been issued."  Plaintiffs acknowledge that the leasing decision is not final, stating that "BLM has not yet executed the Lease, so the [Administrative] Record on the Lease is not yet closed."  Doc. No. 58 at 4.  Pursuant to the APA, Plaintiffs may only challenge "final agency action." 5 U.S.C. § 704.

Public notice of the Otero Mesa parcel's inclusion in the lease sale was provided on May 20, 2005.  AR 18351, 18363.  On June 24, 2005, Plaintiffs formally protested inclusion of the parcel in the lease sale, AR 18520-27, and requested that BLM refrain from the lease sale until the litigation regarding the RMPA was complete.  AR 18521, 18527.  The Parties' July 19, 2005 stipulation allowed the sale to take place on July 20, 2005, but delayed final execution of the lease pending briefing on Plaintiffs' RMPA claims.  Doc. No. 15.  On July 20, 2005, the BRU parcel was included in the regularly scheduled lease sale auction, and auction participants were given notice that the auction was being held subject to unresolved protests and litigation, including the terms of the July 19 stipulation.  AR 18344-48; see AR 18346 ("No bidder will have a property interest in any lease until the lease is actually issued at the time that it is executed with a signature by the BLM authorized officer.").  HEYCO was the high bidder, but no lease has been issued.

On August 18, 2005, BLM denied Plaintiffs' protest and advised Plaintiffs of their ability to appeal the decision to the Interior Board of Land Appeals ("IBLA").  SAR 8 at 4; see 43 C.F.R. §§ 1610.5-3, 3120.1-3.  The 30-day appeal period expired without Plaintiffs filing a notice of appeal for IBLA review. On October 11, 2005, Plaintiffs filed an amended complaint raising two claims against the potential BRU lease.  Doc. No. 57 at 34, 38 (Seventh and Eleventh Claims).  Thus, after choosing not to utilize available administrative remedies regarding the decision to include the parcel for bidding in the lease sale, Plaintiffs now seek to challenge the approval of a lease that has not yet occurred.  Such claims are not ripe for review as BLM could still take additional action in response to this Court's ruling on the related RMPA issues.  Wyoming Outdoor Council, 165 F.3d at 50, 51 (claim is ripe when "there no longer exists the possibility that further agency action will alter the claim in any fashion").  Plaintiffs' NEPA and NHPA lease claims are premature and should be dismissed.

**B.      Plaintiffs' NEPA Challenges To The BRU Lease Are Without Merit**

Even if ripe, Plaintiffs' arguments that BLM was required to prepare an additional NEPA analysis prior to the offering the 1,600-acre lease for the BRU parcel, Pls. Br. at 54-59, would be foreclosed by the Tenth Circuit's decision in Park County Resource Council, Inc. v. U.S. Dept. of Agriculture, 817 F.2d 609 (10th Cir. 1987).  In Park County, the plaintiffs argued that BLM was required to prepare a comprehensive EIS before issuing oil and gas leases in National Forests in the Rocky Mountain Region.  The Tenth Circuit rejected that argument, finding that an oil and gas lease, by itself, was "essentially a paper transaction," and did not "cause a change in the physical environment."  Id. at 621-22.  Because BLM retained control over future development through its authority to approve site-specific development and to impose mitigation, BLM had further opportunity to conduct NEPA analyses when lessees proposed localized action at the APD stage. Id. at 625.[15]  For this reason, the court found that the agency had taken the required "hard look" through preparation of an EA covering leasing issues generally in the area (similar to the EIS for the RMPA), and that the analysis in the EA was "within the bounds of reasoned decisionmaking." Id. at 622.

In addition to BLM's continuing control, the Park County court was influenced by uncertainty that exists at the leasing stage:

Full field development is typically an extremely tentative possibility at best at the

_____

[15] The Park County court analogized the facts before it to the issuance of a mineral patent in South Dakota v. Andrus, 614 F.2d 1190 (8th Cir. 1980).  There, the Eighth Circuit held that the granting of the patent, alone, did not enable the patentee to do anything.  HEYCO will be similarly restricted under the BRU lease.  HEYCO may not, under the terms of the lease and as required by FOOGLRA (enacted *after* the decision in Park County), engage in any surface-disturbing activities on leased lands "without the analysis and approval of the Secretary concerned."  30 U.S.C. § 226(g); see also 43 C.F.R. § 3162.3-1(c).

