**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

_____

**THE STATE OF NEW MEXICO ex rel.**
**GOVERNOR BILL RICHARDSON, et**
**al.**,

          Plaintiffs,

v.                                                                                         No. CIV 05-0460 BB/RHS

**BUREAU OF LAND MANAGEMENT,**
**et al.**,

          Federal Defendants,

and

**INDEPENDENT PETROLEUM ASS'N**
**OF NEW MEXICO,**

          Defendant-Intervenor.                                              and

**NEW MEXICO WILDERNESS ALLIANCE,**
**et al.,**

          Plaintiffs,

v.                                                                                         No. CIV 05-0588 BB/RHS
                                                (consolidated)
**LINDA RUNDELL, et al.**

          Federal Defendants.

**<u>MEMORANDUM OPINION</u>**

These consolidated cases involve administrative appeals from decisions made by the

United States Bureau of Land Management ("BLM").  The decisions challenged by Plaintiffs

include BLM's adoption of a Resource Management Plan Amendment ("RMPA"), as well as

BLM's approval of an oil-and-gas lease covering a portion of the area included in the RMPA.

Plaintiffs maintain that BLM violated the National Environmental Policy Act ("NEPA"); the National Historic Preservation Act ("NHPA"); the Endangered Species Act ("ESA"); the Federal Land Policy and Management Act ("FLPMA"); and the Administrative Procedure Act ("APA").[1] In addition to the administrative appeals, this opinion addresses a motion to supplement the record, filed by Plaintiff State of New Mexico ("State") (Doc. 105).

**Standard of Review:** The parties agree that judicial review of agency actions taken under any or all of the above statutes should be in accordance with the customary arbitrary-and-capricious review of the administrative record. *See, e.g., Silverton Snowmobile Club v. United States Forest Service*, 433 F.3d 772, 779-80 (10th Cir. 2006) (NEPA and FLPMA); *Montana Wilderness Ass'n v. Fry*, 310 F.Supp.2d 1127, 1133-34 (D. Mont. 2004) (NEPA, NHPA, ESA, and FLPMA).[2] In reviewing a decision under the arbitrary-and-capricious standard, the Court reviews the entire administrative record, or so much of that record as has been provided by the parties, and decides only whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Colorado Envtl. Coalition v. Dombeck*, 185 F.3d 1162, 1167 (10th Cir. 1999). The Court does not pass judgment on the wisdom or merits of

---

[1]For ease of reference, unless more specificity is necessary, the Court will refer to all Plaintiffs collectively in most parts of this opinion. The Court recognizes that different Plaintiffs have raised different arguments or have raised challenges under particular statutes, but does not deem it necessary to specify which Plaintiff has raised which argument or arguments.

[2]The parties have assumed that the source of judicial review for all of the statutes is the APA, 5 U.S.C. § 706. The Court notes there is conflicting authority over whether a direct right of action exists under NHPA. *See San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1098 (9th Cir. 2005) (holding no private right of action exists under Section 106 of NHPA); *Boarhead Corp. v. Erickson*, 923 F.2d 1011, 1017 (3d Cir. 1991) (holding such a private right of action does exist). Also, the ESA contains a citizen-suit provision. 16 U.S.C. § 1540(g)(1). Since it does not appear the standard of review would be altered whether the review is conducted under the APA or directly under these two statutes, the Court need not address the question of APA review versus direct review. *See Newton County Wildlife Ass'n v. Rogers*, 141 F.3d 803, 808 (8th Cir. 1998) (judicial review under ESA's citizen-suit provision is limited to administrative record).

the agency's decision.  *See id.,* p. 1172 (NEPA prohibits uninformed actions, but not unwise actions).

  **Summary of Facts:**  The parties are familiar with the facts, and the Tenth Circuit's appellate review of the record (if any) will be identical to this Court's review.  *See id.*, p. 1167, n. 5.  Therefore, the Court will only briefly set out the relevant facts.[3]  In 1986 BLM developed a Resource Management Plan ("RMP") covering federal lands administered by BLM in Sierra and Otero Counties in southern New Mexico ("project area").  Over ten years later, in 1997, an exploratory well located natural gas in a portion of the RMP area called the Bennett Ranch Unit of the Otero Mesa grasslands.  As a result of this find, the oil and gas industry nominated for leasing approximately 250,000 acres of BLM land in the Otero Mesa area.  BLM then decided that the 1986 RMP was inadequate to address the demand for leases and competing uses of the land, and decided to issue an amended RMP after undergoing the process required by NEPA, NHPA, ESA, and FLPMA.  No new oil and gas leases were issued during this process.  In October 2000, BLM issued a draft resource management plan amendment and environmental impact statement ("DEIS") analyzing three alternatives for the amended RMP:  a no-action alternative; BLM's preferred alternative, designated as Alternative A; and Alternative B, which was more restrictive of oil and gas development, and therefore more protective, than Alternative A.

  Following issuance of the DEIS, the public submitted hundreds of comments to BLM.  Almost all of these comments concerned the level of protection provided to natural resources in

---

  [3]Since the background facts are essentially undisputed, the Court has extracted them from the parties' briefs rather than attempting to locate a citation to the record for each factual statement.

the Otero Mesa and Nutt grasslands portions of the project area.[4]  Three years after the DEIS was

issued, BLM released its proposed resource management plan amendment ("PRMPA") and final

environmental impact statement ( "PRMPA/FEIS" or simply "FEIS").  In the PRMPA/FEIS,

BLM did not select one of the three alternatives analyzed in the DEIS as its final plan for the

project area.  Instead, BLM chose an alternative called Alternative A-modified, which consisted

of Alternative A with certain modifications; the significance of those modifications is a crucial

issue in this case.  Plaintiffs and others filed administrative protests against the PRMPA/FEIS in

February 2004, and Plaintiff Governor Richardson ("Governor") submitted written

recommendations to the State BLM Director in March 2004.  In response to the protests and the

Governor's submission, BLM made a change to the RMPA protecting more acreage from oil and

gas development in the Otero Mesa area than had been protected under Alternative A-modified.

BLM also issued a document denominated as a supplement to the proposed RMPA and FEIS, and

allowed public comment on this document.  The BLM State Director's decision was appealed to

the national BLM Director, who rejected the appeal; the State Director then issued a Record of

Decision ("ROD") approving the final RMPA and FEIS in January 2005.

    Subsequently, BLM issued a notice of competitive lease sale for a 1600-acre parcel of land

located within the Bennett Ranch Unit on Otero Mesa.  BLM did not conduct any further

environmental review prior to holding the lease sale in July 2005.  There was one bidder at this

lease sale, a company that owns leases on adjacent lands in the Bennett Ranch Unit.  The lease has

---

[4]All parties, including BLM, agree that the Otero Mesa grasslands and Nutt grasslands are
highly significant environmental resources, as they constitute some of the last large and relatively
unfragmented Chihuahuan Desert grasslands in the United States.  As such, they support a large
variety of relatively rare plants and animals, and constitute potential habitat for certain endangered
species such as the Aplomado falcon.  The environmental significance of these two areas explains
the significant level of public interest in the prospect that oil and gas development will occur in or
near these grasslands, in comparison to the almost total lack of public comment or involvement
concerning the vast majority of the lands in the remainder of the project area.

not yet been executed, however, as BLM has agreed to delay final execution of the lease pending a decision from this Court.

Plaintiffs have challenged BLM's decisions concerning both the RMPA and FEIS for the entire two-county project area, as well as the specific Bennett Ranch Unit lease ("BRU lease"). In this opinion, the Court will separately analyze the claims raised by Plaintiffs with respect to the area-wide RMPA and the BRU lease.

**NEPA Claims--RMPA/FEIS**

Plaintiffs have raised the following NEPA claims in support of their arguments concerning BLM's adoption of Alternative A-modified as the amended RMP for the project area: (1) Since Alternative A-modified was not one of the alternatives discussed in the DEIS, BLM should have prepared a supplemental EIS proposing to adopt Alternative A-modified and discussing the environmental effects of that alternative, rather than simply naming it as the preferred alternative in the FEIS; (2) the FEIS is substantively deficient in several respects, including a failure to adequately analyze the potential impacts of oil and gas development on the Salt Basin aquifer, lack of analysis of fragmentation effects of development, insufficient consideration of the effects of seismic exploration activity, and utilization of a false assumption that reclamation can be successful in the Chihuahuan desert grasslands; and (3) BLM should have considered other, non-development-oriented alternatives in the DEIS, since all three of the alternatives contemplated allowing a certain amount of oil and gas development in the Otero Mesa area.

**Supplemental EIS Issue:** In the DEIS, BLM identified its preferred alternative as Alternative A. This alternative included a significant restriction on oil and gas development on Otero Mesa and the Nutt Grasslands: there was a no-surface-occupancy ("NSO") stipulation that would prevent any construction of roads, well pads, pipelines or other structures outside a 300-meter corridor tracking existing roads. In other words, all surface disturbance and occupation

had to take place within 150 meters, on either side of an existing road.  [DEIS 2-25]  This NSO stipulation would have required exploration to be conducted by means of directional (slanted) drilling rather than vertical drilling.  Representatives of the oil and gas industry objected to this restriction, and in response BLM created a new preferred alternative, Alternative A-modified, which BLM revealed for the first time in the PRMPA/FEIS.  This alternative dropped the NSO stipulation for Otero Mesa and the Nutt Grasslands, and instead identified a new approach. Under the new approach, a leaseholder could only create surface disturbance on 5% of the leased parcel at any one time, and if the 5% level had been met the leaseholder could not move on to disturb more surface until the prior area had been successfully reclaimed.  [PRMPA/FEIS 2-28, 2-29]  In addition, lessees would be subject to a "unitization" requirement, which essentially means several companies would have to coordinate exploration and development activities.  [*Id.*]  This change from the NSO stipulation generated intense protests from Plaintiffs and other members of the public, and BLM responded by increasing protection for the desert grasslands in two ways: first, instead of temporarily withholding what BLM considered the "best" grasslands from leasing, BLM permanently closed those areas; and second, BLM imposed an absolute cap on surface disturbance of approximately 1600 acres, regardless of the 5% limitation applicable to individual leases.  [FEIS 2-29; ROD 3, 6-7, 20]  BLM did not, however, restore the NSO stipulation to the areas of Otero Mesa and the Nutt Grasslands that would be open to leasing.