> leasing stage. Because 'exploration activities are conducted on only about one of ten federal leases issued and development activities are conducted on only one of ten of those leases on which exploration activities have been approved and completed,' . . . the steps from leasing to full field development are not 'so interdependent that it would be unwise or irrational to complete one without the others' -- the benchmark signaling the need for a cumulative impact EIS.

Park County, 817 F.2d at 623. Given these uncertainties, the court concluded that "requir[ing] a cumulative EIS contemplating full field development at the leasing stage would thus result in a gross misallocation of resources, would trivialize NEPA and would diminish its utility in providing useful environmental analysis for major federal actions that truly affect the environment." Id.

Plaintiffs attempt to avoid the dispositive result dictated by Park County by alleging that "gas and oil development on the Otero Mesa lease is not an unlikely outcome; it is a virtual certainty" because HEYCO's "high producing" 1-Y well is located within a mile of the lease and HEYCO has sought approval to construct a gas pipeline to support a gas field on the BRU and bid on the lease after conducting seismic exploration. Thus, Plaintiffs assert, "[f]ull oil and gas field development in the BRU is 'reasonably foreseeable' by any measure." Plaintiffs' speculation is based on HEYCO's behavior alone and is not supported by the Administrative Record.

Although HEYCO's 1-Y BRU well has made a show of gas (and not oil), the productivity of the well has not yet been determined, and will not be known until there are several months of testing and production data. See FEIS at 3-8 (stating that "depending upon success in the offsets" the 1-Y well "may warrant development of the infrastructure needed for development") (emphasis added). For instance gas flaring, which tests "the quantity of gas and pressures of the gas filed," has not yet occurred for either of the two existing BRU exploration wells. AR 18822. Likewise, Plaintiffs' suggestion HEYCO's lone bid on the BRU lease following seismic exploration indicates that full field

development will occur misapprehends what seismic exploration can accomplish. Seismic exploration does not identify oil and gas deposits in the ground, but only locates "rock types, traps and structures which may contain oil and gas, or water or perhaps nothing at all," and there are "no guarantees of a successful well."  SAR 7 2.  Because there have been no producing wells to demonstrate a commercially viable deposit of fluid mineral resources, oil and gas development on the BRU is still in an early, exploratory stage.

As in Park County, the large majority of federal oil and gas leases in the Planning Area do not result in any development, let alone full-field development.  See, e.g., FEIS at 1-1 (reporting that of 77 federal leases in the Planning Area, "shows of oil or gas were reported for 21 of the wells" but "extensive field development has not resulted").  As stated in the gas flaring EA for HEYCO's two existing BRU wells, "the risk of drilling dry holes is high" and therefore "the chance of oil and gas field production and development [on the BRU] . . . is minimal to moderate."  AR 18831.  At this juncture, it is highly speculative whether "full field development [may be] likely to occur," let alone that development of the BRU parcel "could be specifically described at the leasing stage."  Park County, 817 F.3d at 623.  Completion of a site-specific NEPA analysis prior to an APD and any proven commercial production capability on the BRU would be a potentially meaningless and unnecessary exercise, misleading to the public, and a waste of scarce agency resources.  Id.

BLM properly ensured its compliance with NEPA before awarding the BRU lease by completing a "Documentation of Plan Conformance and NEPA Adequacy" or "DNA."  AR 18331-36. "DNAs are forms designed to allow BLM employees to determine whether they properly can rely on existing NEPA documents."  Pennaco Energy, Inc. v. U.S. Dept. of the Interior, 377 F.3d 1147, 1152 (10th Cir. 2004).  As explained in the DNA, the lease sale fully conformed with the RMPA and

ROD, and hence the impacts of leasing were adequately examined in the FEIS.  "[T]he EIS prepared

with the RMP is intended to satisfy NEPA requirements for issuing fluid mineral leases."  Id. at 1160.

Plaintiffs argue that DNA for the BRU lease improperly relied on the cumulative impact

analysis in the Final EIS which, because it "contains only three uninformative pages on cumulative

impacts," does not adequately address the combined effects of the BRU lease in conjunction with

other oil and gas activities such as the gas pipeline, the development and flaring of other wells, and

seismic exploration. Pls. Br. at 57-58.  What Plaintiffs mistakenly ignore is that the cumulative impact

*section* of Final EIS is an analysis of possible environmental effects of potential oil and gas

development under the RMPA in conjunction with effects from other activities in the Planning Area,

such as livestock grazing.  FEIS at 4-61 to 4-64.  In contrast, the *entire* Final EIS is itself a

cumulative impact analysis for leases such as the BRU lease (and gas pipeline), because it analyzes

the impacts of all the development projected in the RMP and associated activities, including the

development of multiple wells, pipelines, roads, and geophysical exploration.  Because the Final EIS

is a cumulative impact analysis of all oil and gas development activities under the RMPA, it satisfies

BLM's obligations under NEPA for the BRU lease, just as the EA "evaluating the issuance of federal

oil and gas leases in the Rocky Mountain region national forests" fulfilled the agency's NEPA

obligations for the lease at issue in Park County.  817 F.3d at 621.