The change in the treatment of leasing on Otero Mesa and the Nutt Grasslands is the primary basis of Plaintiffs' argument that a supplemental EIS should have been prepared, submitted to public review and comment, and then evaluated prior to finalization of the RMPA.[5]

---

[5]Plaintiffs also argue in summary fashion that a supplemental EIS was necessary because Alternative A-modified changes the designation of a large portion of the Planning Area from the status of Controlled Surface Use ("CSU") to Standard Lease Terms and Conditions ("SLTC"), and made other changes which, according to Plaintiffs, lessen the environmental protections provided to lands within the Planning Area.

A supplemental EIS must be prepared if there are significant new circumstances or information relevant to environmental concerns, and the new circumstances or information will affect the environment in a significant manner or to a significant extent, and those effects have not already been considered by the agency. *Dombeck*, *supra*, 185 F.3d at 1177-78. The relative significance of the new circumstances or information is a factual issue, and the Court must review BLM's decision regarding the need for a supplemental EIS under the arbitrary-and-capricious standard set out above. *Id.*, 185 F.3d at 1178. The Court must uphold BLM's decision to forego a supplemental EIS if the record demonstrates that BLM reviewed the new circumstances or information, evaluated the significance of it, and provided an explanation for its decision not to supplement the existing analysis. *Id.*

It is apparent that the change from NSO status to the 5% restriction[6] is a significant new circumstance that is relevant to environmental concerns; on its face it is a very different approach, which does not restrict oil and gas activity to areas that are adjacent to already-disturbed roads. Even BLM employees who worked on the 5% concept felt that it "differs significantly from the Draft EIS preferred alternative..." [AR 11825] In addition, as Plaintiffs argue, the 5% restriction was not mentioned anywhere in the DEIS, so it cannot be argued that it is not a new circumstance or fact. The question, then, is whether the change will affect the environment to a significant extent, in a way that has not already been considered by BLM. Plaintiffs argue strenuously that this is true, based on the following contentions: (1) eliminating the NSO stipulation means that new roads, pipeline corridors, *etc.* can be constructed in the grasslands, drastically increasing the habitat fragmentation that is the primary environmental concern in that area; (2) BLM has nowhere made a "quantitative analysis" (in other words, an estimate in numbers) of the amount of

---

[6]The Court will refer to the 5% restriction and the unitization requirement together, in shorthand, as the 5% restriction.

fragmentation that will be caused under the 5% restriction; (3) it does not matter whether the total amount of surface disturbance will be the same under the 5% restriction as it would have been under the NSO stipulation, because it is the location of the disturbance, along with the "edge effects" of that disturbance, that is important; and (4) because of the failure to provide any analysis of the amount of fragmentation that can be expected under the 5% restriction, the public has never had an opportunity to provide meaningful comments to BLM concerning the new alternative, and so has not had a chance to inform BLM of the potential impacts of that alternative.

BLM, on the other hand, points out that both the DEIS and the FEIS contain four pages of discussion of habitat fragmentation.  BLM also notes there is a cap on surface disturbance, which will not allow more than a small percentage of the grasslands (1600 acres at most) to be disturbed during oil and gas activities.  In addition, BLM contends that the use of best management practices is expected to reduce that amount of disturbance even further, to as little as 500+ acres.  Finally, BLM argues that the purposes of both the NSO stipulation and the 5% requirement are the same--to allow development while protecting the grasslands to the greatest extent possible--and points to evidence that the 5% requirement, in conjunction with the additional "best habitat" acreage closed to leasing, will protect Otero Mesa and the Nutt Grasslands even better than the prior NSO stipulation would have.  In sum, BLM contends that when it changed the proposed alternative to the 5% requirement it had already considered the fragmentation effects that would occur; that the effects would not be much different than they would have been under the NSO stipulation; and that the effects will not be significant, given the small amount of acreage expected to be disturbed.  As a fall-back argument, BLM argues that the purposes of NEPA were served even without a formal Supplemental EIS, because the public was

allowed to comment on the FEIS and the Supplement, and extensively discussed the 5% restriction and the fragmentation issue in those comments.

In reply, Plaintiffs emphasize that there has been no attempt to estimate the total amount of acreage, including edge effects, that will be impacted under either Alternative A or Alternative A-modified. Without such numerical estimates of the potential fragmentation effects, argue Plaintiffs, there is no way for the public to compare the fragmentation effects of the NSO stipulation with the 5% restriction. Furthermore, Plaintiffs point out that at least one BLM employee did make estimates of such fragmentation effects, which could have been used by BLM to inform the public of the expected maximum amount of fragmentation effect, of 34,000 to 36,000 acres. [AR 15496-15522] This draft report relied on by Plaintiffs does not indicate which alternative is being analyzed, but it was apparently prepared in 2004 and therefore was likely aimed at the 5% restriction.[7] [AR 15496, handwritten notation]

It must be kept in mind that the task for the Court is not to determine on a clean slate whether BLM adequately investigated and considered the allegedly different fragmentation impacts that will occur under the 5% restriction than under the NSO stipulation. *See Utahns for Better Transp. v. United States Dep't of Transp.*, 305 F.3d 1152, 1162-63 (10th Cir. 2002). Instead, the Court is limited to deciding whether it was arbitrary and capricious for BLM to decide that the impacts, so far as they could be determined in advance of actual development, would not be so significantly different that a supplemental EIS was necessary. The Court must also decide whether it was arbitrary and capricious for BLM to refuse, at the RMPA stage, to attempt to quantify the fragmentation effects that would occur under either alternative.

---

[7]BLM, for its part, discounts the significance of the draft report, noting that it is an internal memo, was not peer-reviewed, and relies on allegedly false assumptions.

It is true there is evidence in the record that 34,000 to 36,000 acres of fragmentation effects will occur even if surface disturbance is limited to 1600 acres under the 5% restriction. However, there is also evidence from BLM experts that the 5% restriction has the potential to protect more acreage from disturbance than the NSO stipulation, because the NSO stipulation would allow disturbance on up to 40% of the grasslands, while the 5% restriction protects 95% of the grasslands.  [AR 11824-25]  There is also evidence that under today's best management practices, the amount of surface disturbance could be limited to between 500 and 600 acres, which would further reduce the edge effects of the 5% restriction.  In any event, the Court will not resolve the factual dispute between the parties, which is based on speculative projections and assumptions.  Essentially, BLM decided that the 5% restriction could be a better, or at least a similar, means of preventing the fragmentation that will be unavoidable under either the NSO stipulation or the 5% restriction.  [Supp. pp. 15-16]  The Court cannot find that it was arbitrary and capricious for BLM to decide the fragmentation impacts would be generally similar under either alternative, and therefore that a supplemental EIS was not necessary.[8]

Furthermore, the Court cannot find that it was arbitrary and capricious for BLM, prior to any specific development proposals, to fail to include acreage estimates of fragmentation effects in the NEPA documents.  *See Oregon Natural Resources Council v. Lowe*, 109 F.3d 521, 529-30 (9th Cir. 1997).  As noted above, BLM did analyze generally the effects of habitat fragmentation and recognized it as an unavoidable result of oil and gas development in the area.  The specific amounts of new disturbance and resultant fragmentation effects that will occur, however, are

---

[8]The Court does note that if BLM's only reason for refusing to prepare a supplemental EIS had been the fact that only 1600 acres of actual disturbance is projected to occur, the Court might have reached a different result.  It is undisputed that edge effects cause fragmentation to occur over a much larger area than does the area of surface disturbance standing alone.

10

dependent on several factors that cannot be analyzed until the leasing stage.[9]   When a parcel is

proposed for lease, BLM will have information such as the presence of roads on the parcel and

the location of those roads, as well as the likelihood that drilling can be conducted in areas close

to the existing roads.  According to the ROD, best management practices will be required for

development of each lease in the area, and those practices include using existing roads "to the

maximum extent practical..."  [ROD pp. 8, C-6]  At the leasing stage, therefore, it will be possible

to provide the public a much more accurate estimate of the amount of new disturbance, with

concomitant edge effects, that can be expected to occur.  *Id.*  Since more meaningful public

comment can be provided at the stage where more specific and concrete information is available,

it was not arbitrary and capricious to provide only the general fragmentation information available

at the planning stage.

　　　Plaintiffs' secondary argument concerning the supplemental EIS is that Alternative A-

modified makes other changes that substantially reduce protection provided to the environment in

the Planning Area.  The major change pointed to by Plaintiffs involves changing large areas of the

Planning Area from "controlled surface use" restrictions ("CSU") to "standard lease terms and

conditions" ("SLTC") restrictions.  These changes occurred in five watershed areas and several

big-game habitat areas.  [Supp. to EIS pp. 12-13]  As BLM explained, however, the changes did

not involve any change in the level of protection provided to these areas because the stipulations

that were to have been included under the CSU designation were general in nature and virtually

unenforceable.  BLM decided instead to impose specific stipulations, as needed, on a site-specific

basis.  [*Id.*]  Plaintiffs have provided no basis for the Court to question BLM's explanations or

assertions, and the Court therefore cannot find an abuse of discretion in BLM's decision that

---

　　　[9]As discussed below, site-specific environmental analysis will have to be performed at the
leasing stage rather than later, at the APD stage.

these changes to the preferred alternative would not result in any increased environmental impacts and which would require issuance of a supplemental EIS.

Based on the foregoing, the Court determines that it was not arbitrary and capricious for BLM to refuse to prepare a supplemental EIS addressing changes made in the preferred alternative. Plaintiffs presented evidence that it is possible, given certain assumptions, that the fragmentation impacts of the new preferred alternative will greatly exceed those of the NSO stipulation. However, given the uncertainty surrounding the issues of how much development will occur and where the development will be located, postponing efforts at quantifying the fragmentation effects was not unreasonable.