Plaintiffs' argument that the BRU lease, gas pipeline, and gas flaring at Wells 1-Y and 25-1

are "connected actions" that must be analyzed together in a separate NEPA document is equally

unavailing.  As Park County instructs and as demonstrated above, development under an oil and gas

lease is "an extremely tentative possibility at best at the leasing stage," and thus "the steps from

leasing to full field development are not 'so interdependent that it would be unwise or irrational to

complete one without the others.'"  817 F.3d at 623.  Since the BRU lease is not even considered a connected action to development that may occur under that lease, it plainly cannot be considered connected action to development that may occur outside that lease.  <u>Airport Neighbors Alliance</u>, 90 F.3d at 431 (holding that construction of a runway which was part of a Master Plan for upgrade of an airport did not require FAA to prepare "a cumulative EIS analyzing possible future actions postulated in a twenty-year Master Plan that are far from certain" and an EA on the runway construction alone was appropriate).  Thus, the BRU lease, gas flaring at other wells, and the gas pipeline are not connected actions under NEPA requiring a single, additional environmental analysis.

## CONCLUSION

As explained herein, Plaintiffs have not met their burden under the APA of demonstrating that BLM's decisions adopting the RMPA and offering the Bennett Ranch Unit lease were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).  Over the long history of the development of the RMPA, BLM demonstrated good faith compliance with NEPA, FLPMA, and the NHPA, and went to painstaking lengths to involve the public, the Tribes, and the State in the decision-making process.  Federal Defendants are entitled to judgment as a matter of law and respectfully request that this action be dismissed with prejudice.


Dated this 10th day of December, 2005.          Respectfully submitted,

                                                SUE ELLEN WOOLDRIDGE
                                                Assistant Attorney General
                                                U.S. Department of Justice
                                                Environment & Natural Resources Division

                                                 _electronically filed_____
                                                ANDREW A. SMITH, Trial Attorney
                                                U.S. Department of Justice

Environment & Natural Resources Division
C/O United States Attorneys Office
P. O. Box 607
Albuquerque, New Mexico 87103
(505) 224-1468
andrew.smith@usdoj.gov

Attorneys for Federal Defendants

Of Counsel:

Arthur Arguedas
John Murdock
Michael Schoessler
Office of the Solicitor

## CERTIFICATE OF SERVICE

   I hereby certify that on December 12, 2005, copies of FEDERAL DEFENDANTS'
RESPONSE TO STATE PLAINTIFFS' OCTOBER 17, 2005 "OPENING CASE BRIEF" [DOC.
NO. 59] were served by U.S. mail on the following counsel of record:

Alletta Belin
Steven Sugarman
BELIN & SUGARMAN
618 Paseo de Peralta
Santa Fe, New Mexico 87501

Patricia A. Madrid, Attorney General
Stephen R. Farris
Frances C. Bassett
Assistant Attorneys General
P.O. Drawer 1508
Santa Fe, New Mexico 87504-1508

David L. Plotsky
LAW OFFICES OF DAVID PLOTSKY
122 Girard Avenue, SE
Albuquerque, NM 87106

James S. Angell
Nicholas F. Persampieri
McCrystie Adams
EARTHJUSTICE LEGAL DEFENSE
FUND, INC.,
1400 Glenarm Place #300
Denver, CO 80202

Patrick J. Rogers
Earl E. DeBrine, Jr.
MODRALL, SPERLING, ROEHL,
HARRIS & SISK, P.A.
P.O. Box 2168
Albuquerque, New Mexico 87103-2168

Ronald W. Opsahl
William Perry Pendley
MOUNTAIN STATE LEGAL
FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227

Jason Bowles
BOWLES & CROW
P.O. Box 25186
Albuquerque, New Mexico 87125 -5186

Katherine M. Moss
Robert A Stranahan, IV
Christopher G. Schatzman
General Counsel, Commissioner of Public
Lands
P.O. Box 1148
Santa Fe, NM 87504 -1148


  electronically filed
Andrew A. Smith

-61-