**Substantive Adequacy of the FEIS:** In addition to the procedural problem of the failure to issue a Supplemental EIS, Plaintiffs maintain the FEIS is substantively deficient in several ways: it allegedly fails to adequately analyze the potential impacts of oil and gas development on the Salt Basin aquifer, lacks any analysis of the fragmentation effects of oil and gas development, gives insufficient consideration to the effects of seismic exploration activity, and utilizes a false assumption that reclamation can be successful in the Chihuahuan desert grasslands. BLM's substantive responsibility under NEPA is to take a "hard look" at the environmental consequences of its action. *Utahns for Better Transp., supra,* 305 F.3d at 1163. This Court reviews the adequacy of the FEIS under a rule of reason standard, which is essentially an abuse of discretion standard. *Id.* Applying that standard, the Court disagrees with each of Plaintiffs' assertions.

As to the Salt Basin aquifer, the FEIS contains several pages of discussion concerning the impacts of oil and gas development on groundwater sources, and specifically addresses the Salt Basin. [FEIS pp. 4-13 to 4-18] The FEIS recognizes that contamination can occur as a result of hydraulic fracturing and other development activities, but concludes that the likelihood of contamination of the Salt Basin aquifer is small, as is the possibility that the aquifer will be

12

depleted as a result of oil and gas activities.  [*Id.*]  Plaintiffs simply disagree with this conclusion, arguing that contamination of the aquifer is "a virtual certainty" because contaminated water produced by the oil and gas activity will be injected into the Salt Basin aquifer.  Plaintiffs maintain that BLM cannot rely on its regulations and the State's regulations as a basis for stating that contamination of an aquifer is not likely.  However, the Court determines it is not an abuse of discretion to acknowledge the possibility of contamination, but to conclude that the possibility of such contamination is small if existing governmental regulations are enforced correctly.

As to the failure to adequately analyze the fragmentation effects on Otero Mesa and the Nutt Grasslands, this is the same argument addressed in the preceding section concerning the supplemental EIS.  Again, it was not an abuse of discretion for BLM to generally discuss fragmentation issues in the NEPA documents at the RMPA stage, rather than attempting to provide precise estimates of the amount of fragmentation that might occur under particular assumptions.

Plaintiffs also complain that the FEIS refuses to include 5000 acres of disturbance expected during seismic exploration activities as part of the 5% cap or the 1600-acre cap on permanent disturbance.  Plaintiffs argue that the FEIS erroneously fails to categorize this disturbance as permanent.  BLM responds by pointing out that however the 5000 acres is categorized, the effects of seismic exploration are disclosed and described (including the potential that it will cause permanent damage) in every relevant section of the FEIS, including the sections on soils, surface water, air quality, vegetation, and wildlife.  [FEIS Chap. 4, *passim*]  The Court can find no abuse of discretion in BLM's treatment of the impacts expected from seismic exploration activities.

Plaintiffs finally maintain that the FEIS and ROD erroneously assume that disturbed areas in the grasslands can be reclaimed, and that there are no mandatory reclamation requirements in

the RMPA.  Plaintiffs also dispute BLM's assumption in the FEIS that over half of any disturbed areas will be reclaimed within three years.  In support of the claim that reclamation is not mandatory under the RMPA, Plaintiffs point to a provision in the Conditions of Approval for a pipeline located on the Bennett Ranch, close to the Planning Area.  This provision requires the operator to re-seed in June, and if adequate cover is not obtained to re-seed again in "up to 2 subsequent years..."  [AR 20215]  The ROD, however, imposes a different reclamation requirement; reclamation will be considered successful "when healthy, mature perennials are established with a composition and density that closely approximates the surrounding vegetation..."  [ROD p. 13]  Therefore, the reclamation requirements in the RMPA are mandatory, and do not simply end after three attempts.  Furthermore, BLM recognized that reclamation can be problematic but, based on a review of older well pads in the area, believes it is possible.  [FEIS 4-37; ROD p. 22]  BLM is taking steps to make reclamation more likely, including working with a different entity to increase the supply of black grama grass seed for reclamation purposes.  [ROD p. 23]  Although BLM has a much more optimistic attitude toward the potential for reclamation than do Plaintiffs and their experts, the Court cannot find an abuse of discretion in BLM's insistence that reclamation is required by law and will be required of operators.

In sum, the Court finds no abuse of discretion in BLM's treatment of any of the concerns raised by Plaintiffs, especially given the fact that the EIS involved here is not for a specific project but, instead, is for general planning purposes.  Where there are specific concerns about reclamation, aquifer vulnerability, *etc.*, they can be raised when a site-specific NEPA analysis is performed.

**Adequacy of Alternatives Considered:**  Plaintiffs New Mexico Wilderness Alliance, *et al.*, raise an additional argument attacking the validity of the NEPA process engaged in by BLM.

Plaintiffs contend that BLM did not explore and evaluate *all* reasonable alternatives, as BLM was required to do.  Specifically, Plaintiffs maintain that every alternative considered by BLM involved the same level of reasonably foreseeable development ("RFD") for oil and gas purposes, and that BLM should have considered an alternative that allowed little or no development of the oil and gas resources in the Planning Area.  Plaintiffs complain that none of the alternatives considered by BLM would have completely excluded Otero Mesa and the Nutt Grasslands from development, and that BLM refused to consider an alternative that would include designating one or more Wilderness Study Areas ("WSAs") in the Planning Area.

As all parties have recognized, the focus of industry interest and therefore the most likely location for oil and gas development in the Planning Area is the Otero Mesa and Nutt Grasslands area.  BLM was not required by law, therefore, to consider an alternative that would close off the majority of that area to oil and gas development.  BLM was operating under a directive to facilitate the production of oil and gas from federal lands, not restrict such production, and closing the most promising area to oil and gas activity would have been contrary to that policy.  It was not an abuse of discretion for BLM to refuse to consider an alternative that would be contrary to the policy choices BLM was entitled to make.  *See, e.g., Citizens' Comm. to Save Our Canyons v. United States Forest Serv.*, 297 F.3d 1012, 1031 (10th Cir. 2002) (alternatives that do not accomplish the purpose of an action are not reasonable).  In essence, Plaintiffs' argument is not really an attack on the sufficiency of the FEIS, but is an attack on the policy choice made by BLM to allow some level of oil and gas activity to take place on Otero Mesa and in the desert grasslands.  Plaintiffs' NEPA claim is not the appropriate vehicle in which to make such an attack. *See Utahns for Better Transp., supra*, 305 F.3d at 1163 ("So long as the record demonstrates that the agencies in question followed the NEPA procedures ... the court will not second-guess the wisdom of the ultimate decision.").

As to Plaintiffs' claim that BLM should have considered an alternative designating one or more areas as WSAs, that claim is also an attack on BLM's substantive policies rather than on the content of the FEIS.  Furthermore, decisions to create or not create WSAs are beyond the scope of the PRMPA process, which was intended to "address Federal fluid minerals (oil, gas, and geothermal) leasing in ... the Planning Area."  [FEIS p. S-1]  The Court must, therefore, reject the Wilderness Plaintiffs' attacks on the adequacy of the FEIS.

### NEPA Claims--BRU Lease

Plaintiffs' NEPA claims concerning the BRU lease are based on the fact that BLM did not perform any further environmental analysis prior to holding the lease sale in July 2005.  Instead, BLM issued a document entitled "Documentation of Plan Conformance and NEPA Adequacy" ("DNA") stating that the required environmental study had already been performed in the FEIS. [AR 18332-18342a]  BLM therefore did not perform any site-specific review of potential impacts to the BRU lease parcel prior to the lease sale, relying instead on the general review of environmental impacts contained in the FEIS.  BLM makes two arguments in response to Plaintiffs' claims.  First, BLM argues the NEPA challenge to the lease is not ripe, because the lease has not yet been issued.  Second, BLM maintains no site-specific environmental analysis is necessary until the APD stage, so the failure to perform such analysis prior to leasing does not violate NEPA.[10]

---

[10]Intervenor-Defendant makes one other argument, not joined in by BLM, that is without merit and needs little discussion.  That argument is that Plaintiffs failed to exhaust their remedies by failing to file an appeal to the Interior Board of Land Appeals ("IBLA").  The Tenth Circuit, however, has held that a district court abused its discretion in dismissing a case for failure to exhaust remedies, in a NEPA case like this one challenging the issuance of a lease.  *Park County Resource Council, Inc. v. United States Dep't of Agriculture*, 817 F.2d 609, 619-20 (10th Cir. 1987), *overruled on other grounds*, *Village of Los Ranchos de Albuquerque v. Marsh,* 956 F.2d 970, 973 (10th Cir. 1992).  The Court therefore declines to apply the doctrine in this case.  *See also Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 317 (D.C. Cir. 1987); *Montana Wilderness Ass'n, supra*, 310 F.Supp.2d at 1138-39.

**Ripeness:**  As noted above, the BRU lease has not been executed at this point; the parties entered into a stipulation delaying such execution while this case is being litigated.  BLM contends that until the lease is actually executed, the claim that issuance of the lease violates NEPA is not ripe for adjudication.  However, the Tenth Circuit has held that a NEPA procedural claim challenging a particular action becomes ripe when the agency completes its NEPA process with respect to that action.  *See Sierra Club v. United States Dep't of Energy*, 287 F.3d 1256, 1263-64 (10th Cir. 2002).  On the other hand, if there is still a real possibility that the agency will conduct further environmental analysis, the NEPA claim is not yet ripe.  *Wyoming Outdoor Council v. United States Forest Serv.*, 165 F.3d 43, 50 (D.C. Cir. 1999).  In this case, BLM has completed its environmental analysis for the BRU lease parcel and has issued the DNA indicating no more analysis is necessary prior to issuance of the lease.  The fact that the lease has not yet been formally executed, therefore, does not render the NEPA claim unripe.

**Timing of Site-Specific Environmental Analysis:**  The issue to be resolved here is straightforward:  under the circumstances of this case, given the language in the BRU lease, can BLM wait until the APD stage to perform further environmental analysis, or should it be required to perform that analysis prior to issuing the lease?  BLM relies on the *Park County* case, *supra*, for the proposition that merely issuing an oil and gas lease is not a "major federal action significantly affecting the quality of the environment."  Therefore, argues BLM, preparation of an EIS or environmental assessment ("EA") was not required prior to the lease sale.  In *Park County*, BLM had prepared an EA of 100 pages evaluating in a general way the issuance of federal oil and gas leases in the Rocky Mountain region national forests.  817 F.2d at 621.  BLM compares the FEIS prepared in this case to the EA in *Park County*, and maintains no further environmental analysis will be required until the APD stage of oil and gas development.

If *Park County* were the only pronouncement from the Tenth Circuit on this issue, the Court might be inclined to agree with BLM.  However, less than two years ago the Tenth Circuit decided that, at least under the facts of that case, the critical stage for environmental analysis was the leasing stage, rather than the APD stage.  *Pennaco Energy v. United States Dep't of the Interior*, 377 F.3d 1147, 1160 (10th Cir. 2004).  The Tenth Circuit, quoting BLM's own "Handbook for Planning for Fluid Mineral Resources," held that the environmental impacts of oil and gas leasing must be analyzed before the agency makes an irreversible commitment, and that "[i]n the fluid minerals program, this commitment occurs at the point of lease issuance."  *Id.*  The Tenth Circuit then distinguished *Park County* on several grounds.  The task for this Court, therefore, is to decide whether the BRU lease situation is more similar to the situation in *Park County* or the one addressed in *Pennaco*.

In both *Pennaco* and *Park County*, BLM relied on prior environmental analyses and argued sufficient study of the effects of leasing had already been performed.  In *Pennaco* the prior analyses consisted of a fairly old RMP EIS covering the leased area, and a recent EIS that did not completely overlap the leased area.  The Tenth Circuit held that these documents were not sufficient because the RMP EIS did not address coal bed methane ("CBM") extraction, which was the purpose for the current leases, and the recent EIS was a post-leasing EIS and therefore BLM had not considered the option of not issuing leases at all.  *Pennaco*, 377 F.3d at 1159-60.  In *Park County*, on the other hand, BLM relied on the extensive EA mentioned above, and the Tenth Circuit accepted that reliance.  As in *Pennaco*, in the case before the Court BLM has not considered the option of not offering this particular BRU lease parcel for leasing at all, due to environmental concerns (although the issue has been addressed in a general way in the RMPA/FEIS, which determined the area including the parcel should be open to leasing).  On the

18

other hand, there is no indication in *Park County* that the panel in that case considered this to be an important issue.

　　As noted above, in *Pennaco* the Tenth Circuit considered it highly significant that an irreversible commitment of resources occurs at the lease stage.  377 F.3d at 1160.  The leases involved in *Pennaco* contained stipulations, but none of the stipulations (except the ESA stipulation) gave BLM the option of denying all drilling activity due to environmental concerns. *Id.*  The BRU lease provisions in this case appear to be similar to those present in *Pennaco*; there are stipulations, but there is no stipulation that would allow BLM to completely forbid surface disturbance on the lease parcel due to environmental concerns, except, as in *Pennaco*, the ESA stipulation.  [AR 18337-42]  The only NEPA stipulation is the requirement that no more than 5% of the surface area of the leased parcel may be disturbed at any one time.  [AR 18340]  As in *Pennaco*, therefore, BLM does not have the authority to completely forbid any drilling or other surface disturbance on the BRU lease parcel, once the lease is issued.  *See* 43 C.F.R. § 3101.1-2 (lessee has right to use surface of leased parcel, subject only to stipulations, nondiscretionary statutes, and "reasonable" restrictions); *Pennaco*, 377 F.3d at 1160 (lessees had already acquired certain rights, subject only to stipulations in their leases).

　　As in *Pennaco*, then, an irreversible commitment of resources will occur when the BRU lease is executed, and under BLM's own Handbook that is the stage at which site-specific environmental analysis should take place.  *See also Wyoming Outdoor Council, supra,* 165 F.3d at 49 (agency must do an EIS when it reaches stage that will result in irreversible commitment of resources, and leasing is that stage unless agency reserves right to preclude surface occupancy). It does not appear that the *Park County* court considered this irreversible-commitment-of-resources question in making its decision, as the opinion provides no direct information about whether the lease constituted such a commitment to allow at least some surface disturbance.

One factor that was important in *Park County* was the Tenth Circuit's opinion that it was highly possible the 10,000-acre leased parcel would not be developed at all, and any EIS performed at the leasing stage would necessarily be boilerplate that would "likely result in the absence of site-specific proposals...."  817 F.2d at 624.  In this case, on the other hand, the BRU lease is adjacent to a lease that contains a producing well, and the 1600-acre lease parcel is small enough to allow site-specific analysis of environmental impacts.  Development prospects for the BRU lease are not nearly as speculative as the large lease parcel at issue in *Park County*.[11]

Finally, the Court notes another difference between *Park County* and this case that the Court finds important.  In *Park County*, there is no indication that the leased parcel was located in an area of unusual environmental concern or value.  In this case, on the other hand, the BRU lease is located on Otero Mesa, which as the BLM itself acknowledges contains uniquely large parcels of desert grassland habitat.  The area is exceptionally dry, making reclamation of disturbed lands difficult at best.  Given the significance of Otero Mesa environmentally, as well as the similarities between this case and *Pennaco*, the Court will follow *Pennaco* rather than *Park County* and hold that some type of site-specific environmental analysis must be performed before the BRU lease

---

[11]While this fact was not relied on by the Tenth Circuit, the Court notes the Circuit did have the benefit of hindsight, knowing that the drilling activity that had occurred on the lease had been abandoned, the well was dry, and the well site had already been reclaimed at the time the Circuit issued its opinion.  817 F.2d at 615.

may be executed.[12]  The Court therefore decides that, as to the BRU lease parcel, BLM has not

yet complied with NEPA and may not execute the lease.[13]

**FLPMA Claims--RMPA**

Plaintiffs claim BLM violated FLPMA substantively and procedurally in several ways.

First, they maintain the RMPA is not consistent with State plans and interests to the maximum

extent possible, as they claim FLPMA requires.  Second, they maintain the plan submitted to

BLM by the Governor provides the best balance between state and federal interests, and BLM

was therefore required to adopt that plan.  Finally, they claim the Governor's plan should have

been submitted to the public for comment before BLM refused to adopt it.

**Inconsistency With State Plans:**  Plaintiffs' "inconsistency" claim is based on the

following statutory language in FLPMA:  "Land use plans of the Secretary under this section shall

be consistent with State and local plans to the maximum extent he finds consistent with Federal

---

[12]The Court has purposely used the phrase "some type of environmental analysis," as the Court need not decide at this time whether an EA would be sufficient or whether an EIS is necessary.  To the extent any party might argue that the PRMPA/FEIS is sufficient to satisfy the requirement of an environmental analysis, the Court would disagree.  The FEIS contains no information about the particular BRU lease parcel, and merely discusses the Otero Mesa area in general.  Similarly, the FEIS does not address the question of how much development might be expected on this particular parcel, and where it might be located (to the extent BLM might or might not be able to predict that, given the geology and environment on the parcel).  The habitat fragmentation discussion in the FEIS is not specifically tailored to the BRU lease parcel.  No other examples are necessary; the FEIS is simply not site-specific enough to allow BLM to decide whether this particular 1600-acre parcel should be leased or should not be leased, and is therefore not adequate to satisfy the site-specificity requirements of NEPA.  *See Pennaco.*

[13]Due to this decision, the Court need not address the argument made by some Plaintiffs, that BLM made a commitment to formulate a "lease strategy" before executing any leases in the Planning Area, and failed to come up with such a strategy prior to the BRU lease sale.  The Court does harbor some doubt, however, that such a general and discretionary commitment is enforceable in court.  In addition, the Court notes it has considered the supplemental authority submitted by the Defendant-Intervenor, but finds *Pennaco* to be a more apt comparison than the situation analyzed in that case, *Northern Alaska Envt'l Center v. Kempthorne*, 457 F.3d 969 (9th Cir. 2006).

law and the purposes of this Act." 43 U.S.C. § 1712(c)(9). In other words, when BLM creates

an RMP, the RMP should be as consistent with State and local "plans" as the Secretary deems

appropriate, given the multiple-use purposes of FLPMA and other requirements of federal law.

Plaintiffs contend that the RMPA "conflicts with a number of State plans, policies, and

programs." [State Opening Brief p. 42] The State plans that are allegedly in conflict with the

RMPA include the State Water Plan, two wildlife management plans, the Noxious Weed

Management Act, and the State Water Quality Control regulations. Plaintiffs claim the RMPA

conflicts with these plans, statutes, and regulations in the following ways: (1) the State Water

Plan calls for protection of the Salt Basin freshwater aquifer, and oil-and-gas activity will

contaminate the aquifer; (2) the State has plans for the recovery and expansion of desert bighorn

sheep and black-tailed prairie dogs in New Mexico, and Alternative A-modified will "likely"

preclude the reintroduction of bighorn sheep populations into certain areas, and "interferes" with

the prairie dog plan by "allowing surface disturbance up to 1/4 mile from prairie dog colonies;"

and (3) the RMPA's restrictions on the introduction of noxious weeds into the grasslands are not

strict enough to prevent such introduction. [State Opening Brief pp. 42-44]

In response, BLM points out that Plaintiffs have not directed the Court's attention to any

specific conflicts with specific State plans, policies or programs. For example, the mere general

statement in the Water Plan, to the effect that the water in the Salt Basin aquifer should be

protected, cannot be the basis for a claim of conflict so egregious that the RMPA must be found

to violate FLPMA. Similarly, the unsupported assertions that reintroduction of bighorn sheep will

"likely" be precluded by the RMPS, and that surface disturbance up to a quarter-mile from prairie

dog colonies will "interfere" in some unspecified way with the colonies, do not come close to

demonstrating an abuse of discretion on the part of BLM. *See, e.g., Humane Society of the*

*United States v. Bureau of Land Management*, 1990 WL 134832, *3 (D.D.C.) (agency's actions

were reasonable where plaintiff offered argument but no evidence of FLPMA violation).  The portion of FLPMA that encourages cooperation between BLM and the states, and commands BLM to pay attention to state plans, also grants deference to BLM to decide whether the states' plans are consistent with the federal goals mandated by FLPMA.  In other words, the agencies have the final say over the consistency issue, and only a clear, specific conflict between a federal land use plan and a specific state plan could possibly rise to the level of a statutory violation.  *Cf. Columbia Basin Land Protection Ass'n v. Schlesinger*, 643 F.2d 585, 605 (9th Cir. 1981) (construing different section of FLPMA, and stating, "[m]uch stronger language would be needed for us to conclude that Congress was delegating so much power from the federal government to the states.").  This conclusion is buttressed by the legislative history of FLPMA, which indicates that the House and Senate conferees revised the prior versions of FLPMA to make it "clear that the ultimate decision as to determining the extent of feasible consistency between BLM plans and such other plans rests with the Secretary of the Interior."  H. Conf. Rep. 94-1724, at 2 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6228, 6229.  The required clear and specific conflict not having been demonstrated here, the Court finds against Plaintiffs on their "inconsistency" argument.

**Required Adoption of Governor's Proposal:**  Plaintiffs' argument on this point proceeds as follows.  First, according to BLM's own regulations, BLM **"shall** accept the recommendations of the Governor(s) if he/she determines that they provide for a reasonable balance between the national interest and the State's interest." 43 C.F.R. § 1610.3-2 (e) (emphasis added).  Second, BLM has characterized the Governor's proposal as similar to Alternative B in the DEIS, and BLM has also stated that Alternative B would accomplish the purposes of the RMPA.  Therefore, BLM is required to accept the Governor's proposal, because that proposal meets the purposes of the RMPA and there is no evidence that it is not a reasonable balance between the national interest and the state's interest.  Plaintiffs' argument essentially is that it does not matter if BLM

23

prefers Alternative A-modified as a matter of policy or if that alternative is a reasonable balance of interests; if the Governor's proposal is also a reasonable balance of interests, BLM must adopt that proposal instead of its own preferred alternative.  Plaintiffs' argument in effect gives a governor veto power over BLM's choice of an RMP; by proposing a reasonable alternative, a governor can force BLM to choose the governor's plan rather than BLM's.

To the extent the mandatory language of the regulation might support Plaintiffs' argument, the Court finds it conflicts with the language and intent of the relevant statutory provision.  Nothing in the statute itself even mentions a "reasonable balance of state and local interests," much less requires BLM to adopt a governor's proposal if that proposal constitutes such a reasonable balance.  43 U.S.C. § 1712(c)(9).  Instead, FLPMA provides that state, local, and tribal officials may "furnish advice" to BLM concerning RMPs and other land use regulations; that BLM should "assure that consideration is given" to state, local, and tribal land use plans; and requires BLM to ensure that state and local government officials have "meaningful public involvement" in the development of RMPs and other land use decisions.  *Id.*  Thus, while FLPMA requires that BLM pay attention to the suggestions, concerns, and land use plans of a state, it falls far short of granting governors the type of power Plaintiffs claim exists.[14]  Given this conflict between the statute itself and the regulation relied on by Plaintiffs, at least as Plaintiffs interpret that regulation, the Court must follow the statute and not the regulation.  *See, e.g., Snyder v. Shalala*, 44 F.3d 896, 899 (10th Cir. 1995) (statute controls where there is a conflict between a

---

[14]The legislative history supports the conclusion that Congress did not intend to grant state or local officials the authority to impose their suggestions on BLM.  *See also* George Cameron Coggins and Parthenia Blessing Evans, *Multiple Use, Sustained Yield Planning on the Public Lands*, 53 U. Colo. L. Rev. 411, 464 (1982).  As Professor Coggins and Ms. Evans note of this section of FLPMA, Congress intended to, and did, ensure that the Secretary of Interior makes the final decision as to whether it is feasible to have consistency between BLM's plans and state, local or tribal land use plans.

regulation and the express terms of the statute).[15]  Therefore, the Court holds that BLM was not required to adopt the Governor's proposals, even if there was undisputed evidence that those proposals constituted a reasonable balance between state and federal interests.  Instead, BLM was entitled to decide that as a policy matter it preferred its own proposal, and the Court is not in a position to question that policy decision.

The Court also notes that Plaintiffs' argument, to the effect that BLM has already acknowledged the Governor's proposal does constitute a reasonable balance of state and national interests, rests on a slim foundation.  As pointed out above, the only support for this argument in Plaintiffs' brief is a sentence from the DEIS stating that Alternative B accomplishes the same purposes as Alternative A, as well as the fact that BLM has characterized the Governor's proposal as being similar to Alternative B.  However, BLM chose neither Alternative A nor Alternative B, because BLM decided those alternatives were too restrictive of the ability to conduct oil and gas exploration and extraction activities in the project area.  BLM apparently decided, therefore, that neither of these alternatives was a reasonable balance of federal interests with state interests.  Deciding what is "reasonable" in this context is largely a policy issue, and the Court cannot find there was an abuse of discretion in BLM's weighing of the policy questions, or

---

[15]It is not clear why the regulation in question contains the mandatory language relied on by Plaintiffs, when the statute's language is so clearly discretionary.  The language in the regulation appears to be borrowed from, or modeled after, identical language contained in 30 C.F.R. § 256.31(b), which is a regulation concerning an oil and gas leasing program for the Outer Continental Shelf.  That leasing statute, however, contains mandatory language similar to the regulation, requiring the Secretary of the Interior to accept recommendations of a governor if those recommendations "provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State."  43 U.S.C. § 1345(c).  As pointed out above, FLPMA contains no such language and therefore, unlike the Continental Shelf leasing statute, does not grant broad authority to governors to make recommendations that could become binding.

its balancing of the need for oil and gas production with the need to protect rare desert grassland habitat.

**Allowing Public Comment on Governor's Plan:**  As noted above, FLPMA requires that BLM provide for "meaningful" public involvement of state and local officials in the development of RMPs.  43 U.S.C. § 1712(c)(9).  To effectuate that requirement, BLM has promulgated a regulation stating that a governor should be provided an opportunity to make recommendations concerning a land use plan or decision.  43 C.F.R. § 1610.3-2(e).  The regulation also requires that, if the governor recommends "changes in the proposed plan or amendment which were not raised during the public participation process on that plan or amendment, the State Director shall provide the public with an opportunity to comment on the recommendation(s)."  *Id.*  Plaintiffs maintain that the Governor's proposal in this case did recommend changes that had not been the subject of discussion during the public comments on the DEIS, and therefore that BLM should have allowed the public an opportunity to comment on the Governor's proposal before rejecting it.[16]  BLM, on the other hand, argues that the Governor's proposal was largely based on Alternative B, and that other aspects of the proposal had also already been discussed in other comments on the DEIS.  BLM also contends that the issues underlying the Governor's proposal had been discussed extensively during the public participation process, and it is not significant whether all of the specific proposals made by the Governor were raised separately or explicitly during that process.

The Court is hampered in addressing this issue by the fact that, as with other aspects of § 1610.3-2(e), no case law has been found interpreting the regulation's requirement that under certain circumstances the public should be allowed to comment on a governor's recommendation.

---

[16]The Court recognizes that BLM did not completely reject the Governor's proposal, as in response to the Governor's submissions BLM did close several thousands of additional acres to leasing in the Otero Mesa and Nutt Grasslands areas.

Therefore, there is no guidance as to whether each change suggested by the Governor must have been specifically raised previously during the public comment period, or whether it is enough that the general issues underlying the suggested changes were discussed during that process.  It is clear to the Court, however, that Congress did not intend that the public-participation requirements of FLPMA be enforced in a hyper-technical manner.  *See, e.g., Sagebrush Rebellion, Inc. v. Hodel*, 790 F.2d 760, 767-68 (9th Cir. 1986) (where hearings were held for NEPA purposes rather than FLPMA purposes, but public had full and fair opportunity to be heard on concerns relevant to FLPMA, second set of hearings was not necessary).  As long as the public had an opportunity to comment on the substance underlying the Governor's proposal, it was not necessary to provide the same opportunity to comment on the details of that proposal.

After reviewing the Governor's recommendations and the DEIS, the Court concludes the public did indeed have the requisite opportunity to comment on the basic issues raised in the recommendations.  The fundamental issue discussed by the Governor is how much of the project area to protect from oil and gas development, and how extensive those protections should be. The Court has compared the Governor's suggestions concerning areas that should remain closed to leasing with the lease-free areas proposed in Alternative B, and notes that the two proposals are quite similar.  *See, e.g.,* AR 16765 (map of Governor's proposed alternative), and DEIS Map 2-3 (map of Alternative B).  Furthermore, the Governor proposed stipulations concerning no-surface-occupancy, timing restrictions on oil and gas activity to protect wildlife, use of existing roads, unitization requirements, revegetation requirements, prevention of noxious weed introduction, and prevention of groundwater pollution.  [AR 16767-769]  Most of these topics, with the possible exception of unitization requirements, were discussed in the DEIS.  [DEIS chapters 2 and 4]  The unitization requirement was part of Alternative A-modified, and the public was given an opportunity to comment on that requirement when BLM allowed public comment

on the document, denominated as a supplement to the RMPA/FEIS, that explained why
Alternative A-modified was chosen.  Thus, the public had an opportunity to comment on the
amount of the project area that should be closed to leasing, as well as the measures that should be
taken to protect lands where leasing would be allowed.  The Court finds this was sufficient, and it
was not necessary for BLM to disseminate the Governor's specific recommendations for public
comment.

### NHPA--RMPA and BRU Lease

**Section 106 Consultation Claim:**  NHPA, like NEPA, is a procedural statute rather than
a substantive law.  *See Friends of the Altglen-Susquehanna Trail v. Surface Transp. Bd.*, 252
F.3d 246, 252 (3d Cir. 2001).  In general, NHPA requires that a federal agency take into account
any adverse effects on historical or culturally significant sites, before taking action that might
harm such sites.  *Id.; see also Pueblo of Sandia v. United States*, 50 F.3d 856, 859 (10th Cir.
1995).  In order to accomplish this, federal agencies must engage in consultation with parties such
as the state historical preservation officer and any potentially affected Indian tribes ("Section 106
consultation") to determine whether historic properties or traditional cultural properties ("TCPs")
exist in the area of the planned activity.  *Id.*

The major NHPA dispute in this case is similar to the timing issue discussed above with
respect to NEPA--the parties disagree as to when the Section 106 consultation process must be
completed.  Plaintiffs contend that where TCPs are concerned, BLM is required to complete its
consultation with interested Indian tribes before the final RMPA is issued.[17]  BLM, on the other
hand, argues that the Section 106 consultation need not be completed until after leasing, at the
APD stage, when a party has applied for permission to drill and BLM knows exactly where the

---

[17]Plaintiffs limit their argument to situations in which TCPs are or may be involved, as
opposed to other historical or cultural sites such as burials or archaeological sites, although they
include "historic trails" in the category of TCPs.

proposed disturbance of land will occur.  As a fall-back position, BLM argues that it did adequately perform Section 106 consultation with all affected Indian tribes.[18]

      **Timing Issue:**  As noted above, Plaintiffs' specific argument in this case concerns the type of site known as a TCP.  Such sites include "landscape level" sites such as mountains, mesas, and canyons that have special cultural significance to an Indian tribe.  Plaintiffs say that once an RMP or RMPA has been finalized, BLM has lost its ability to protect such landscape-level sites if they are later identified.  For that reason, according to Plaintiffs, BLM was required to make sufficient efforts to identify any and all TCPs that might exist in the Planning Area, prior to issuing the RMPA.  BLM's position is that there could be "a total of approximately 130,000 archaeological and historical sites in the Planning Area," and it would be impossible to identify all of them at the RMPA stage.  Furthermore, according to BLM, it is unnecessary to do so because only a small portion of the Planning Area will ever be subject to oil-and-gas development.  It is therefore appropriate to postpone completion of the Section 106 consultation until the APD stage, when BLM will know exactly where the ground disturbance will occur and can then notify interested tribes to find out whether any culturally significant sites are located in the area of disturbance.

      The Court does not agree with either party's position.  First, the Court notes its disagreement with Plaintiffs' somewhat surprising contention that the RMPA stage is the last point at which BLM can preclude oil and gas leasing on lands it has identified as suitable for such

---

[18]Intervenor-Defendants Independent Petroleum Association raised one additional argument, not supported by any case law, which the Court considers devoid of any merit.  The Association argues that no Plaintiff has standing to raise the Section 106 consultation issue because only the Indian tribes that should have been consulted, but allegedly were not, have been harmed by that alleged failure.  As the State of New Mexico argues, however, the State has an interest in protecting all cultural and historical resources located within the state.  In fact, NHPA and the regulations implementing NHPA explicitly grant states a role in protecting such resources, including tribal resources.  16 U.S.C. § 470a(d); 36 C.F.R. § 800.2(c) (2005).  Therefore, the State has standing to complain of BLM's alleged failure to discover and potentially protect such resources by failing to consult with Indian tribes at the appropriate juncture.

development.  Plaintiffs' position in essence appears to be that BLM is required to hold lease sales for, and subsequently lease, any land identified in the RMPA as open to leasing, and therefore cannot protect TCPs once the RMPA has been finalized.  In the Court's view, however, BLM remains free to conduct further environmental and cultural review after the RMPA stage, and to refuse to offer for lease any lands that, upon such further review, do not appear suitable for leasing.  In fact, the RMPA itself explicitly states this in several places, by making it clear that the RMPA grants no rights to proceed with fluid mineral activities and that subsequent site-specific actions "would undergo a determination of adequacy under the National Environmental Policy Act (NEPA) and interdisciplinary review process."  PRMPA/FEIS, p. S-1.  Even after the RMPA is finalized, therefore, BLM retains the ability to protect TCPs by refusing to offer for lease any lands upon which oil and gas activity would adversely impact the value of such TCPs.  *See, e.g., In re:  Marathon Oil Co.*, 139 IBLA 347, 356 (1997) (BLM is not bound by RMP when considering whether to lease a particular parcel, and may eliminate parcels from leasing even where RMP designated them as generally suitable for leasing).

    Unlike BLM, however, the Court finds that TCPs may not be able to be adequately protected if the Section 106 consultation process is delayed until the APD stage, after land has already been leased for oil and gas development.  BLM's argument focuses on historical sites covering relatively small areas, such as discrete archaeological sites.  For such sites, mitigation of impacts can be accomplished simply by moving the proposed drill site to a different location on the leased parcel.  For landscape-level TCPS that may or may not be located on the leased parcel itself, however, such movement may not be adequate mitigation.  It is possible, for example, that the entire leased parcel could be located on a TCP.  *See, e.g., Pueblo of Sandia, supra*, 50 F.3d at 857 (due to tribal members' varied religious uses of canyon, tribe maintained that entire canyon constituted a TCP).  As discussed in the NEPA section above, once  a parcel of land has been

30

leased for oil and gas, BLM does in fact lose a great deal, if not all, of its ability to entirely preclude drilling or other development on the parcel.  If BLM could stop all development the lease would likely be illusory, as the lessee would be receiving nothing in return for a substantial investment.  *See, e.g., Amber Resources Co. v. United States*, 68 Fed. Cl. 535, 547 (2005).  In cases where such total preclusion is necessary to protect a TCP, waiting until the APD stage to complete the Section 106  consultation process does not comply with NHPA.

    In sum, as is the case with NEPA, the Court finds that the most significant point in the process as far as NHPA is concerned, with respect to TCPs, is the point at which BLM makes an irrevocable commitment of resources and thereby surrenders its ability to prevent any development on a particular parcel of land.  As with NEPA, this point is the time at which a lease is issued (or, as is the case here, is in effect provisionally awarded, although formal issuance of the lease has been delayed pending the outcome of a legal challenge).  This result comports with the intent of NHPA, which requires a federal agency to "take into account the effect of the undertaking" at a time "prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license..."  16 U.S.C. § 470f.  That is, an agency must consider the impacts of a project on a TCP or other historic site before any concrete action is taken to make that specific project a reality.  Significantly, the regulations implementing NHPA specifically approve of a process in which the Section 106 consultation need not be completed until an irrevocable commitment of resources is to occur.  Under the regulations, agency officials are not prohibited from "conducting or authorizing non-destructive project planning activities before completing compliance with section 106, provided that such actions do not restrict the subsequent consideration of alternatives to avoid, minimize or mitigate the undertaking's adverse effects on historic properties."  36 C.F.R. § 800.1(c) (2005).  In this case, entering into a lease will likely restrict BLM's ability to consider all means of mitigation, including a ban on any

disturbance of the leased parcel. On the other hand, the pre-leasing RMPA phase is a mere planning phase that is non-destructive. It is not until the leasing stage, therefore, that the Section 106 consultation must be completed.[19]

**BLM Actions In This Case:** As noted above, BLM claims that it did adequately conduct Section 106 consultation in this case, a claim Plaintiffs vigorously reject. To resolve the issue it is necessary to examine what steps BLM took, and when, to obtain input from potentially affected tribes. In May 1999, BLM sent letters to five tribes, generally describing the Planning Area and the low level of development expected in that area. [AR 4014-4023] These letters solicited input from the tribes concerning any resources and places with "special traditional cultural significance" for the tribes that might be located in the Planning Area. Given the large amount of land covered by the Planning Area and the complete lack of specificity in the letters concerning any areas of special interest for oil and gas development (such as the Otero Mesa area), it is not surprising that

---

[19]The Court has taken into account Plaintiffs' reliance on BLM's own internal national and state Instruction Memoranda ("IM"), which instruct respectively that the RMP stage is the appropriate stage "at which to initiate consultation with tribes" concerning TCPs, and that "[i]n general" the New Mexico BLM will "emphasize consultations with Indian Tribes" concerning TCPs at the RMP stage, rather than the APD stage. [Exhs. 12, 13, State motion to supplement administrative record] As to the national IM, as BLM points out, it requires that consultation be initiated at the RMP stage, not completed. As to the New Mexico IM, the better procedure to follow would be to attempt to identify as many potential TCPs as possible in a planning area, prior to issuing an RMP or RMPA. In this case, however, where the planning area covered approximately 2,000,000 acres, it was not a violation of NHPA to postpone completion of the Section 106 consultation to a time when specific leasing proposals had been made.

The Court has also taken into account BLM's reliance on a lease stipulation that will be included in any oil and gas lease issued in the Planning Area. This stipulation states that "[t]his lease" may contain properties protected under NHPA, and that BLM may disapprove any activity that is likely to have adverse effects that cannot be avoided, minimized, or mitigated. [ROD p. 27] As Plaintiffs argue, however, one problem with this stipulation is that it appears to be limited to sites that are located within the leased area, meaning that nearby TCPs will not be protected. Furthermore, it is not clear that this stipulation would allow BLM to completely forbid any development of the leased parcel, which might be necessary to adequately protect a landscape-level TCP. The only stage at which such complete protection can without question be provided is the pre-leasing stage.

only two tribes responded to the letters before the DEIS was published in October 2000.  One tribe, the Mescalero Apache Tribe, which has a reservation in south central New Mexico, simply requested "a copy of maps of the area to be covered by the RMP and EIS so that we may locate any cultural resources and TCPs that may have significance to the Tribe."  [AR 4386]  Another tribe, the San Carlos Apache Tribe headquartered in Arizona, stated that the entire area is traditional Apache territory and has "considerable cultural significance to Apaches" but did not identify any specific TCPs in the Planning Area.[20] [AR 4209]

Subsequently, after the DEIS was published, BLM received several communications from the Ysleta del Sur Pueblo, a tribe of pueblo Indians with a reservation near El Paso, Texas, south of the Planning Area.  The materials submitted by the Pueblo to BLM included copies of letters to Senators and Congressional Representatives stating the Pueblo's opposition to the planned oil and gas development in the "Greater Otero Mesa Area," because that area is sacred to the Pueblo. [*See, e.g.,* AR 12469]  The Pueblo also submitted four volumes of the Pueblo's Archives, about which no information is provided in the administrative record; and a Cultural Affiliation Paper briefly describing the Pueblo's cultural affiliation with various past and present inhabitants of New Mexico and Arizona, which does not mention any sacred areas.  [AR 12531-32]  Finally, the Pueblo submitted a paper entitled "Tigua Cultural Affiliation with Alamo Mountain and Otero Mesa," written by Dr. John A. Peterson.  Dr. Peterson, a consulting archaeologist to the Pueblo, made several statements about Otero Mesa[21] in the paper, including the following:  (1) the

---

[20]Amici National Trust for Historic Preservation, et al., as well as Plaintiffs, argue that these two letters put BLM on notice that TCPs do exist in the Planning Area.  However, a letter stating that an entire area has cultural significance does not give any notice that specific TCPs exist in the area; neither does a simple request for more information.

[21]Dr. Peterson also discussed other locations within the Planning Area, including Alamo Mountain.  However, the Court's discussion is limited to Otero Mesa because there is no controversy concerning the other locations; for example, Alamo Mountain is closed to fluid minerals leasing, as it is managed as an Area of Critical Environmental Concern.  FEIS p. 2-15.

Pueblo's land claims (as opposed to the land currently recognized as Pueblo land) extend north into the Alamo Mountain and Otero Mesa area, and the Tribe "continues to practice ritual and sacred engagement with the region"; members of the Pueblo still conduct hunting and ritual activities in the Otero Mesa area; and the proposal to conduct oil and gas activity in the Otero Mesa area west of Alamo Mountain "would have an extremely adverse effect on the viewshed of this sacred landscape."  [AR 14058-60]

At approximately the same time as Ysleta del Sur Pueblo was submitting the above information to BLM, a mediator was interviewing interested parties to explore the possibility of mediating the dispute over oil and gas development in the Otero Mesa area.  [AR 12545]  In a draft report, the mediator pointed out that tribal representatives had "strongly challenged" the statement in the DEIS that no TCPs or religious sites had been identified in the Planning Area.  [AR12566]  The mediator also noted that the Mescalero claim to have used Otero Mesa as a "bridge" between several mountain ranges, and that the Ysleta del Sur reported that "their people took annual salt migrations through the area..." [*Id.*]  Later in the report, the mediator stated that concerns had been raised about whether BLM actually conducted the required Section 106 consultation with tribes, and that the tribes did not feel they had been consulted about TCPs.  [AR 12567]  Finally, the mediator noted that tribes have serious concerns about sharing detailed information concerning the location of sacred sites.  [AR 12568]

Approximately a year after the mediator's report, BLM issued the FEIS in December 2003, which again states that "[n]o American Indian ... traditional cultural places have been identified within the Planning Area."  FEIS p. 3-29.  According to the ROD, BLM made what appear to be its first extensive efforts to involve tribes with the issuance of the Supplement to the FEIS, in late May 2004.  BLM made "several personal contacts via telephone" with a number of tribes, and followed up on those contacts.  ROD, p. 26  After the ROD was released in January

34

2005, in preparation for the lease sale, BLM sent letters to a number of tribes in May 2005. These letters informed the tribes of the location of the 1600-acre parcel and asked each tribe whether oil and gas development on that parcel would affect TCPs, sacred sites or access to sacred sites.  [Defs' Supplemental AR Materials, filed Dec. 16, 2005, Exh. 5]  Several tribes, including the Ysleta Del Sur Pueblo, responded with correspondence indicating the lease sale would have no adverse effect on any TCPs.  [*Id.*, Exh. 6]

It is apparent from the above recitation that, if BLM was required to complete its Section 106 consultation process before issuing the PRMPA/FEIS, it failed to comply with the requirement.  The Mescalero Tribe had requested further information from BLM, but there is no indication in the record that such information was provided prior to the FEIS issuance.  The Ysleta del Sur Pueblo had provided ample information indicating that sacred areas and viewsheds are located in the Otero Mesa area, yet BLM simply stated in the FEIS that no TCPs or religious sites had been identified in the Planning Area.  At minimum, the submissions from these tribes put BLM on notice that TCPs might exist in the Planning Area and, particularly, in the Otero Mesa area.  *See Pueblo of Sandia, supra*, 50 F.3d at 860-61 (information provided to Forest Service was sufficient to require further investigation by Forest Service concerning existence of TCPs in canyon).[22]

As the Court has held above, however, the point in time by which Section 106 consultation must be completed is the leasing stage of the process.  By the time BLM held the lease sale for the BRU lease in July 2005, BLM had engaged in sufficient consultation with the

---

[22]It is less clear whether adequate Section 106 consultation was completed prior to the issuance of the ROD over a year after the PRMPA/FEIS was released.  As pointed out above, BLM claimed to have engaged in personal contacts with several tribes following the issuance of the Supplement to the FEIS, although there is no indication in the record as to the tribes' responses to those contacts.  Due to the Court's decision on the NHPA claim, however, there is no need to address this question.

affected tribes to determine that, at least with respect to the 1600-acre parcel at issue, oil and gas development would not adversely affect any TCPs. The tribe that had expressed the most cultural interest in the Otero Mesa area, the Ysleta del Sur Pueblo, specifically notified BLM that development of the BRU lease would not affect any TCPs, and stated that the tribe had no opposition to the lease, and no other tribe indicated there was any possibility of an adverse effect on a TCP.[23]  [Supp. AR Exh. 6]  The Court therefore finds that, although BLM started slowly in meeting its Section 106 obligations, it did complete them as to the BRU lease in a timely manner.[24]

In sum, the Court holds that BLM was allowed to continue the planning process for fluid mineral leasing in the Planning Area without completing the required Section 106 consultation. That consultation, however, must be completed before any leases are issued in the Planning Area, and cannot wait until the APD stage.  Finally, the Court holds that adequate Section 106 consultation was performed prior to the BRU lease sale in July 2005.  For these reasons, the Court determines that BLM has, to this point at least, satisfied the requirements of Section 106 of NHPA.

---

[23]Plaintiffs complain that BLM's letter to the tribes did not specifically state that the 1600-acre parcel is located on Otero Mesa.  However, there was a map attached to the letter showing the location of the parcel and indicating its location on Bennett Ranch.  The Court cannot find that the mere omission of the words "Otero Mesa" somehow deceived the tribes and constituted a failure to consult in good faith.

[24]As noted above, Plaintiffs included historic trails in the category of TCPs for purposes of the Section 106 consultation claim.  Plaintiffs have failed to provide any information to the Court, however, as to how BLM failed to engage in sufficient consultation to discover the existence of such historic trails, particularly on the 1600-acre BRU lease parcel.  Plaintiffs do raise a substantive claim, maintaining that a quarter-mile buffer zone on either side of a historic trail is not sufficient mitigation.  They offer nothing in support of this claim other than a bare assertion, and the Court cannot find an abuse of discretion on that basis.  Therefore, any NHPA claim directed at historic trails is without merit.

**Section 110 Claim:** In one paragraph, Plaintiffs make an argument under Section 110 of NHPA, found at 16 U.S.C. §470h-2, claiming there is no evidence in the record that BLM considered and planned for preservation needs of historic or cultural sites in the Planning Area. Review of Section 110 establishes that the broad mandates contained in Section 110, as well as the broad discretion granted to federal agencies in that provision, cannot be the basis of the type of substantive claim urged by Plaintiffs. *See, e.g., Nat'l Trust for Historic Preservation v. Blanck*, 938 F.Supp. 908 (D.D.C. 1996) (citing legislative history indicating that Section 110 is merely intended to flesh out requirements of Section 106). Therefore, the claim is without merit.

**ESA**

In response to concern over the extinction of both animals and plants, Congress enacted the Endangered Species Act ("ESA") in 1973. 16 U.S.C. § 1531 *et seq.;* U.S.C.C.A.N. 2989, 2990 (1973). The Act is designed to protect endangered species by protecting the ecosystems on which they depend. *Palila v. Hawaii Dept. of Land & Natural Resources*, 649 F. Supp. 1070, 1076 (D. Haw. 1986), *aff'd*, 852 F.2d 1106 (9th Cir. 1988). Under Section 7(a)(2) of ESA, each federal agency must insure that any action authorized, funded or carried out by the agency "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a). A federal agency may prepare a "biological assessment" ("BA") to evaluate the potential effects of the proposed action; however, BAs are only *required* if an agency is proposing to engage in a "major construction activity." 50 C.F.R. § 402.12(a), (b).

Informal consultation is an optional process comprised of discussions and correspondence between the resource agency, here the Fish and Wildlife Service ("FWS"), and the action agency, here BLM, prior to a formal consultation if it is required. 50 C.F.R. § 402.02; § 402.13(a). If after the informal consultation, the agency concludes no adverse impact is likely, then no formal

consultation with FWS would be required.  50 C.F.R. § 402.14(b); *Alabama Power Co. v. Federal Energy Regulatory Comm'n*, 979 F.2d 1561, 1564 (D.C. Cir. 1992).  During consultation, if BLM determined with written concurrence of FWS, that the action "is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary."  50 C.F.R. § 402.13(a); § 402.14(1)(3).  However, a formal consultation is necessary if either agency ultimately concludes the proposed action is "likely to adversely affect" listed species or designated critical habitat.  50 C.F.R. § 402.13(a), § 402.14(a).

Under the RMPA, it is undisputed that at least some development is likely to occur within the Chihuahuan Desert grasslands in Otero County.  These grasslands are part of the ecosystem which serves as refuge for a host of species, including the Aplomado falcon ("Falcon").  The Falcon became a species listed under the ESA in 1986 and therefore it is to be identified and protected when possible.  It can be found in the Chihuahuan Desert and a breeding population is known to exist in northern Mexico just south of the international boundary.  These birds range into New Mexico and at least one breeding pair, well outside the RMPA area, has been documented in southern Luna County.

In light of the fact the Falcon habitat is so limited in the United States, BLM recognized from the very outset of the planning process that the agency would need to engage in some level of consultation with FWS.  In an October 1999 memorandum to BLM concerning proposed oil and gas leasing alternatives, FWS reiterated its concern that desert grassland species, such as the Falcon, could be harmed by the "existing effects from ongoing livestock grazing combined with habitat loss and fragmentation associated with extensive oil and gas leasing."  AR 2136; *see also id.* 1970 (1997).

BLM's recognition that the RMPA had a likelihood to affect the Falcon is evident in the agency's draft and final biological assessments for the proposal.  On June 13, 2003, BLM formally

requested that FWS enter into formal consultation with the agency regarding the impacts of the proposed RMPA on the Falcon and two other species.

After an initial BA, BLM concluded development under the RMPA was likely to "adversely affect" the Falcon.  This was based "primarily on the fact that there is suitable or potential habitat for this species in Otero and Sierra Counties, as well as historical and uncommon sightings of individual birds in the general area."  ROD 002618.  BLM summarized the extended study and dialogue with FWS as follows:

> Following delivery of the April 2003 BA, we met with your biologists on Otero Mesa to discuss the requested Core Habitat Areas.  These areas we agreed to withhold from leasing until more information is available to either permanently set them aside from leasing or allow leasing with stipulations that provide adequate protection for aplomado falcon habitat.
>
> On June 13, 2003, we submitted a memorandum with an addendum to the BA, which clarified that these areas would be withheld from leasing pending further monitoring.  In that memorandum, we requested initiation of formal consultation and stressed that the completion of this RMPA is a high priority for BLM.
>
> Further discussions among our offices resulted in a memorandum on July 28, 2003, which included an addendum to incorporate an additional 5,256 acres to one of the core areas.  We again requested your help in expediting this Section 7 Consultation.

Following further discussions and data sharing with FWS, the BLM State Director changed the determination from "likely to adversely affect" to "may affect not likely to adversely affect."  ROD 002625.  She explained the revised decision was based on the following:

> "Aplomado falcon sightings are rare or uncommon.
>
> Ten sightings since 1991, eight of which were on Ft. Bliss (McGregor Range) and White Sands Missile Range; two on Otero Mesa, off military land.
>
> The most recent sighting on Otero Mesa, off Military land, was in 2001.
>
> No sightings in Sierra County since 1928.

No falcon nesting is known to occur nor has been documented in either county.

With the addition of the core habitat areas, the best potential habitat in the planning area will be withheld from immediate leasing...

The Biological Opinion included a description of Best Management Practices and Conservation Measures/Stipulations that are designed to minimize surface disturbance or eliminate effects on resources.  The practices, measures, and stipulations would remain in the Plan...

It is unlikely that oil and gas activities at the proposed levels in the grasslands would impact falcons that rarely occur in the area.

In addition to the practices, measures, and stipulations in the Proposed Plan, the Las Cruces Field Office proposes to conduct annual pre- and post-nesting season falcon surveys in the core areas."

The Wilderness Alliance Plaintiffs initially argue that the ESA Consultation Handbook requires a formal consultation on federal action unless it will be "discountable, insignificant or beneficial."  (Opening Br. Wild. All. p. 42)[25]  These Plaintiffs reason that "[t]herefore, BLM's failure to carry out a formal consultation on the RMPA – and the concurrence of the FWS in BLM's decision, can be upheld by this Court only if it finds that the administrative record demonstrates that the RMPA's impacts meet this standard."   However, agency interpretations based on a handbook are not entitled to the same weight as regulations promulgated pursuant to statutory authority.  *Roman v. CIA*, 297 F.3d 1363, 1368-9 (Fed. Cir. 2002).  Moreover, if the handbook is not consistent with the statutory language, the handbook is, of course, not controlling.  *Auer v. Robbins*, 519 U.S. 452, 461 (1997).  This Court will therefore use the statutory language of "not likely to adversely affect" the Falcon to frame the analysis.

Plaintiffs next argue that BLM should be held to its initial opinion that the RMPA was "likely to affect" the Falcon.  Plaintiffs cite no law in support of this position, and, in fact, it lacks

---

[25] The necessity for a formal FWS consultation is subject to review under the Administrative Procedure Act standards.  *Sierra Club v. United States Fish & Wildlife Serv.*, 189 F. Supp. 2d 684, 690 (W.D. Mich. 2002).

support in both logic and precedent.  The goal of informal consultation and dialogue is to explore the potential impact on a species and ways to ameliorate it.  The fact that a draft Biological Assessment concludes a project may adversely affect an endangered species does not prohibit an agency from engaging in further study and dialogue and, based on that, reaching the opposite conclusion.  *Center for Biological Diversity v. Federal Highway Admin.*, 290 F. Supp. 2d 1175, 1195-6 (S.D. Cal. 2003).  Indeed, courts have generally been more inclined to uphold a final decision of "no adverse effect" if it was reached, as here, after extended conversation and data exchange with FWS.  *Sierra Club v. Bosworth*, 352 F. Supp. 2d 909, 920-21 (D. Minn. 2005); *Fund for Animals v. Norton*, 365 F. Supp. 2d 394, 424 (S.D.N.Y. 2005); *Center for Biological Diversity, supra*.

Plaintiffs also argue that increased sightings since the record was closed contradict the BLM conclusion of "not likely to adversely affect" the Falcon.  This Court took the somewhat unusual step of holding an evidentiary hearing to determine if any Falcon activity since the record closed was indicative of earlier evidence that should have led BLM to modify its conclusion or require a formal FWS consultation.  Dr. Joy Nicholopoulus, who was previously the New Mexico state administrator for ecological services of FWS and the agency decision-maker on the Falcon, testified that there have indeed been additional Falcon sightings since the ROD.  She testified this is not surprising as there are ongoing studies from Fort Bliss and since the recent sightings have become public, amateur ornithologists hoping to see the Falcon are drawn to the area.  (May Tr. 30-31).  She concluded the increased sightings of transient birds do not cast doubt on the 2003 decision of "not likely to affect."  (Tr. 24, 36).

The ultimate decision maker on the ROD, Linda Rundell, also testified.  (Tr. 62).  She testified that the Falcon was the focus of pre-ROD concern and the BLM initiated a contract with New Mexico State University and others to do potential Falcon surveys and evaluate habitat in

41

the area.  Because of this, she testified the initial proposal was to prohibit development outside of

established corridors.  (Tr. 71-5).  In the final ROD, however, BLM adopted a more flexible

approach limiting oil and gas development to 5% maximum area disturbance.  If and when it

appeared a pair of Falcons had actually established a territory within the leasing area, BLM was

prepared to take additional precautions.  (Tr. 78, 83-93).  Ms. Rundell also concluded that none

of the information regarding Falcon activity since the ROD would cause her to reconsider or

mitigate consultation with FWS.  (Tr. 96, 111-118).

If anything, the evidentiary hearing emphasized that both BLM and FWS were well aware

of transient Falcons and there has been no subsequent evidence that a pair has taken up residence

in the RMPA.  When an agency has recognized and taken into account the population of the

species, new facts regarding the size of that population do not necessarily require a formal

consultation with FWS.  *Wyoming Outdoor Council v. Bosworth*, 284 F. Supp. 2d 81, 94-95

(D.D.C. 2003); *cf. Headwaters, Inc. v. Bureau of Land Management*, 914 F.2d 1174, 1180 (9th

Cir. 1990) (subsequent sighting of spotted owl breeding pair did not require preparation of

supplemental EIS).

Based on the foregoing discussion, the Court finds BLM's actions in this matter did not

violate the requirements of ESA.

### APA--Direct Attack on Adoption of RMPA

The Wilderness Plaintiffs maintain that BLM's adoption of the RMPA was arbitrary and

capricious in violation of the APA.  As BLM points out, the APA alone cannot be the source of a

cause of action; there must be an underlying statute under which the action was taken.  In reply,

Plaintiffs acknowledge that is correct, but argue they are bringing these claims under NEPA and

the requirement that an agency prepare a ROD adequately explaining its decision.  The Court

need not delve into the particulars of the source of Plaintiffs' possible claims, as they lack merit in any event, as discussed briefly below.

Plaintiffs first argue that BLM's approval of the RMPA was erroneously based on BLM's assertion that the 5% requirement would provide the same level of protection as the NSO stipulation.  First, BLM did not say the same level of protection would be provided; the Supplement states that the grasslands could be "adequately protected" while still allowing oil and gas development to proceed.  [Supp. p. 14]  Second, BLM did not say that its approval of the RMPA rested entirely on the assumption that the same level of protection must be provided as would have been provided by the NSO stipulation.  Plaintiffs' premises for this argument are therefore wrong.

Plaintiffs also argue that BLM removed the NSO stipulation due to its misunderstanding of what "directional drilling" is, as well as its misunderstanding of a comment submitted by a New Mexico Bureau of Mines and Minerals employee.  Again, Plaintiffs' premise is wrong.  BLM removed the NSO stipulation because industry representatives complained about it and did not believe exploration could adequately be conducted under the NSO stipulation.  Furthermore, BLM reasonably understood the Mines and Minerals employee's comment to be critical of the NSO stipulation, given the substance of the comment.  [Supp. p. 14]  Plaintiffs' arguments that BLM's adoption of the RMPA was  arbitrary and capricious must be rejected.

**Conclusion**

As discussed above, Plaintiffs' challenges to the RMPA and FEIS lack merit.  However, BLM must comply with  NEPA and prepare an EA or EIS, whichever is appropriate, prior to issuing the BRU lease.  All other challenges to the BRU lease are without merit.

Dated this 27th day of September, 2006.

BRUCE D. BLACK
United States District Judge